# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

### SAN ANTONIO DIVISION

|  |  |
|---|---|
| LOGAN PAUL,<br><br>            *Plaintiff*,<br><br>    v.<br><br>STEPHEN FINDEISEN AND COFFEE BREAK<br>PRODUCTIONS LLC D/B/A COFFEEZILLA,<br><br>            *Defendants*. | Civil Action No. 5:24-cv-00717 |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Introduction ..................................................................................................................... 1

I.    Background ......................................................................................................... 2

    A.    Paul and the CryptoZoo Project. ................................................................ 2

    B.    The "Coffeezilla" Show and its Three-Episode CryptoZoo Investigation (the "Contextual Publications"). .......................................................................... 4

    C.    Paul Takes the High Road and Focuses on His Buyback Efforts. .................... 7

    D.    Defendants Persist in Maligning Paul by Publishing the "Challenged Publications." ............................................................................................. 7

    E.    The Complaint is Replete with Evidence That Defendants Knew Their Statements Were False When They Made Them. ............................................ 9

II.    Legal Standard ................................................................................................ 10

III.    Argument ........................................................................................................ 11

    A.    The Challenged Publications Are Verifiably Factual ...................................... 13

    B.    Context Further Confirms That Defendants Accused Paul of Committing Fraud in Connection with the Failed CryptoZoo Game. ........................................... 16

    C.    Defendants' Buried, Half-Hearted "Disclaimer" Weighs Little in the Balance. ................................................................................................ 19

IV.    Conclusion ..................................................................................................... 20

i

## **<u>TABLE OF AUTHORITIES</u>**

**<u>Page(s)</u>**

<u>**Cases**</u>

*Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*,
    111 S.W.3d 168 (Tex. App. 2003) ............................................................. 14, 15, 16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 11

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ................................................................................. 11

*Bennett v. Comput. Assocs. Int'l, Inc.*,
    932 S.W.2d 197 (Tex. App. 1996) ............................................................ 14

*Bentley v. Bunton*,
    94 S.W.3d 561 (Tex. 2002) ....................................................... 11, 12, 14, 18

*Bostic v. Daily Dot, LLC*,
    No. 1:22-cv-158, 2023 WL 2317789 (W.D. Tex. Mar. 1, 2023) ............................ 12

*Budget Van Lines, Inc. v. Better Bus. Bureau of the Southland, Inc.*,
    No. B235338, 2013 WL 4494318 (Cal. Ct. App. Aug. 20, 2013)........................... 17

*Campbell v. Clark*,
    471 S.W.3d 615 (Tex. App. 2015) ............................................................ 19

*D Mag. Partners, L.P. v. Rosenthal*,
    529 S.W.3d 429 (Tex. 2017) ....................................................... 12, 14, 16, 20

*Dickson v. Lilith Fund for Reproductive Equity*,
    647 S.W.3d 410 (Tex. App.  2021) ............................................................ 18

*Elorreage v. Kijakazi*,
    No. 22-cv-01352, 2023 WL 7312498 (W.D. Tex. Nov. 3, 2023) ........................... 11

*Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*,
    194 F. Supp. 3d 263 (S.D.N.Y. 2016) ....................................................... 17

*Fernandez-Montes v. Allied Pilots Assoc.*,
    987 F.2d 278 (5th Cir. 1993) ................................................................... 11

*Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*,
    708 F.2d 944 (5th Cir. 1983) ................................................................... 12

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
   313 F.3d 305 (5th Cir. 2002) ......................................................... 10

*Gross v. N.Y. Times Co.*,
   623 N.E.2d 1163 (N.Y. 1993) ....................................................... 18

*Johnson v. Matrix Fin. Servs. Corp.*,
   No. 5:22-cv-01250-OLG, 2024 WL 4527315 (W.D. Tex. June 26, 2024) ............................ 10

*Kumaran v. Brotman*,
   617 N.E.2d 191 (Ill. App. 1993) ................................................... 14

*L.P. v. Rosenthal*,
   529 S.W.3d 429 (Tex. 2017) ........................................................ 12

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990) ....................................................... 11, 12, 19

*Musser v. Smith Protective Servs., Inc.*,
   723 S.W.2d 653 (Tex. 1987) ........................................................ 12

*New Times, Inc. v. Isaacks*,
   146 S.W.3d 144 (Tex. 2004) ........................................................ 12

*Pisharodi v. Barrash*,
   116 S.W.3d 858 (Tex. App. 2003) ................................................... 20

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
   No. 17-cv-02824, 2019 WL 281370 (N.D. Cal. Jan. 22, 2019) ......................... 17

*Scripps NP Operating, LLC v. Carter*,
   573 S.W.3d 781 (Tex. 2019) .................................................... 12, 17

*Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*,
   738 F. Supp. 1499 (D.S.C. 1989) .............................................. 14, 18

*Turner v. KTRK Television, Inc.*,
   38 S.W.3d 103 (Tex. 2000) ......................................................... 12

*Turner v. Upton Cnty., Tex.*,
   967 F.2d 181 (5th Cir. 1992) ...................................................... 11

*Wilbanks v. Wolk*,
   121 Cal. App. 4th 883 (2004) ..................................................... 16

**Rules**

Fed. R. Civ. P. 12 ................................................................. 1, 10

**<u>Other Authorities</u>**

*Con*, *New Oxford American Dictionary* (2010 3d ed.) ................................................................. 13

*Scam*, *New Oxford American Dictionary* (2010 3d ed.) ............................................................. 13

**INTRODUCTION**

After electing not to move to dismiss when this case was filed in June 2024, and with discovery apparently not proceeding as they had hoped, Defendants have belatedly filed a Federal Rule of Civil Procedure 12(c) Motion for Judgment on the Pleadings [Dkt. 41], some six months after the pleadings closed.  The Motion raises one lone issue: Defendants' assertion that the statements at issue in this defamation action are mere expressions of opinion and therefore not actionable.  But it is well established that there is no defamation exemption for anything that might be labeled opinion, and simply calling a statement an opinion does not make it so.  Rather, the dispositive question for the Court at this stage is simply whether a reasonable fact finder ***could*** perceive that Defendants' repeated accusations that Plaintiff Logan Paul conceived of and operated a fraudulent business conveyed a provably false assertion of fact, when considered in the entire context in which the publications occurred.  Common sense and Texas law dictate that the answer to that question is "yes," and therefore Defendants' Motion must be denied.

