UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LOGAN PAUL, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | SA-24-CV-717-OLG (HJB) |
| § | |
| STEPHEN FINDEISEN and COFFEE § | |
| BREAK PRODUCTIONS, LLC, § | |
| § | |
| Defendants. § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns Defendants' Motion for Judgment on the Pleadings (Docket Entry 41). Pretrial matters have been referred to the undersigned for consideration. (Docket Entry 33.) For the reasons set out below, I recommend that Defendants' motion (Docket Entry 41) be **DENIED**.

**I.     Jurisdiction.**

The Court has original jurisdiction over this defamation action pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff and Defendants are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Docket Entry 1, at 5–6, 46.) The undersigned is authorized to issue this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1).

**A. Background.**[1]

1. *CryptoZoo*.

In early 2021, Plaintiff Logan Paul, "a globally recognized entertainer, athlete, and

---

[1] As Defendants seek judgment on the pleadings, the Court accepts Plaintiff's well-pleaded factual allegations as true and views them in his favor. *See Phillips v. Collin Cmty. Coll. Dist.*, 630

entrepreneur,"[2] conceived of CryptoZoo—a game utilizing blockchain technology in which players purchase Non-Fungible Tokens[3] ("NFTs") in the form of eggs, which would then hatch into NFT animals that the players could breed to create increasingly unique NFT animals. (Docket Entry 1, at 1–2.) By creating new breeds, players could earn in-game cryptocurrency called "Zoo Tokens," with the amounts earned corresponding to the rarity of the breed created. (*Id.* at 2.)

Having developed the idea, Plaintiff assembled a team of individuals whom he believed to be experts to help him bring it to fruition. (Docket Entry 1, at 11–12.) Jack Greenbaum was hired "as an advisor on all blockchain and cryptocurrency-related aspects of the project." (*Id.* at 12.) Eddie Ibanez was hired to "lead[] the game's development efforts, . . . including putting together and managing a team of developers to work on gameplay, user interface, and website design." (*Id.*) For his part, Plaintiff "focused on creating rules for the game, assigning names and rarities to the featured animals, providing high-level input on in-game features, design, and functionality, and assisting in the hiring and oversight of graphic artists for the game." (*Id.* at 12–13.) Plaintiff was also responsible for "marketing and promoting the game." (*Id.*)

---

F. Supp. 3d 828, 833 (E.D. Tex. 2022) (citing *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012)).

[2] Plaintiff is a professional wrestler in the WWE, has a podcast with 4.6 million subscribers on YouTube, and is the co-founder of Prime Hydration, LLC, an energy drink company that had $1.2 billion in annual sales in 2023. (Docket Entry 1, at 9–10.)

[3] "Non-fungible tokens (NFTs) are assets like a piece of art, digital content, or video that have been tokenized via a blockchain." Rakesh Sharma, *Non-Fungible Token (NFT): What it Means and How it Works*, Investopedia (Updated June 12, 2024) https://perma.cc/7RK6-Z3YU. "Tokens are unique identification codes created from metadata via an encryption function." *Id.* "A blockchain is a distributed database or ledger . . . . [providing] a secure and decentralized record of transactions." Adam Hayes, *Blockchain Facts: What is it, How it Works, and How it Can be Used*, Investopedia (Updated Sep. 16, 2024) https://perma.cc/HFV5-Z2U2.

Soon after the launch of Zoo Tokens in June of 2021, Greenbaum secretly began selling them for personal enrichment. (Docket Entry 1, at 13.) When Plaintiff discovered this in August of 2021, he took steps to remove Greenbaum from the project, "even going as far as launching a new Z[oo] Token and blacklisting all wallets associated with Greenbaum." (*Id.* at 14.) Meanwhile, Ibanez provided false assurances to Plaintiff regarding the progress of development on the game. (*Id.*) In August of 2021, after Ibanez told Plaintiff the game was nearly finished, Plaintiff publicly announced the upcoming launch of CryptoZoo on his podcast. (*Id.*) Plaintiff also began releasing NFT eggs for sale on September 3, 2021, as the first step in the rollout of the game, which he believed was practically complete. (*Id.*) As a result of Ibanez's mismanagement of the game's development, the sales of NFT eggs "experienced significant technical issues and delays." (*Id.*)