As set forth in detail in the Complaint, Paul does not dispute that the project hit many unforeseen roadblocks and challenges that derailed it and ultimately resulted in the project failing to come to fruition as Paul envisioned.  But of course, new business ventures fail all the time for all kinds of reasons.  Here, Defendants made a conscious choice to label the entire project not just a failure but a "scam" and a "massive con" and, as they put it, "***Logan Paul's*** Biggest Scam."  Defendants thus conveyed to their audience that Paul was not acting in good faith or trying to build a legitimate business, but rather that he was simply aiming to scam people out of their money, including the very fans to whom Paul owes his success.  And at this stage of the case, as Defendants acknowledge, the Court must accept as true Paul's allegations that these accusations are false, and that Paul acted in good faith and with honest intention to build a novel and successful business venture.

Even putting aside the question of the specific context in which Defendants made these statements—which is the crucial inquiry when assessing an opinion defense, as discussed in detail herein—Texas law holds that statements accusing a defamation plaintiff of operating a business as a fraud and a scam *are actionable*. That alone could and should end the inquiry. But analysis of the context of the statements also favors the conclusion that a reasonable reader could understand them as factual assertions about Paul's conduct and motives, and not mere speculation or hyperbole. Indeed, Defendants themselves portrayed these accusations as factual conclusions based on a supposed year-long, in-depth, journalistic investigation—one conducted by an individual (Defendant Findeisen) who portrays himself to the public as an expert in ferreting out and exposing financial frauds and scams. Given that context, a reasonable fact finder could (and would) conclude that Defendants' statements claiming that Paul was "guilty" of conceiving of and operating his venture as a "con" to "scam" his "victims" were intended to convey factual assertions about Paul, his conduct, and his motives.

Accordingly, and for the reasons set forth below, Defendants' Motion for Judgment on the Pleadings should be denied.

## I.    BACKGROUND

### A.    Paul and the CryptoZoo Project.

Plaintiff Logan Paul, a well-known entertainer, athlete, and entrepreneur, conceived of the idea for "CryptoZoo" in early 2021. (Compl. ¶¶ 1-3, 38.) CryptoZoo was to be a game utilizing emerging blockchain technology, in which players would be able to purchase Non-Fungible Tokens ("NFT") "eggs" that would then "hatch" into animal NFTs. (*Id.* ¶¶ 3, 38-46.) Players would then be able to crossbreed those animals to create new, unique and ever-rarer hybrid animals, which could earn players an in-game cryptocurrency called "ZOO Tokens" based on their rarity. (*Id.*) All of this activity would be carried out in a virtual ecosystem, where animals could

continue to be bred, traded, used for mini arcade games, or sold to earn more ZOO Tokens. (*Id.*) Although CryptoZoo as conceived was a new concept in some ways, the "animal fusion" concept to be utilized was established in the blockchain space and had been the basis for other successful projects. (*Id.* ¶ 38.)

Although the CryptoZoo concept was Paul's brainchild, Paul is not a coding, blockchain, or cryptocurrency expert, and he recognized at the outset that he did not personally possess the technical expertise, relevant experience, or time necessary to turn his vision into a reality. (*Id.* ¶ 40.) Thus, Paul's management team worked to evaluate potential candidates from Paul's professional or social networks that had (or claimed to have) the relevant expertise. (*Id.*) Among others, the core team included Jake Greenbaum, who claimed expertise in the digital asset market and was to oversee blockchain and cryptocurrency-related aspects of the project, and Eddie Ibanez, who was responsible for leading the game's development efforts, including hiring and managing a team of developers to work on gameplay, user interface, and website design. (*Id.* ¶ 43.) Paul focused his efforts on developing rules for the game, providing high-level input on in-game features, design, and functionality, and assisting in the hiring and oversight of graphic artists and animators to create artwork and animations. (*Id.* ¶ 44.) In the early months of the project alone, Paul incurred $220,000 in out-of-pocket expenses, most of which went to paying artists. (*Id.* ¶ 46.)

Despite Paul's efforts over the course of nearly two years, the project never ultimately came to full fruition, for a variety of reasons set forth in detail in the Complaint. Chief among them was the incompetence and obfuscation of Ibanez, who repeatedly misled Paul about the progress of the game's development and mismanaged the developers, whose job it was to do the actual coding and technical work necessary to create a functioning game. (*Id.* ¶ 50.) Paul and his team spent months from the fall of 2021 to the end of 2022 trying to fix the development nightmare

Ibanez had created—including spending large sums to hire new teams of developers—but the problems ultimately proved insurmountable. (*Id.* ¶¶ 50-54.) Greenbaum, for his part, proved more interested in trying to profit through unapproved, surreptitious transactions in Zoo Tokens, resulting in Paul having to remove him from the project and "blacklist" wallets that could be identified as belonging to Greenbaum in order to put a stop to his activities. (*Id.* ¶¶ 49-51.)