In September 2021, as a result of the botched launch of the NFT eggs, Plaintiff removed Ibanez from the project and hired a new development team to take over his responsibilities. (Docket Entry 1, at 15.) Throughout the remainder of the year and through most of 2022, Plaintiff received updates and assurances that the project was finally progressing, albeit slowly. (*Id.*) By December 14, 2022, Plaintiff had accepted that the game might never be completed. (*Id.*)

    2. *Coffeezilla's investigative video series.*

On December 16, 2021, Defendant Stephen Findeisen, using the moniker "Coffeezilla," published a video on YouTube entitled "Investigating Logan Paul's Biggest Scam." (Docket Entry 1, at 18.) This was the first in a three-part series of videos about Plaintiff and CryptoZoo, which Findeisen indicated was "a year in the making," and followed a "high effort investigation." (*Id.* at 18–19.) In the video, Findeisen states that Plaintiff "scammed victims out of millions of dollars" through CryptoZoo. (*Id.*)

Four days later, on December 20, 2022, Findeisen published part two, entitled "The Biggest Fraud in Logan Paul's Scam." (Docket Entry 1, at 20.) The video focuses on Ibanez, exposing his "falsely claiming to be an orphan, lying about attending MIT, lying about working with the CIA, and lying about having helped the Philadelphia Eagles win a Super Bowl." (*Id.* at 21.) The video also discusses a phone call Findeisen had with Greenbaum, who confirmed that Ibanez was "the biggest reason" that CryptoZoo failed. (*Id.*) Greenbaum also insisted that Plaintiff was not responsible for the project's failure. (*Id.*)

Findeisen published part three of the video series, entitled "Ending Logan Paul's Biggest Scam," on December 23, 2022. (Docket Entry 1, at 22.) In the video, Findeisen explains how Greenbaum "secretly created numerous crypto wallets . . . to surreptitiously purchase some $200,000 worth of Z[oo] Tokens," and discusses text messages in which Greenbaum appears to provide a false explanation as to the suspicious trading activity to a dubious Plaintiff. (*Id.* at 23.) Findeisen also explains how Plaintiff took corrective measures by "mint[ing] a new Z[oo] Token and airdrop[ing] an identical amount" to legitimate holders while blacklisting "wallets associated with Greenbaum." (*Id.*) Findeisen also noted that, based on his investigation, Plaintiff never sold any Zoo Tokens. (*Id.* at 24.) Nevertheless, Findeisen concluded that Plaintiff was not innocent as he promised his investors CryptoZoo but "failed to deliver a viable game." (*Id.*)

Plaintiff initially responded to Findeisen's video series by posting videos of his own, hinting that a lawsuit may be forthcoming. (Docket Entry 1, at 33.) But on January 7, 2023, Plaintiff posted another video, walking back his initial hostility to Findeisen's series, ultimately thanking Findeisen for exposing Greenbaum and Ibanez's misdeeds, and foreshadowing the announcement of a plan to "make this right." (*Id.* at 34.) Plaintiff unveiled that plan in a follow-up video on January 13, 2023, pledging "up to $1.3 million of personal funds to buy back all of

4

the base Egg and base animal NFTs from disappointed holders." (*Id.*)  Shortly thereafter, Plaintiff had a telephone conversation with Findeisen, during which Findeisen "expressed his belief that [Plaintiff] was not a bad actor," and "complimented [Plaintiff's] buyback announcement."  (*Id.*)

> 3. *The allegedly defamatory statements.*

The allegedly defamatory statements in this case took place about five months after Plaintiff's telephone conversation with Findeisen.  Three statements are set out in Plaintiff's complaint.