Paul eventually came to the conclusion that the project likely could not be salvaged given all the difficulties it had faced. (*Id.* ¶ 55.) This was a crushing blow for Paul, who had invested hundreds of thousands of dollars into the project, to say nothing of his time, energy, and passion. (*Id.* ¶ 56.) But Paul also felt a responsibility to make things right for those who had purchased CryptoZoo NFTs in anticipation of being able to utilize them in a game that failed to come to fruition. (*Id.* ¶ 122.) In January 2023, Paul announced a "buyback" initiative whereby he pledged personal funds to buy back the base egg and animal NFTs from disappointed holders, despite the fact that Paul had never profited from the project and had in fact incurred hundreds of thousands of dollars in expenses trying to turn it into a reality. (*Id.* ¶ 124.) That initiative—which was unprecedented at the time and to Paul's knowledge has not been replicated since—was an enormous success, and Paul ultimately dispersed over $1 million of his own money to buy back CryptoZoo-related NFTs from holders who submitted a claim. (*Id.* ¶¶ 147-149.)

**B.    The "Coffeezilla" Show and its Three-Episode CryptoZoo Investigation (the "Contextual Publications").**

Defendant Stephen Findeisen is a realtor turned host of the YouTube show "Coffeezilla," published by his wholly-owned entity, Defendant Coffee Break Productions LLC d/b/a Coffeezilla. (Compl. ¶¶ 1, 15-16.) Findeisen holds himself out to his audience as an investigative journalist and "internet detective" who specializes in "exposing scams" and uncovering "scams" and "fraudsters." (*Id.* ¶ 15.)

From December 16 to 23, 2022, Findeisen published a three-segment investigative series on the Coffeezilla YouTube channel, falsely accusing Paul of having scammed people through CryptoZoo. (Compl. ¶¶ 70-71, 73, 75-76, 77-79, 83, 96-97.) The episodes were titled "Investigating Logan Paul's Biggest Scam," "The Biggest Fraud in Logan Paul's Scam," and "Ending Logan Paul's Biggest Scam," respectively. (*Id.* ¶¶ 70, 78, 83.)

In the first video, "Investigating Logan Paul's Biggest Scam," Findeisen promised his audience right off the bat that he would be revealing the inside story of how Paul scammed victims out their money, saying: "some of you guys think you know the story, but it goes so much deeper. . . . And of course, at the center of it, we have Logan Paul, who has abandoned this thing . . . leaving thousands of victims in his wake." (*Id.* ¶¶ 70-71.) The video proceeded to discuss, in detail, the CryptoZoo project and the problems that beset it, including issues with developers and difficulties completing the programming for the game. (*Id.* ¶¶ 71-76.) Findeisen claimed that after the trouble-filled launch on "hatch day," Paul entirely washed his hands of CryptoZoo, failing to make any additional contributions and "abandoning the project"; he further claimed that those who had bought CryptoZoo NFTs were led on by allegedly false assurances that Paul remained invested in the project. (*Id.* ¶ 75.)

Four days later, on December 20, Findeisen published Part 2, titled, "The Biggest Fraud in Logan Paul's Scam." (*Id.* ¶ 78.) The video focused on Ibanez and his role in the project's failure. (*Id.* ¶¶ 78-82.) It included an interview with Greenbaum, who stated on the record that Ibanez's incompetence and misrepresentations were "the biggest reason" for the project's ultimate failure. (*Id.* ¶ 81.) Greenbaum—who by this time had been unceremoniously kicked off the project by Paul—also went out of his way to state of Paul: "I don't want it to ever be thought that Logan's the reason it failed. He's not." (*Id.* ¶ 82.)

Three days later, on December 23, 2022, Findeisen published Part 3, titled, "Ending Logan Paul's Biggest Scam." (*Id.* ¶ 83.)  The opening monologue of the video promised viewers that Findeisen would present the "truth" about CryptoZoo and identify "who's to blame."  (*Id.* ¶ 84.). To that end, the video largely focused on internal text messages among the project's founders that had been leaked to Findeisen by a source.  (*Id.* ¶ 84.)  Findeisen pointed to Greenbaum's unapproved token transactions as a contributing factor, but ultimately concluded that the "number one," "boring" reason for the project's demise was Ibanez's mishandling of the developers who were essential to creating a functioning game.  (*Id.* ¶¶ 87-95.)

Perplexingly, despite the fact that every video in the three-part series had a title that labeled CryptoZoo as "Logan Paul's scam," Findeisen ultimately admitted, belatedly and only towards the very end of Part 3, that his investigation had actually determined that Paul and his manager, Jeff Levin, had never sold any of the Zoo Tokens they were allocated as founders—meaning they never profited at all from the project.  (*Id.* ¶ 94.)  Findeisen called this revelation a "huge surprise," and the "most important thing" in terms of assigning "guilt" for the demise of CryptoZoo.  (*Id.* ¶ 94.) Findeisen did claim that Paul was not "innocent" because he was the most recognizable person behind CryptoZoo and had failed to ultimately deliver a viable game, but in essence he ultimately concluded that Paul's "guilt" amounted to failing to put together a team that was up to the task of developing the game, and failing to effectively manage the project—which, of course, is a far cry from intentionally engaging in an effort to scam people and commit financial fraud.  (*Id.* ¶¶ 96-97.)

Collectively, these three videos about "Logan Paul's Scam" achieved more than 23 million views on YouTube, generating substantial revenue for Defendants.  (*Id.* ¶¶ 7, 120, 160.)