*The first statement.*[4]  On June 29, 2023, Findeisen published a post on his Coffeezilla X account, which stated: "Logan Paul really is the type of dude to thank you when you expose his scam, then block you when you remind him to pay up." (Docket Entry 1, at 35, 42–43.)  The post included two pictures placed side-by-side: a screenshot from Plaintiff's video thanking Findeisen for his exposing Greenbaum and Ibanez on the one side, and a screenshot of Plaintiff's X page—as viewed through Coffeezilla's account—with a message stating that "@LoganPaul blocked you[;] You are blocked from following @LoganPaul and viewing @LoganPaul's Tweets." (*Id.* at 36.)  By the time Plaintiff filed this lawsuit, Findeisen's post had been viewed "more than 6.5 million times." (*Id.*)  Comments from X users who saw the post called Plaintiff "evil" and "Scumdog millionaire," accusing him of "grift[ing]" and "exploit[ing]" people by perpetrating a "scam" with CryptoZoo.  (*Id.* at 37.)

---

[4] The X post is incorporated into the complaint. *See* Coffeezilla (@cofeebreak_YT), X (June 29, 2023, 9:35 P.M.), https://perma.cc/XQ6Z-QS5G.

*The second statement.*[5]  The following day, on June 30, 2023, Findeisen published another video on his Coffeezilla YouTube channel, entitled "Logan Paul's Scam Isn't Over." (Docket Entry 1, at 37, 43–44.)  In the opening lines of the video, Findeisen refers to CryptoZoo as "a scam created by Logan Paul." (*Id.* at 37.)  Findeisen further refers to the people who bought NFT eggs or Zoo Tokens as "his victims," stating that Plaintiff was "guilty," and that his buy-back plan was an "admission" of guilt. (*Id.*)  At the time Plaintiff filed this lawsuit, the video had been viewed "nearly 6 million times." (*Id.* at 38.)  Viewers left comments, calling Plaintiff a "thief" and a "scammer," and saying that he committed a "crime" and should face "criminal charges." (*Id.*)

*The third statement.*[6]  On January 4, 2024, Plaintiff announced on X that his buy-back program was operational, posting a link to a website where holders could submit claims. (Docket Entry 1, at 38.)  The next day, on January 5, 2024, Findeisen published another video—the last statement at issue in this case—entitled "Logan Paul's Refund." (*Id.* at 38.)  In the video, Findeisen asserts that Plaintiff "is refunding the people he scammed if they promise to stop suing him" and accuses Plaintiff of orchestrating a "massive con." (*Id.* at 39.)  Findeisen concludes that Plaintiff is "a serial scammer who's offering a minority refund as a last-ditch effort to save his wallet and his reputation." (*Id.*)

---

[5] The video is incorporated into the complaint. *See* Coffeezilla, *Logan Paul's Scam Isn't Over* (June 30, 2023) https://www.youtube.com/watch?v=uYYiypp6WaY (last visited Mar. 21, 2025).

[6] The video is incorporated into the complaint. *See* Coffeezilla, *Logan Paul's "Refund"* (Jan. 5, 2024) https://www.youtube.com/watch?v=BZNUo7orS3k&t=293s (last visited Mar. 21, 2025).

4. *The current lawsuit.*[7]

Plaintiff filed suit against Findeisen and his codefendant Coffee Break Productions, LLC, d/b/a Coffeezilla, on June 27, 2024. (Docket Entry 1.) In his complaint, Plaintiff asserts three separate claims for defamation—more precisely, libel *per se*—based on the X post of June 29, 2023, the YouTube video from June 30, 2023, and another YouTube video from January 30, 2023. (*Id.* at 42–46.) Defendants answered the complaint on August 5, 2024.[8] (Docket Entry 9.)

On February 17, 2025, Defendants filed the instant motion for judgment on the pleadings. (Docket Entry 41.) They argue that the three allegedly defamatory statements are not reasonably capable of defamatory meaning, and that, even if they are capable of such meaning, they are nevertheless unactionable opinions. (*Id.* at 7–11.) Plaintiff has responded to the motion (Docket Entry 55), and Defendants have replied (Docket Entry 60).