6

### C.    Paul Takes the High Road and Focuses on His Buyback Efforts.

As set forth in the Complaint, Paul's initial reaction to Findeisen repeatedly labeling him a scammer was one of hurt and anger, and he considered a lawsuit at the time.  (Compl. ¶ 121.) Ultimately, recognizing the time, expense, and energy required of a lawsuit, Paul instead elected to focus his energy on his ultimately successful initiative to buy back CrypoZoo NFTs from disappointed holders.  (*Id*. ¶ 122.)  During this time, Paul actually spoke on the phone with Findeisen, who complimented Paul's buyback plan and called it a novel and "noble" thing to do. (*Id*. ¶ 125.)  Findeisen also stated his belief that Paul was not a "bad actor" and that he had simply surrounded himself with the wrong people on the CryptoZoo project.  (*Id*.)  Given that Findeisen had claimed all along that his videos about CryptoZoo were intended to seek justice for "victims" of the project, and that Paul was actively working on a publicly-announced plan to make would-be game participants whole, Paul was hopeful that he and Findeisen could bury the hatchet in pursuit of that common goal.  (*Id*. ¶ 126.)

### D.    Defendants Persist in Maligning Paul by Publishing the "Challenged Publications."[1]

However, six months after Paul announced the buyback—which was complex and took time to organize—Findeisen renewed his attacks, continuing to claim that CryptoZoo was a scam and a fraud conceived of and perpetrated by Paul. (Compl. ¶¶ 12, 129.)  As alleged in the Complaint, Findeisen did so because his earlier three-part series labelling Paul a scammer had been enormously successful, generating Findeisen substantial revenue via his YouTube channel, and teaching Findeisen the value of leveling such attacks at a well-known celebrity.  (*Id*. ¶¶ 7, 120, 160.)  Indeed, Findeisen's popularity had soared on the back of his scam allegations against Paul,

---

[1] The Challenged Publications are those on which the Complaint's libel claims are based, specifically a June 29, 2023 X post (Count I), a June 30, 2023 YouTube video (Count II), and a January 5, 2024 YouTube video (Count III).

and he had even been invited to appear as a guest on the Joe Rogan Experience, one of the most popular podcasts in the world.  Simply put, Findeisen enjoyed the attention he was receiving and wanted it to continue.

First, on June 29, 2023, Findeisen posted on his Coffeezilla X account (formerly Twitter): "Logan Paul really is the type of dude to thank you when you expose his scam, then block you when you remind him to pay up." (*Id.* ¶ 130.) It featured two screenshots: one from a video Paul made in reaction to Defendants' original investigative series—in which he thanked Findeisen for bringing the situation to his attention—and another of the webpage notifying Defendants that Paul had blocked them on X. (*Id.*)  Thus, the context of the post made it clear that Findeisen was referring to CryptoZoo and claiming that he had "expose[d] [Paul's] scam."  Readers' comments on the post are universally negative toward Paul and accepting of Findeisen's claim that Paul had conceived of and operated CryptoZoo as a fraudulent scam. (*Id.* ¶ 133.)  For example, commenters accused Paul of "grift" and "exploit[ing] people," of operating a "scam," and labeled him a "scumdog millionaire." (*Id.* ¶ 134.)

The next day, June 30, Findeisen published a video to his Coffeezilla YouTube channel with the title, "Logan Paul's Scam Isn't Over." The video purported to be about Paul's offer to buy out holders of CryptoZoo Egg NFTs.  But in reality, the purpose of the video was to continue to lob false accusations at Paul, so that Findeisen could profit from achieving more views by leveraging Paul's fame and celebrity. (*Id.* ¶ 136.)  In addition to the title directly accusing Paul of intentionally defrauding people via a scam business, the opening lines of the video refer to CryptoZoo as "a scam created by Logan Paul."  Findeisen left no doubt that he was accusing Paul of intentionally defrauding people by referring to "his [i.e., Logan Paul's] victims," declaring that Paul was "guilty" and that his offer to reimburse buyers of Egg NFTs was an "admission" of guilt,

and stating that Paul was just "pretending [he'd] changed." (*Id.* ¶ 137.) To date, Findeisen's June 30, 2023 YouTube video has been viewed nearly 6 million times, and once again commenters who viewed the video were universally negative toward Paul and accepting of Findeisen's claim that Paul had committed financial fraud. (*Id.* ¶ 138.) For example, commenters called Paul a "thief" and a "scammer," accused him of committing "crimes," and suggested he should face "criminal charges." (*Id.* ¶ 139.)

On January 5, 2024, Findeisen published a video to the Coffeezilla YouTube page with the title, "Logan Paul's Refund." As with the previous video from June 2023, the January 5, 2024 video purported to be about Paul's offer to buy out holders of CryptoZoo Egg NFTs. But again, Findeisen's real purpose in publishing the video was to make more money by airing false accusations about Paul. (*Id.* ¶ 142.) The video opened with Findeisen proclaiming, "Logan Paul is refunding the people he scammed if they promise to stop suing him . . ." Findeisen then continued by accusing Paul of engaging in a "massive con," and ridiculing Paul's buyback efforts by saying that "Logan Paul is not a hero for doing this or making things right, he's a serial scammer who's offering a minority refund as a last-ditch effort to save his wallet and his reputation." (*Id.* ¶ 143.) To date, Findeisen's January 5, 2024 YouTube video has been viewed over 5 million times, and once again commenters who viewed the video understood Findeisen to be accusing Paul of committing financial fraud. (*Id.* ¶ 144.) For example, commenters called Paul "dishonest" and a "scumbag" who "needs jailtime," labeled him a "sociopath," accused him of "fraud," and called him "the guy who scammed his fans." (*Id.* ¶ 145.)