## II. Legal Standard.

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). A judgment on the pleadings serves "to dispose of cases where the material facts are not in dispute and a judgment on the merits can be

---

[7] In addition to this suit, a related putative class-action matter is pending in the Austin Division of the Western District of Texas, *Holland, et al. v. CryptoZoo, Inc., et al.*, 1:23-CV-110-ADA-RCG. Plaintiff is a defendant in that case, along with Ibanez, Greenbaum, and several others; they are charged with fraud, breach of contrast, unjust enrichment, conspiracy to commit fraud, aiding and abetting fraud, violation of state laws prohibiting deceptive trade practices, violation of the Racketeer Influenced and Corrupt Organizations Act, and violations of both the Securities Exchange Act and the Commodity Exchange Act. *See id.,* First Amended Complaint (W.D. Tex. Aug. 19, 2024).

[8] Pleadings are closed "upon the filing of a complaint and answer." *Nortel Networks Ltd. v. Kyocera Wireless Corp.*, No. CIV.A.3:02-CV-0032-D, 2002 WL 31114077, at *1 (N.D. Tex. Sept. 20, 2002) (citing FED. R. CIV. P. 7(a); 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1367, at 5012–13 (1990)).

rendered by looking to the substance of the pleadings and any judicially noticed facts." *Phillips*, 630 F. Supp. 3d at 833 (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)). "The central issue is whether . . . the complaint states a valid claim for relief." *Tex. Ass'n for Rights of Unemployed v. Serna*, 690 F. Supp. 3d 732, 739 (W.D. Tex. 2023) (quoting *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001)). In making that determination, "the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff." *Phillips*, 630 F. Supp. 3d at 833 (citing *Bowlby*, 681 F.3d at 219).

### III. Discussion.

The sufficiency of the pleadings in this case is determined under Texas law. *See Mack v. Nelson*, No. A-12-CV-016-LY, 2012 WL 12874200, at *1 (W.D. Tex. July 6, 2012) ("Where jurisdiction is based on diversity, th[e] court applies the substantive law of the forum state, here Texas.") (citations omitted). In Texas, "[d]efamation is generally defined as the invasion of a person's interest in her reputation and good name." *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). "Libel" refers to "defamation expressed in written or other graphic form . . . that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM. CODE § 73.001.

"Defamation's elements include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998), and *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 146 n.7 (Tex. 2014)). The status of the person allegedly

defamed determines the requisite degree of fault: a private individual need only prove negligence, whereas a public figure or official must prove actual malice. *WFAA-TV, Inc.*, 978 S.W.2d at 571. "Actual malice" in this context means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000).

The plaintiff must also plead and prove damages, unless the statements are defamatory or libelous *per se*. *Waste Mgmt. of Tex.*, 434 S.W.3d at 162 n.7. "A written defamatory statement is libel *per se* if the words in and of themselves are so obviously hurtful to the . . . [defamed] that they required no proof of injury." *Scripps NP Operating, LLC v. Carter*, 567 S.W.3d 1, 16 (Tex. App.—Corpus Christi-Edinburg 2016) *aff'd* 573 S.W.3d 781 (Tex. 2019). Examples of libel *per se* include "statements that (1) unambiguously charge a crime, dishonesty, fraud, rascality, or general depravity, or (2) are falsehoods that injure one in his office, business, profession, or occupation." *Id.*

Defendants' motion for judgment on the pleadings turns on the "defamatory" element of Plaintiff's allegations. The threshold question in considering this issue is whether the statement at issue is "reasonably capable of defamatory meaning." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018). "Meaning is a question of law" for the Court to determine from the point of view of an "objectively reasonable reader." *Id.* at 625, 631.

Even if a statement is reasonably capable of defamatory meaning, it must be more than a mere opinion. Whether a statement is mere opinion is likewise a question of law. *Tatum*, 554 S.W.3d at 639. This issue has two components. First, if a statement cannot be "verifiable as false," then it "cannot form the basis of a defamation claim." *Id.* at 639 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21–22 (1990)). In other words, the alleged statement must be "sufficiently factual

to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21.  Second, even if a statement *is* verifiable, it nevertheless cannot give rise to liability for defamation "if the entire context in which it was made discloses that it was not intended to assert a fact." *Tatum*, 554 S.W.3d at 638 (quoting *Bently v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002)) (internal quotation marks omitted).  "A statement that fails either test—verifiability or context—is called an opinion," and is not actionable as defamatory.  *Tatum*, 554, S.W.3d at 638.