E. **The Complaint is Replete with Evidence That Defendants Knew Their Statements Were False When They Made Them.**

Although Defendants' Motion for Judgment on the Pleadings does not argue that Paul's Complaint fails to sufficiently allege actual malice, it is noteworthy, and relevant to the issue of

opinion, that Paul's Complaint is replete with evidence that Defendants knew, ***factually***, that their statements that Paul orchestrated CryptoZoo as a scam and a massive con were false when Defendants made them.  Just by way of example, the Complaint alleges that:

- Defendant Findeisen read scores of contemporaneous internal text messages between Paul and his co-founders, documenting CryptoZoo development efforts, Paul's reliance on Greenbaum and Ibanez for technical aspects of the game's development and implementation, Paul's good faith efforts to develop the game regardless of cost, and Paul's extreme frustration when those he relied upon failed to deliver as promised. (Compl. ¶¶ 100-101, 103, 113.)

- When Findeisen later included excerpts of these text messages in his YouTube videos about CryptoZoo, he affirmatively distorted and took them out of context in a transparent effort to portray Paul as a knowing participant in a nefarious money grab, despite the texts demonstrating the exact opposite.  (*Id*. ¶¶ 104-113.)

- Findeisen knew that Paul did not profit at all from his supposed "scam," and in fact lost large sums of money on the project. (*Id.* ¶ 114.)

- One of Paul's co-founders—who was no friend of Paul's, given that Paul had kicked him off the project—nevertheless told Findeisen that it would be false to claim that Paul was responsible for the failure of CryptoZoo.  (*Id*. ¶ 82.)

- Findeisen admitted to Paul that he knew Paul was not a "bad actor" with respect to CryptoZoo.  (*Id*. ¶ 125.)

- Paul's team continued trying to get the project back on track until the release of Findeisen's CryptoZoo series, and after.  In fact, Paul's team ultimately was able to successfully complete the development of the game in 2023, only to eventually realize that its release was not feasible for regulatory reasons that Paul had never previously been apprised. (*Id.* ¶ 115.)

## II.     LEGAL STANDARD

"Under the Federal Rules of Civil Procedure, courts use the same standard for deciding a Rule 12(c) motion for judgment on the pleadings as for a Rule 12(b)(6) motion." *Johnson v. Matrix Fin. Servs. Corp.*, No. 5:22-cv-01250-OLG, 2024 WL 4527315, at *1 (W.D. Tex. June 26, 2024); *see also Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002).  Rule 12(b)(6) provides that a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, a claim must contain enough factual allegations "accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In conducting this inquiry, the Court must assume the complaint's factual allegations are true and construe the facts in the light most favorable to the nonmoving party. *See Fernandez-Montes v. Allied Pilots Assoc.*, 987 F.2d 278, 284 (5th Cir. 1993). Matters outside the pleadings cannot be considered without converting the motion into one for summary judgment. *Elorreage v. Kijakazi*, No. 22-cv-01352, 2023 WL 7312498, at *1 (W.D. Tex. Nov. 3, 2023).

## III.    ARGUMENT

Defendants' Motion for Judgment on the Pleadings raises just one issue: their claim that the Challenged Publications constitute nonactionable statements of "opinion."[2]    Importantly though, while the Motion frames the issue as whether Defendants' accusations constituted an "opinion," it is well established that there is no broad "defamation exemption for anything that might be labeled opinion" because "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990) (internal quotation marks omitted); *see also Bentley v. Bunton*, 94 S.W.3d 561, 580-81 (Tex. 2002) ("[t]he analysis prescribed by *Milkovich* supplants various proposed dichotomies between fact and opinion," which

---

[2] The Motion's statute of limitations discussion is a red herring. (*See* MJP at 6-7.) None of Paul's claims are based on those older publications. (Compl., Counts I-III.) Rather, they serve as part of the "context" to be considered when interpreting the later Challenged Publications, which did not occur in a vacuum. (*See* Section III.B, *infra*.) That is perfectly appropriate. *See Turner v. Upton Cnty., Tex.*, 967 F.2d 181, 185 (5th Cir. 1992) ("[a]lthough the statute of limitations clearly destroys the utility of the events occurring before December 8, 1986 as the basis of a cause of action, the statute does not make relevant evidence of the creation and pursuit of [a] conspiracy inadmissible at trial" and "does not preclude the jury from considering those events as evidence in support of its verdict" as to timely claims).

courts used prior to the Supreme Court's decision).  Thus, a true, non-actionable, "pure" opinion statement is protected only when it cannot be said to "contain a provably false factual connotation." *Milkovich*, 497 U.S. at 20.

Thus, the dispositive question for the Court at this stage is only whether a ***reasonable*** fact finder ***could*** conclude the statement declares or implies a provably false assertion of fact. *See Bentley*, 94 S.W.3d at 580-81 (holding that *Milkovich* supplants pre-1990 tests for identifying protected opinion and "focuses the analysis on a statement's verifiability and the entire context in which it was made."); *Bostic v. Daily Dot, LLC*, No. 1:22-cv-158, 2023 WL 2317789, at *9 (W.D. Tex. Mar. 1, 2023) ("plaintiff must show a statement that 'expressly or impliedly asserts facts that can be objectively verified'") (citation omitted).  The court thus determines, as a matter of law, whether the challenged publications are capable of defamatory meaning, and only when a publication is solely susceptible to a non-actionable meaning can that the issue be resolved against plaintiff pre-trial. *See D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 438 (Tex. 2017) (citing *Musser v. Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654 (Tex. 1987)); *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 948 (5th Cir. 1983).