As noted above, Plaintiff's complaint alleged three instances of libel *per se* in this case; in each instance, Findeisen is accused of stating that Plaintiff perpetrated a "scam."  The post on X from June 29, 2023, stated that Plaintiff thanked Findeisen for "expos[ing] his scam," only to turn around and "block" Findeisen when he "remind[ed] him to pay up." (Docket Entry 1, at 42.)  The YouTube video from June 30, 2023, was entitled: "Logan Paul's Scam Isn't Over," and in it Findeisen immediately labeled CryptoZoo as "a scam created by Logan Paul." (*Id.* at 44.)  In that video, he even described Plaintiff's CryptoZoo investors as "his victims," and declared that Plaintiff was "guilty."  (*Id.*)  And in the YouTube video from January 5, 2024, entitled "Logan Paul's 'Refund,'" Findeisen accuses Plaintiff of orchestrating a "massive con," labels him a "serial scammer," and refers to his investors as the "people he scammed."  (*Id.* at 45.)  This Report and Recommendation first considers whether these statements meet the legal definition of "defamatory," and then turns to whether they must be viewed as statements of opinion, rather than of fact.

**A.   *Whether Findeisen's Statements Meet the Legal Definition of "Defamatory."***

The word "scam" meets the legal definition of "defamatory," as it is reasonably capable of defamatory meaning in both its noun and verb forms.  As a noun, "scam" means "a fraudulent or deceptive act or operation."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).  As

a verb, to "scam" means to "deceive, defraud, . . . [or] obtain (as money) by a scam," *i.e.*, by "a fraudulent or deceptive act or operation." *Id.* And "fraud," in turn, is defined as "deceit, trickery; *specif*: intentional perversion of truth in order to induce another to part with something of value: . . . an act of deceiving or misrepresenting." *Id.* The Texas Supreme Court has unambiguously held that an accusation "of deception . . . is reasonably capable of impeaching the [accused's] 'honesty[] [and] integrity[.]'" *Tatum*, 554 S.W.3d at 638 (citing TEX. CIV. PRAC. & REM. CODE § 73.001). Moreover, a statement is defamatory *per se* when it "unambiguously charge[s] . . . dishonesty . . . [or] fraud," *Scripps*, 567 S.W.3d at 16. Thus, all three statements in this case are sufficiently capable of defamatory meaning to constitute libel *per se*.[9]

### B. *Whether Findeisen's Statements Are Mere Opinion.*

As Findeisen's three statements meet the legal definition of defamatory, Defendants are not entitled to judgment on the pleadings unless the statements must be seen as mere "opinions," either because they were unverifiable or because they were clearly not intended, in light of the entire context, to be understood as asserting facts. *See Tatum*, 554 S.W.3d at 638.

#### 1. *Verifiability.*

All three of Findeisen's statements are verifiable, *i.e.*, "sufficiently factual to be susceptible of being proved true or false." *Milkovich*, 497 U.S. at 21. Findeisen accuses Plaintiff of having orchestrated a "scam" through his CryptoZoo project—in other words, that Plaintiff committed fraud. "[S]tatements to the effect that [a person] committed specific acts of fraud . . . . [are] objectively verifiable, making them actionable as defamation." *Whitelock v. Stewart*, 661 S.W.3d

---

[9] Specifically, the defamatory meaning here is explicit—a form of textual defamation. "Textual defamation occurs when a statement's defamatory meaning arises from the words of the statement itself, without reference to any extrinsic evidence." *Tatum*, 554 S.W.3d at 626 (citing *Defamation per se*, BLACK'S LAW DICTIONARY (10th ed. 2014)).