To make this determination, the publication is viewed from the perspective of a "person of ordinary intelligence," which is one who "exercises care and prudence, but not omniscience." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 157 (Tex. 2004).  The analysis also requires consideration of the "entire context" in which an allegedly defamatory remark was made, including the publication as a whole and the surrounding circumstances. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000).  As discussed more fully below, that includes all related publications in a "series." *Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 790-91 (Tex. 2019).

Here, the relevant considerations; namely, the statements themselves and the context in which they were made, point emphatically to Defendants' statements being actionable factual assertions rather than a non-actionable "pure" opinion.

### A.    The Challenged Publications Are Verifiably Factual.

As set forth above, the June 29, 2024, "X" post (the subject of Count I) stated "Logan Paul really is the type of dude to thank you when you ***expose his scam***, then block you when you remind him to pay up." (Compl. ¶ 130.)  The next day's YouTube video (Count II), ***titled "Logan Paul's Scam Isn't Over,"*** referred to CryptoZoo as "**a scam** created by Logan Paul," referred to supposed **"victims"** of said scam, declared that Paul was "**guilty**" of operating a scam, and labeled his initiative to buy back Egg NFTs from holders an **"admission"** of guilt.  (*Id.* ¶ 137.)  And the January 5, 2024 YouTube video titled "Logan Paul's Refund" (Count III) opened with Findeisen proclaiming, "Logan Paul is refunding **the people he scammed** if they promise to stop suing him . . ." He then continued by accusing Paul of engaging in a "**massive con**," and ridiculing Paul's buyback efforts by saying that "Logan Paul is not a hero for doing this or making things right, **he's a serial scammer** who's offering a minority refund as a last-ditch effort to save his wallet and his reputation." (*Id.* ¶ 143.)

Defendants' words—that Paul ran CryptoZoo as a "con" to "scam" his "victims," such that he was "guilty"—were loaded with provably false defamatory meaning.  Indeed, particularly in the context of accusations about the legitimacy of a business venture, the term scam has a readily identifiable, dictionary meaning: A "**scam**" is "a dishonest scheme; a fraud," as in "an insurance scam." *Scam*, *New Oxford American Dictionary* (2010 3d ed.).[3]  Such accusations are assertions

---

[3] And a "**con**" is "an instance of deceiving or tricking someone," or "persuad[ing] (someone) to do or believe something, typically by use of a deception," as in "she was jailed for conning her aunt out of $500,000."  *Con*, *New Oxford American Dictionary* (2010 3d ed.).

of fact, not opinion, because they can be proven or disproven—either Paul ran a "con" to "scam" his "victims," such that he was "guilty" of culpable conduct, or he did not.

That is why courts in Texas and elsewhere regularly hold exactly these types of statements to be actionable in defamation cases. *See, e.g.*, *Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 175-77 (Tex. App. 2003) (accusing entity of being a "scam" was actionably defamatory); *Kumaran v. Brotman*, 617 N.E.2d 191, 200-201 (Ill. App. 1993) (allegation that plaintiff engaged in a "scam" or swindle was factual); *Sunshine Sportswear & Elecs., Inc. v. WSOC Television, Inc.*, 738 F. Supp. 1499, 1506 (D.S.C. 1989) (holding that terms "scam," "rip-off," and "bait and switch," considered in context, "ha[d] ascertainable meaning and c[ould] be identified as either true or false"); *Bennett v. Comput. Assocs. Int'l, Inc.*, 932 S.W.2d 197 (Tex. App. 1996) (referring to a former employee as a "thief" and a "crook" who had stolen software was defamatory *per se*); *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) (allegations that judge was "corrupt," held actionable); *D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 438 (Tex. 2017) (publication held actionable where "a reasonable person could construe the article to accuse Rosenthal of fraudulently obtaining thousands of dollars of SNAP benefits").

The 2003 *Allied Marketing* case is instructive and directly on point. The plaintiff in that case, a direct mail offer business, sued the program *Hard Copy* over a segment that, the plaintiff contended, accused the plaintiff of operating a "sweepstakes scam." 111 S.W.3d at 171. The Texas Court of Appeals had little trouble concluding that an accusation that the plaintiff operated a company as a scam was capable of a defamatory meaning because a reasonable juror could interpret it as a factual allegation of financial fraud:

> *Paramount also asserted that it was entitled to summary judgment, even if the segment was "of and concerning" Allied, because the segment did not defame Allied. Whether a publication is capable of defamatory meaning is initially a question of law for the court. To determine the issue, the trial court construes the*

> *allegedly defamatory publication as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive the publication. If the publication is ambiguous or of doubtful import, the jury must determine the publication's meaning and the effect the publication has on an ordinary reader. If a defamatory meaning may exist, then the publication is considered ambiguous, and the court must allow the jury to determine whether an ordinary reader would perceive the statement as defamatory. Thus, if a publication is capable of two interpretations, one of which is defamatory, the trial court is required to submit the publication to the jury....*

> *One reasonable interpretation of the segment is that Sweepstakes Clearinghouse was a sham company that "con men" created for the purpose of engaging in sweepstakes scams. As such, ordinary viewers of the segment could reasonably perceive that Sweepstakes Clearinghouse was engaging in fraudulent activity—a sweepstakes scam. As set forth above, Allied presented evidence that a viewer did perceive that Sweepstakes Clearinghouse was engaging in the scam. Statements charging a sweepstakes company with engaging in sweepstakes fraud would ordinarily tend to injure the company's business reputation and result in financial injury to it. The segment is reasonably capable of a defamatory meaning.*

*Id*. at 175-76. The same result follows here. Defendants' accusations that CryptoZoo was a "massive con," "Logan Paul's scam," and a "scam created by Logan Paul" are equally capable of a defamatory meaning because, just as in *Allied Marketing*, a "reasonable interpretation of the [publications] is that [CryptoZoo] was a sham company that [a] 'con m[a]n' created for the purpose of engaging in [a crypto] scam[]." *See id*. at 176.