583, 600 (Tex. App.—El Paso 2023, pet. denied); *see also In re Nw. Senior Housing Corp.*, No. 22-30659-mlv11, 2024 WL 2822148, at \*7 (Bankr. N.D. Tex. June 3, 2024) ("Texas courts have determined that statements . . . . synonymous with fraud . . . . [a]re verifiable factual assertions.") (citing *Bass v. United Dev. Funding, L.P.*, No. 5-18-00752-CV, 2019 WL 3940976, at \*18–19 (Tex. App.—Dallas Aug. 21, 2019, pet. denied)).[10]  Accordingly, the three instances of alleged defamation pass the verification test.  *See Tatum*, 554 S.W.3d at 638.

    2. *Context.*

Defendants argue that the full context of Findeisen's statements reveals that they were intended to be received as mere opinions, not as assertions of fact. (Docket Entry 41, at 11; Docket Entry 60, at 5.)  In considering the context of a statement, the Court must assume "the perspective of a reasonable person's perception of the entirety of the communication, not from isolated statements." *O'Rourke v. Warren*, 673 S.W.3d 671, 683 (Tex. App.—Austin 2023, pet. denied) (quoting *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023)).  "Such a reasonable person reads the communications 'in their entirety[,]' . . . and 'is also cognizant of the speaker's method and style of dissemination.'" *O'Rourke*, 673 S.W.3d at 683 (quoting *Lilith Fund*, 662 S.W.3d at 363–64).

Accepting Plaintiff's factual allegations as true at this stage, an objectively reasonable reader would perceive Findeisen as an "investigative journalist" who specializes in "exposing scams." (Docket Entry 1, at 5.)  In his complaint, Plaintiff incorporates by reference an article from *The New Yorker*, published on May 14, 2022, entitled "Coffeezilla, the YouTuber Exposing Crypto Scams," which describes Findeisen's transformation in the summer of 2021 from "a snarky

---

[10] While Defendants cite several opinions taking a contrary position, none are from Texas courts or courts within the Fifth Circuit. (Docket Entry 41, at 10.)

YouTube critic to something more akin to an investigative journalist." (*Id.* at 17.)  Findeisen can hardly challenge this characterization, as he himself similarly declared that he has "become widely known for [his] investigative journalism related to cryptocurrency scams," and has come to be regarded as a "powerful independent news source, . . . cataloguing and exposing some of the biggest instances of alleged fraud in the crypto industry." (Docket Entry 62-1, at 3.)[11]  This general context supports a finding that Findeisen's challenged statements should be considered factual assertions rather than mere opinion.

More specifically, context is also derived from the original three-part series published in December of 2022, as detailed in the complaint. (Docket Entry 1, at 18–22.)  As noted above, the videos were presented as Findeisen's findings after a "high effort investigation" that was "a year in the making," and they promised viewers that Findeisen would present them with the "truth" about "who's to blame" for CryptoZoo. (*Id.* at 18–19, 22.)  Although Plaintiff has not asserted independent claims for defamation based on this three-part video series,[12] an objectively reasonable reader would consider the two videos at issue in this case in the context of the previous three-part investigative series, since the videos are continuations of that series, and the X post directly refers to a video in which Plaintiff publicly thanked Findeisen for that series. *See, e.g.*, *Scripps*, 573 S.W.3d at 790 (holding that court of appeals properly relied on related articles that formed a series when determining whether article at issue constituted defamation); *Diocese of*

---

[11] The objectively reasonable person should also be viewed as being "aware of relevant contemporary events." *O'Rourke*, 673 S.W.3d at 683 (quoting *Lilith Fund*, 662 S.W.3d, at 363–64). In this case, such events would reasonably include Findeisen's investigations of and interviews with Sam Bankman-Fried regarding the collapse and bankruptcy of his multi-billion dollar cryptocurrency exchange, FTX. (*See, e.g.,* Docket Entry 62-1, at 3 (Findeisen's declaration discussing FTX investigation and his highly-publicized interviews of Bankman-Fried).)