Moreover, just as the court in *Allied Marketing* found persuasive the fact that plaintiff had "presented evidence that a viewer did perceive that [the plaintiff] was engaging in a scam," *id*. at 176, Paul's Complaint presents similar evidence of viewer reactions in spades. Audience reactions to Defendants' statements confirm that not only ***could*** viewers perceive Defendants' statements as allegations of wrongdoing and financial malfeasance, but that they in fact did. The Complaint details how readers and viewers left comments on the June 29, 2024, "X" post (Count I), the June 30, 2024 YouTube video (Count II), and the January 5, 2024 YouTube video (Count III) that labeled Paul a "scumdog millionaire," a "thief," a "scammer," a "sociopath," "dishonest," a "scumbag" who "needs jailtime," and a "guy who scammed his fans." (Compl. ¶¶ 134, 139, 145.)

Readers and viewers also interpreted Defendants' statements as conveying that Paul committed "crimes," "grift," and "fraud," that he "exploited people," and operated a "scam," and that he should face "criminal charges." (*Id.*)

In sum, a reasonable juror could readily conclude that Defendants accused Paul of engaging in the fraudulent activity of running a crypto scam ***because that is exactly what Defendants accused him of***. The statements at issue are therefore more than capable of a defamatory meaning, and Defendants' Motion for Judgment on the Pleadings must be denied.

## B. Context Further Confirms That Defendants Accused Paul of Committing Fraud in Connection with the Failed CryptoZoo Game.

For the foregoing reasons, the accusations are factual and actionable on their face. But lest there be any doubt, Texas law instructs that in separating actionable statements from pure, non-actionable opinion, courts should also consider the "***entire context***" in which they occurred (contrary to the perfunctory analysis in Defendants' Motion (MJP at 9-11)). *See D Mag. Partners*, 529 S.W.3d at 437. When the statements at issue are considered in the context of the Coffeezilla show and the entire CryptoZoo series, the conclusion that a reasonable juror could perceive that Defendants factually accused Paul of scamming and defrauding is even greater.

As alleged in the Complaint, despite its somewhat goofy name, the Coffeezilla program is presented to viewers as a hard-hitting investigative program that sets out to expose malfeasance (not unlike the *Hard Copy* program in the *Allied Marketing* case), and the host, Defendant Findeisen, holds himself out as an experienced, subject-matter expert in "exposing scams" and uncovering "scams" and "fraudsters." (Compl. ¶ 15.) This context weighs heavily in favor of finding the statements actionable, as legions of cases recognize that viewers can reasonably interpret statements as factual more readily when they are presented as the conclusions of a claimed expert. *See, e.g.*, *Wilbanks v. Wolk*, 121 Cal. App. 4th 883 (2004) (defamation defendant's

"position as a crusader and watchdog to the industry also works against any argument" that her statements were nonactionable opinion because an "accusation that, if made by a layperson, might constitute opinion may be understood as being based on fact if made by someone with specialized knowledge of the industry"); *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 285-86 (S.D.N.Y. 2016) (rejecting "opinion" defense where defendant held itself out as an expert in malware); *Budget Van Lines, Inc. v. Better Bus. Bureau of the Southland, Inc.*, No. B235338, 2013 WL 4494318, at *9 (Cal. Ct. App. Aug. 20, 2013) (BBB's statement accusing company of engaging in "misleading" advertising capable of factual interpretation because BBB "holds itself out as an expert" on advertisers' trustworthiness); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, No. 17-cv-02824, 2019 WL 281370, at *6 (N.D. Cal. Jan. 22, 2019) ("[A] statement is more likely to be viewed as one of fact, as opposed to opinion, when the speaker might reasonably be perceived as an expert or authority on the topic of the statement.").

The context of Defendants' three-part CryptoZoo series published prior to the statements at issue in this case weighs similarly.[4]  At the outset, in Part 1 of that series, Defendant Findeisen claimed that his "high effort investigation" was "a year in the making," and he teased, "some of you guys think you know the story, but it goes so much deeper." (Compl. ¶ 71.)  Thus, not only did Findeisen hold himself out as an expert in exposing fraudulent business schemes generally, but

---

[4] Defendants' three-episode "investigation" into CryptoZoo—which was part of the same "series" of statements as the Challenged Publications—provides important context, rendering the claims even more factual. Indeed, courts cannot "make a proper assessment of the alleged defamatory material in this case without looking at the 'surrounding circumstances' encapsulated in [a] series." *Scripps NP Operating*, 573 S.W.3d at 790-91. Thus, courts "correctly consider[] all the articles [in a series] together to determine whether they were defamatory" when the publication "itself characterizes the articles in this case as a 'series,' and all of the articles reported on the same subject matter." *Id.* (consider all articles in a series about "financial irregularities at [an organization]" which were "linked to [plaintiff's] entitlement to a bonus and [plaintiff's] attempts to intimidate his critics").