[12] Indeed, Plaintiff concedes they were published outside the one-year statute of limitations for defamation claims. (Docket Entry 55, at 16.)

13

*Lubbock v. Guerrero*, 591 S.W.3d 244, 251 (Tex. App—Amarillo 2019) ("[W]hether one is defamed depends on evaluating not only the statement uttered but also its context or surrounding circumstances based upon how a person of ordinary intelligence would perceive it, . . . . [which] may include a series of writings or events."), *vacated on other grounds*, 624 S.W.3d 563 (Tex. 2021).

Defendants point out that all of Findeisen's videos include a disclaimer in the area of the YouTube page reserved for the publisher's description of the video, which reads:

> This video is an opinion and in no way should be construed as statements of fact. Scams, bad business opportunities, and fake gurus are subjective terms that mean different things to different people.

(Docket Entry 41, at 4, 11.) Although the disclaimers should be considered in addressing context, it is important to note that they are not particularly prominent. The video-description sections are expandable, with only three lines worth of text visible in the default collapsed form; the disclaimers are 17 lines down, and thus are visible only when the section is expanded. (*See* Docket Entry 1, at 44–45.) Even if the disclaimers were more prominently on display, however, they would not materially change the factual nature of Findeisen's assertions. Merely calling a factual assertion subjective cannot make it so; if it did, then no assertion, no matter how defamatory, would be actionable so long as the defamer labeled it "subjective." Similarly, "simply couching . . . statements in terms of opinion" cannot render an otherwise verifiable statement of fact into one that is not actionable. *Milkovich*, 497 U.S. at 18-19.

Accepting Plaintiff's factual allegations as true, and making reasonable inferences in his favor, the context of the statements at issue in this case do not show them to be mere opinion. Rather, an objectively reasonable reader—cognizant of Findeisen's method and style as an investigative journalist who specializes in exposing scams, and familiar with those portions of his

14

oeuvre that establish the pertinent context—would understand the statements at issue in this case to be asserting matters of demonstrable fact based on a year-long investigation. Accordingly, the Court should reject Defendants' contention that context renders Findeisen's statements non-defamatory. At the pleading stage, Plaintiff has sufficiently alleged that the statements at issue in this case are reasonably capable of defamatory meaning and are not unactionable opinions.[13]

## IV.   Recommendation.

For the reasons discussed above, I recommend that Defendants' Motion for Judgment on the Pleadings (Docket Entry 41) be **DENIED**.

## V.   Notice of Right to Object.

The United States District Clerk shall serve a copy of this Report and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this Report and Recommendation must be

---

[13] Given the early stage of the proceedings and the limited basis of the motion before the Court, this Report and Recommendation does not address the veracity of Findeisen's statements. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 73.005(a) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action"); *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 743 (5th Cir. 2019) ("In a defamation suit against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity."). Nor does this Report and Recommendation address whether Findeisen had the requisite mental state to defame Plaintiff. *See, e.g.*, *WFAA-TC, Inc.*, 978 S.W.2d at 573–74 (requiring actual malice where media defendant made statement about limited-purpose public figure on matter of public concern); *Berrios v. Cox*, No. EP-23-CV-63-KC, 2024 WL 5038710, at *6 (W.D. Tex. Dec. 9, 2024) ("In public figure . . . defamation cases, the plaintiff . . . bears the 'difficult burden of proving actual malice by clear and convincing evidence.'") (quoting *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 564 (5th Cir. 1997)).

filed **within 14 days** after being served with a copy of the same, unless this time period is modified by the District Court. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

The parties shall file any objections with the Clerk of the Court and serve the objections on all other parties. Absent leave of Court, **objections are limited to 20 pages in length**. An objecting party must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; "objections that are frivolous, conclusory, or general in nature needn't be considered." *Williams v. Lakeview Loan Serv. LLC*, 694 F. Supp. 3d 874, 881 (S.D. Tex. 2023) (citing *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987)).

A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the party from a *de novo* review by the District Court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to, proposed findings and conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED** on March 26, 2025.

_____
Henry J. Bemporad
United States Magistrate Judge