he claimed to the public that he had conducted a deep-dive investigation into the causes of CryptoZoo's ultimate failure.  As courts regularly recognize, that context would also support the reasonableness of a reader or viewer concluding that Findeisen's subsequent statements that CryptoZoo was "Logan Paul's scam," "a scam created by Logan Paul," and a "massive con" orchestrated by Paul were intended to be factual accusations regarding Paul's conduct and culpability.  *See, e.g.*, *Bentley*, 94 S.W.3d at 569 (defendant's "claim[] to have made lengthy investigations of [the] matters, reviewing records and interviewing employees at the courthouse" rendered allegations of corruption verifiable fact, not opinion); *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1169 (N.Y. 1993) (statements made after "what purported to be a thorough investigation" rendered allegations of corruption verifiable fact, not opinion); *Sunshine Sportswear*, 738 F. Supp. at 1506 (holding that terms "scam," "rip-off," and "bait and switch," considered in context, "ha[d] ascertainable meaning and c[ould] be identified as either true or false," because they "relay[ed] to the average viewer that the defendants ha[d] access to knowledge confirming that the plaintiffs ha[d] engaged in some course of wrong doing").

This context helps to highlight the difference between this case and those superficially relied upon by Defendants (*see* MJP at 10-11 & n.3.)[5]  Given the context of the Coffeezilla program and the prior investigation into CryptoZoo, Defendants' explicit accusations of wrongdoing cannot be brushed aside as "mere rhetorical flourish or the speculative accusation of an angry but ill-informed citizen made during the course of a heated debate," because they involved accusations resulting from "a lengthy, copiously documented [journalistic] series … written only after what purported to be a thorough investigation." *Gross*, 623 N.E.2d at 1169; *see also Campbell v. Clark*,

---

[5] *See, e.g.*, MJP at 11 (citing *Dickson v. Lilith Fund for Reproductive Equity*, 647 S.W.3d 410, 414 (Tex. App.  2021), which concerns political speech equating abortion to murder).

471 S.W.3d 615, 627 (Tex. App. 2015) (distinguishing politically influenced, exaggerated speech from serious allegations of wrongdoing).  Put simply, given that Findeisen has chosen to portray himself as an expert in identifying and exposing supposed financial scams, ***and*** chosen to portray himself as an authority on the "truth" of what happened with CryptoZoo, he can hardly claim to be surprised that a reasonable viewer could assume he was making assertions of fact when he stated that CryptoZoo was "Logan Paul's scam," "a scam created by Logan Paul," and a "massive con" orchestrated by Paul.

### C.    Defendants' Buried, Half-Hearted "Disclaimer" Weighs Little in the Balance.

Finally, Defendants point to the fact that their YouTube videos contain a "disclaimer" statement that claims that Defendants' videos are "an opinion and in no way should be construed as fact."[6]  (MJP at 11.)  Putting aside the fact that this "disclaimer" cannot even be found unless the viewer clicks a link for "more" information about the video, and then reads to the bottom of the text that appears,[7] the notion that including a generic opinion disclaimer on a video magically shields all statements therein from defamation liability is, to put it simply, completely wrong.  The remedies and protections that the law of defamation provides would be hollow indeed if any speaker could insulate himself simply by claiming that any factual accusation, no matter how odious or harmful to reputation, was just his "opinion."  This is why the Supreme Court has emphatically rejected the notion that simply calling something an opinion can convert a factual assertion into something else.  *Milkovich*, 497 U.S. at 18-19 ("Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a

---

[6] This argument does not apply to the X post that is the subject of Count I, as Defendants do not contend that it had any disclaimer.

[7]    Coffeezilla, *Logan Paul's Scam Isn't Over*, YouTube (June 30, 2023), https://www.youtube.com/watch?v=uYYiypp6WaY&list=PL4qw3AkxFDSNYGZAS84sPlQn20Ezcx8Ks&index=5.

liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'").  Texas cases are in accord.  *See Pisharodi v. Barrash*, 116 S.W.3d 858, 863 (Tex. App. 2003) ("Although Dr. Barrash couches his accusation of assault in terms of his professional opinion, such hedging does not mitigate the defamatory impact of a criminal accusation."); *D Mag. Partners*, 529 S.W.3d at 438 (holding that a "prefatory disclaimer" does not insulate statements accusing the plaintiff of engaging in fraudulent conduct where "[c]onsidered in context, the disclaimer carries little weight").  Given the obvious import of the statements at issue and the context in which they were made, Defendants' hidden disclaimer should similarly be accorded little weight in the opinion analysis.

## IV.     CONCLUSION

Defendants' Motion for Judgment on the Pleadings should be denied.

March 3, 2025

/s *Andrew C. Phillips*
Andrew C. Phillips (*Pro Hac Vice*)
Shannon B. Timmann (*Pro Hac Vice*)
MEIER WATKINS PHILLIPS PUSCH LLP
919 18th Street NW, Suite 650
Washington, DC 20006
(202) 318-3655
Email: andy.phillips@mwpp.com
Email: shannon.timmann@mwpp.com

Jeffrey A. Neiman (*Pro Hac Vice*)
Jason L. Mays (*Pro Hac Vice*)
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
100 SE 3rd Ave., Suite 805
Ft. Lauderdale, Florida 33394
Email: jneiman@mnrlawfirm.com
Email: jmays@mnrlawfirm.com

Ricardo G. Cedillo (Texas Bar No. 04043600)
DAVIS, CEDILLO & MENDOZA, INC.
755 E. Mulberry Ave., Ste. 250
San Antonio, TX 78212
(210) 822-6666
Email: rcedillo@lawdcm.com

*Counsel for Plaintiff Logan Paul*

21

## CERTIFICATE OF SERVICE

I hereby certify that, on March 3, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record who are deemed to have consented to electronic service.

/s *Andrew C. Phillips*