```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   LOGAN PAUL,                    )
                                    )
 4        Plaintiff,                )
                                    )
 5        v.                        )  No. 5:24-cv-00717-OLG-HJB
                                    )
 6   STEPHEN FINDEISEN, and         )  San Antonio, Texas
     COFFEE BREAK PRODUCTIONS, LLC, )  March 24, 2025
 7                                  )
                                    )
 8        Defendants.               )
     _____)
 9
                    TRANSCRIPT OF MOTION HEARING
10          BEFORE THE HONORABLE HENRY J. BEMPORAD
                 UNITED STATES MAGISTRATE JUDGE
11
     A P P E A R A N C E S:
12
     FOR THE PLAINTIFF:
13   Ricardo G. Cedillo
     Brian L. Lewis
14   Davis, Cedillo & Mendoza
     755 E. Mulberry Avenue, Suite 500
15   San Antonio, TX 78212

16   Andrew Clay Phillips
     Meier Watkins Phillips Pusch, LLP
17   919 18th Street NW, Suite 650
     Washington, DC 20006
18
     Jason Leonard Mays
19   Marcus Neiman Rashbaum & Pineiro
     One Biscayne Tower
20   2 S. Biscayne Blvd., Suite 2530
     Miami, FL 33131
21
     Jeffrey A. Neiman
22   Marcus Neiman & Rashbaum LLP
     100 SE 3rd Avenue, Suite 805
23   Fort Lauderdale, FL 33494

24

25
```

1    FOR THE DEFENDANTS:
     Jason Davis
2    Rachel Garza
     Davis & Santos, P.C.
3    719 S. Flores Street
     San Antonio, TX 78204
4
     COURT RECORDER:   FTR Gold
5
     Proceedings reported by electronic sound recording.   Transcript
6    produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      (1:38 p.m.)
 2           THE COURT:  Good afternoon.  Please be seated.
 3      Calling case number SA:24-CA-717, Logan Paul v. -- and I'll
 4  need help with the pronunciation -- Stephen Findeisen?
 5           MR. DAVIS:  That's correct, Judge.
 6           THE COURT:  Hey.  Very good -- Findeisen and Coffee
 7  Break Productions, LLC.
 8      Let me get announcement of counsel, if I may, starting with
 9  counsel for plaintiff, please.
10           MR. CEDILLO:  Here or there, Your Honor?
11           THE COURT:  Always better for -- once we start --
12           MR. CEDILLO:  Yes.
13           THE COURT:  -- arguing, at the podium.  But really,
14  Mr. Cedillo, it's fine either way.
15           MR. CEDILLO:  Thank you, Your Honor.  Good afternoon.
16  Ricardo Cedillo for the plaintiffs, who are respondents and
17  movants today, Jason Mays, Andrew Phillips, Brian Lewis and
18  Jeff Neiman --
19           THE COURT:  All right.
20           MR. CEDILLO:  -- appearing today, Your Honor.
21           THE COURT:  All right.  Very well.  Good afternoon to
22  all of you.
23      And for defendant.
24           MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis
25  and Rachel Garza are here on behalf of Mr. Stephen Findeisen
```

1  and Coffee Break Productions, Your Honor.

2    THE COURT:  All right.  Very well.  Thank you.

3   I think I have a third party, he needs to make a

4  representation for.

5    MR. SANFORD:  Good afternoon, Your Honor.  Josh

6  Sanford.  I'm here for attorney Thomas Kherkher, who is a

7  nonparty witness subject to a subpoena.

8    THE COURT:  All right.  Good afternoon to you as well.

9    MR. SANFORD:  Nice to see you again.

10   THE COURT:  Nice to see everyone.  Familiar faces all

11 around.

12  We're set on a number of motions today.  I think we were

13 originally set on six motions.  One, I think the parties have

14 resolved, and I issued an order regarding that.  That was

15 Docket Entry 26.

16  And another motion I'm going to take off the argument

17 calendar today and then focus on the other motions.  That

18 motion is the defendants' opposed motion to stay discovery

19 pending a ruling on their motion for judgment on the pleadings.

20 Taking that one off because I expect to be doing a

21 recommendation on that judgment on the pleadings within -- it's

22 going to be within the week, I'll get it resolved.

23  And I think the parties who are familiar with my practice

24 will know that the way I always do those things is I assume

25 that my recommendation to Judge Garcia would be accepted.  So

1  if I recommend granting the motion for judgment on the
2  pleadings, I will stay discovery pending the judge's
3  reconsideration -- consideration of that.  If I recommend
4  denying it, I will deny the motion to stay discovery, for
5  obvious reasons.  So we don't need to have that argument here
6  today.  So that would allow us to get more to the details of
7  some of the other motions.

8      I think the first set I'd like to address, but I'm happy to
9  hear from the parties if they wish to approach it another way,
10 would be the confidentiality motions.  Those are two motions
11 from the plaintiff to preserve confidentiality designations
12 under the confidentiality and protective order that's been put
13 in place.

14     I guess I'll hear from you first on that, Mr. Cedillo, if I
15 may.

16         MR. CEDILLO:  Well, Your Honor, you're going to hear a
17 strenuous objection because you took off the one I was going to
18 argue.  So with the Court's permission, my colleague,
19 Mr. Phillips will address that one, Your Honor.

20         THE COURT:  All right.  Very well.

21         MR. CEDILLO:  Thank you, Your Honor.

22         THE COURT:  All right.  Good afternoon, Mr. Phillips.

23         MR. PHILLIPS:  Good afternoon.

24     May it please the Court.  Your Honor, again, my name is
25 Andy Phillips for the plaintiff, Logan Paul.

```
 1      So Mr. Paul has filed two motions to preserve
 2  confidentiality designations.  Those are docket 36 and 42.
 3  They were filed within about a week of each other, because I'm
 4  sure Your Honor's familiar with the process under the
 5  protective order, which in this case is the form order from the
 6  Western District.  We have two separate challenges, so we have
 7  two separate motions to preserve our designations, although, as
 8  I'll submit to you, they're very overlapping in terms of the
 9  issues.
10          THE COURT:  That's what it appeared like.
11          MR. PHILLIPS:  Yeah.
12      So with the operative question for the Court -- well, let
13  me start with just a little more background.  The defendants
14  challenged, I believe it was about 253 documents that we have
15  designated as confidential.  We, in good faith, before filing
16  our motion -- we made an effort to narrow that down as much as
17  we could.  And I'll talk about how we endeavored to do that.
18  But I think we ended up with only 125 documents at issue
19  between the two motions.  So more than half of them went away
20  before we got here today.
21      So as to the 125 documents that are at issue, with the
22  operative question for the Court being whether they are
23  properly designated as confidential under the protective order,
24  I want to start with the language of the Court's form
25  protective order.  And that's my first slide.
```

1    Paragraph 3(a) is the paragraph of the protective order
2  that governs the scope of what can be designated as
3  confidential in discovery in this district.  And the one we're
4  focusing on today is the highlighted language there, which says
5  that parties can designate correspondence and other
6  communications between the parties or with nonparties if the
7  communication was made with the understanding or reasonable
8  expectation that the information would not become generally
9  available to the public.
10    Next slide, please.
11    Your Honor, our position is that all of the documents at
12  issue in the two motions to preserve fall squarely within that
13  definition.  We've submitted all of those documents to the
14  Court as appendices to the motions.  Mr. Paul has averred, in
15  declarations submitted with each motion, that, in fact, those
16  documents at issue are private correspondence with friends
17  and/or business associates and that they were made without any
18  reasonable expectation that they would become available to the
19  general public.
20    Now, the reason we're here doing, I think it's 125
21  documents and not 253 is, again, we did make an effort to
22  narrow the issues.  And we looked at it, and we said, what's a
23  principled way to do that?  And we said, regardless of whether
24  a given document might fit within that 3(a) definition, be
25  private communication, not intended for public consumption, we

1  said, look, if that communication focused primarily on the

2  CryptoZoo project, which is the subject of this litigation, or

3  more specifically defendants' statements about same, then, you

4  know, we were going to withdraw our designations as to those.

5  It seemed like a reasonable approach.  And we informed

6  defendants of such and, like I said, managed to whittle out 133

7  documents.

8      And we did not condition that offer on, you know,

9  defendants agreeing to withdraw their challenge to our

10 designations.  We just said, we're going to do it.

11     So what remains of those 125 documents is a subset of

12 communications, primarily text messages between Mr. Paul and,

13 again, business associates or friends or sometimes a mix of the

14 two, that primarily focus on topics other than, you know, what

15 the main subject matter of this litigation is.

16     And on the next slide we give a few examples just to

17 illustrate the point.  The first exhibit to the appendix is a

18 35-page -- of messages between Paul and one of his business

19 partners in a different venture, not CryptoZoo.  In those 35

20 pages there's a very brief discussion of, like, hey, what's

21 going on with that CryptoZoo project?  What's the status?  It's

22 a minor back and forth.

23     The second bullet there is Exhibit 7 to our appendix, eight

24 page, texts with friends, a large group of friends.  There's

25 one joking reference to the defendant, whose name appears in

1  there.

2      And, you know, it's discovery, right?  So we take a broad

3  view, and we participate in discovery in good faith, of course.

4  And so there are many, many documents and many instances of

5  private communications where they really have very little to do

6  with the defendant.  But if his name is mentioned or, you know,

7  a search term popped up in response to defendants' request, you

8  know, we produced that document even if, you know, as I think

9  this slide illustrates, many of these -- or all of these, in

10  our view, are of very tangential relevance to the actual issues

11  of the case.

12          THE COURT:  Can I ask you a question about that?

13          MR. PHILLIPS:  Of course, Your Honor.

14          THE COURT:  I understood from the response of

15  defendants that there may have been some of these documents --

16  the one -- and the real question, as to 125.  Some of those

17  documents, that portions -- because these text chains can go on

18  forever -- portions of them may have been disclosed by you, but

19  confidentiality is being -- you're making a confidentiality

20  designation as to other parts of the chain.

21      Now, is that -- those were -- the ones that I saw were

22  stuff that had since been de-designated.  What I'd like to know

23  is, are any of these in the 125 things where y'all have used

24  part of it for one reason or another or used it in some other

25  context but are still trying to preserve its confidentiality

1  here?

2          MR. PHILLIPS:  I do not --

3          THE COURT:  Do you -- I hope you understand my

4  question.

5          MR. PHILLIPS:  I do not believe so, Your Honor.

6          THE COURT:  Okay.

7          MR. PHILLIPS:  Really, the core documents that are,

8  like -- form the basis of our complaint, things like that,

9  those have all been de-designated.  I don't want to swear on my

10 life, as I stand here.  And maybe they'll disagree with me.

11 But I do not believe so.

12         THE COURT:  Okay.

13         MR. PHILLIPS:  And yeah, I thought that was

14 interesting in their response, is there's -- it's kind of this,

15 like, fanatic, like, well, we're trying to hide stuff and only

16 produce the good stuff.  But then all the documents they're

17 using to illustrate are documents that are not confidential.

18 So I think what they actually illustrated is that we were

19 principled in how we did it.

20         THE COURT:  It could have also been that, look,

21 they're trying to preserve the confidentiality.  So they're

22 just responding with the ones that are -- that they felt they

23 could do openly, without it being -- causing all kinds of

24 problems or making special sealed responses or anything like

25 that.  I'll find out from the other side about that.  But I

 1   just wanted to know what your perspective was on that, sir.

 2         MR. PHILLIPS:  Sure thing, Your Honor.

 3      So I want to emphasize two key points for the Court.  One

 4   is that defendants do not appear to dispute that the 125

 5   documents we're talking about, the subject communications, meet

 6   the definition under the plain language of the protective

 7   order, that they are private communications and no reasonable

 8   expectation of them becoming public.  Again, we've submitted

 9   evidence on that, and they haven't controverted it.

10         Point two, defendants have not sought to file any of those

11   125 documents.  And I've actually asked defendants:  Do you

12   have any intention to file any of those?  And if so, like,

13   let's talk about it.  And we can, you know, talk about

14   revisiting the issue so that you don't have to deal with

15   under-seal filing.

16         And I haven't gotten any indication that they have any

17   intention of filing any of those materials with the Court.

18   That's not surprising to me because, again, you know, I believe

19   that those materials are of very tangential relevance to the

20   case.

21         The reason that second point is important is we're not

22   talking here about sealed judicial records where there's a

23   concern about public right of access to judicial records.

24   We're talking here about materials exchanged in discovery, just

25   between the parties.  And in typical practice, as Your Honor

1    surely knows, those materials aren't available to the general
2    public.  The general public doesn't have access to my
3    E-discovery platform.  You know, they don't get thrown up on a
4    website or something.
5        So I think it's important because it's actually a
6    distinction that the Fifth Circuit has drawn, Your Honor.  And,
7    you know, one of the cases that defendants rely upon primarily
8    is this *Binh Hoa Le* case from the Fifth Circuit.
9            THE COURT:  Yeah.  I'm familiar with the case.
10           MR. PHILLIPS:  Oh, great.  Well, I just wanted to
11   highlight for the Court that they draw the exact distinction
12   I'm talking about, difference between judicial records, where
13   the Court's been asked to make a decision based on some
14   document, and now that's being obscured from public view versus
15   your run-of-the-mill materials exchange in discovery.  And the
16   Fifth Circuit's very clear that it's a lower bar when you're
17   talking about materials at the discovery stage.  And, again,
18   that's what we're talking about here.
19       As Your Honor's probably seen, there's not a whole lot of
20   authority on motions to preserve in this district.  I think --
21           THE COURT:  Well, and -- yeah.  I mean, the basic
22   reason is because our rule -- our standing order says, look,
23   you don't waive by not fighting this issue out at the
24   preservation stage.  You can fight this issue out when it's
25   time to use the documents, in whatever context.

1          MR. PHILLIPS:  Yep.

2          THE COURT:  Like, you'll file the motion for summary

3    judgment.  There'll be sealed documents.  You file a motion to

4    unseal at the same time.  And then there'll be, like, a

5    redacted version and an unredacted version to try to comply

6    with *Binh Hoa Le* --

7          MR. PHILLIPS:  Right.

8          THE COURT:  -- at the same time as to make our way

9    through thoughtfully on those issues.  It's almost never --

10   it's rare for us to see them in this context.

11         MR. PHILLIPS:  I thought so, too, Your Honor.  In

12   fact, I think the parties, like, collectively cited, like, five

13   cases on the question, some of which I don't think are really

14   that relevant.  So I just -- I want to highlight some of that

15   case law for Your Honor because, like I said, I think, yeah,

16   generally the cases either favor our position or are

17   inapposite.

18       The one I want to highlight for the Court is the *Forbes v.*

19   *San Gabriel Ranch* case.  That's 2023 Westlaw 3467783.  That's

20   this Court from last year, May 2023, before Magistrate Judge

21   Hightower.  As far as I can tell, that's the only case the

22   parties have cited that actually presents this issue, like, in

23   this context, to the Court.

24       And so the question there was a motion to preserve

25   confidentiality.  It was opposed.  And the way Judge Hightower

1    adjudicated that motion was, she looked at the form protective
2    order.  Said, okay.  What's your argument, producing party or
3    designating party?
4        And designating party said, well, these are, you know,
5    proprietary or operational business plans, and the protective
6    order allows us to designate those.
7        Well, Judge Hightower's analysis was, okay.  Well, the
8    protective order says you may designate those as confidential.
9    I'm going to look at the documents or your description of them,
10    or the parties' description of them, to make sure that they
11    actually are that and, having found that they were, quickly
12    granted the motion and preserved the confidentiality
13    designations.
14        You know, we believe that straightforward application of
15    the protective order and its plain language is the correct
16    approach and, really, what dictates the result here.  Again,
17    defendants are not disputing that the materials at issue are
18    things that the protective order says you can designate as
19    confidential.
20        The *Oncology Tech* case, that's 2013 Westlaw 12169359,
21    Western District of Texas 2013, and *Powers*, 2015 Westlaw
22    1758079, this district, 2015, both cited by defendants, I just
23    want to point out to Your Honor that those both involve AEO
24    designations.  They're not --
25            THE COURT:  I'm sorry?

```
1            MR. PHILLIPS:  AEO, attorney's eyes only designations.
2            THE COURT:  Oh, okay.
3            MR. PHILLIPS:  They're not confidentiality disputes.
4   In fact, in both of those cases the parties were not
5   disputing --
6            THE COURT:  That actually anticipated a question that
7   I had.  I did not understand your motion to say that there was
8   a situation where any of these particular documents were
9   attorney's eyes only, so couldn't be shared with, for example,
10  the defendant himself or experts or something like that.
11           MR. PHILLIPS:  Absolutely correct, Your Honor.  I
12  don't believe we've designated any documents in this case
13  attorney's eyes only.  And it is a distinction that matters.
14  As Your Honor is suggesting, when it comes to attorney's eyes
15  only, you're now putting restrictions on, you know, the counsel
16  even being able to discuss and share a document with their
17  client.
18           THE COURT:  Yeah, the workings of the other side in
19  handling their business.
20           MR. PHILLIPS:  Yeah.  Yeah.  And that's just not what
21  we're talking about here.
22           THE COURT:  All right.
23           MR. PHILLIPS:  Again, you know, at this stage of the
24  case, when they're not even trying to file these documents,
25  confidentiality is not putting restrictions on their ability to
```

 1  use the documents in depositions, to share them with experts,
 2  to share them with their client, discuss them with their
 3  client.
 4      It's really just a ban on, you know, writ large, throwing
 5  them out into the public sphere, which I think would be an
 6  inappropriate thing to do in any event.  And, you know, in
 7  terms of, you know, Rule 26(c) and its interest in protecting
 8  parties from, you know, humiliation, annoyance, embarrassment,
 9  those sorts of things, I mean, you can't ignore the overall
10  context of this case.
11      It's a defamation case where, you know, my client -- his
12  view is that he was publicly attacked by the defendant, you
13  know, over the course of several years.  And so, you know, he
14  does have a legitimate concern in producing private
15  communications, about those being used for -- you know, not for
16  advancement of the litigation purposes.
17          THE COURT:  Can I ask you -- I had a question about
18  that, and then I had one technical question.
19          MR. PHILLIPS:  Sure.
20          THE COURT:  My question about that had to do with the
21  other pending case.  Obviously, Mr. Logan is a plaintiff here,
22  but he's a defendant in the other case.  That case is, as I
23  understand it, pending before Judge Albright and Judge Griffin,
24  with an Austin number.
25      Is there any concern -- I don't think it's really expressed

1    in your motion.  But is there some concern that these documents

2    which have been identified as classified could potentially be

3    used in that litigation, or perhaps they've already been

4    disclosed in that litigation under another confidentiality and

5    protective order?

6        I was just wondering how this set of documents -- how

7    that -- how the two interact, if you know.  I know that some of

8    the attorneys are on both cases.  So I'm hoping you can

9    answer --

10           MR. PHILLIPS:  Yeah.  I'm not one of those attorneys,

11   but my understanding is that the other matter has not even

12   really progressed into discovery --

13           THE COURT:  Ah, okay.  So this hasn't even happened.

14   Okay.

15           MR. PHILLIPS:  -- so I do not believe -- yeah.  These

16   would not have been produced in that case.  Whether the purpose

17   of defendants' challenge at this point is because --

18           THE COURT:  Well, and I think defendants' lawyers are

19   different --

20           MR. PHILLIPS:  Yeah.

21           THE COURT:  -- if I'm --

22           MR. PHILLIPS:  No.  That's --

23           THE COURT:  Yeah.  I don't think Mr. -- yeah,

24   Mr. Findeisen, he's not in that case.

25           MR. PHILLIPS:  Correct.

1           THE COURT:  Okay.

2           MR. PHILLIPS:  Again, because I just very honestly do

3    not know why they're raising this challenge at this stage.  I'm

4    just saying, if that is the reason they're doing it, it's

5    possible.  But I have no way of doing that.  I don't know why

6    they're --

7           THE COURT:  So that's -- and that's not a concern that

8    you're trying to raise at this time --

9           MR. PHILLIPS:  No, Your Honor.

10          THE COURT:  -- which that's what I was asking.

11          MR. PHILLIPS:  Correct.

12          THE COURT:  My technical question was, first motion is

13   28 documents and then maybe 97 in the second motion?

14          MR. PHILLIPS:  I believe that's right, Your Honor.

15          THE COURT:  Okay.  That's how we got to our 125?

16          MR. PHILLIPS:  Yes.

17          THE COURT:  I just wanted to know where we were.

18          MR. PHILLIPS:  Correct.

19          THE COURT:  All right.  Got it.  All right.

20          MR. PHILLIPS:  If Your Honor has no further questions,

21   that's all I have.

22          THE COURT:  No.  Those are the main things.

23      Let me hear from the defense on -- defense on these issues.

24          MR. DAVIS:  Your Honor, may I approach?

25          THE COURT:  Sure.

1          MR. DAVIS:  I have a notebook, one for the Court, one

2    for the court clerk, on some of these issues.

3          THE COURT:  All righty.

4          MR. DAVIS:  If I may, Your Honor, given your ruling, I

5    may pull up a different PowerPoint real quick.

6          THE COURT:  Okay.  Take your time.  Get it whichever

7    way you want to present it, Mr. Davis.  Happy to hear from you,

8    sir.

9          MR. DAVIS:  Sure.  And I think you -- hopefully you

10   can see that, Your Honor.

11         THE COURT:  Hold on a second.  Yes.  I got it, kind

12   of.

13         MR. DAVIS:  May I proceed, Your Honor?

14         THE COURT:  Uh-huh.

15         MR. DAVIS:  You know, Judge, a few things were said

16   that I think were important.  Number one, in response to the

17   Court's question about, well, did you choose to disclose

18   certain things and then try to maintain the designation of

19   confidentiality on others?  The answer is yes, as you'll see in

20   a moment.  And so it's kind of like the sword and the shield

21   issue, Your Honor.

22      Now, secondly, Your Honor, we're talking about 125

23   documents.  It's over 2,000 pages.  And the 2,000 pages, Your

24   Honor, do involve chains of communications, some of which have

25   been produced.  And so in this -- in a defamation case --

1          THE COURT:  Well, when you say "have been produced,"
2    have been published?
3          MR. DAVIS:  Have been published.
4          THE COURT:  Portions of them have been published in
5    some other context.
6          MR. DAVIS:  That's right, Your Honor.
7          THE COURT:  I'm assuming all of them have been
8    produced.  They need to have been produced.  Otherwise, it's
9    going to make it for a very long hearing.
10         MR. DAVIS:  They have been produced, Judge.
11         THE COURT:  Go ahead.  Yes.
12         MR. DAVIS:  In fact -- and that answers one question,
13    which is, no one's arguing relevance.
14         THE COURT:  Okay.  All right.
15         MR. DAVIS:  So they're admitting, and they produced
16    them in response, that these are all relevant documents.  In
17    fact, they're critical, Your Honor, not only for their claims,
18    but our defenses.
19       So you heard that there was a principled look at documents,
20    and then the documents were de-designated, except for those
21    that didn't have anything to do with Mr. Findeisen or
22    Coffeezilla.  And that's just not accurate, when we look at the
23    documents themselves.
24       And, Your Honor -- so, first of all, you know, counsel
25    mentioned the *Binh Hoa*, and I know the Court is familiar with

1  that.  Those principles don't apply just when something is

2  filed.  In fact, I think Justice Willett speaks a lot to this

3  in that 2021 opinion.  And I think it governs this discussion

4  as well.

5      There is an argument, Your Honor, well, we're not filing

6  them right now.  Well, we have a motion to dismiss that's

7  pending.  These will be used in our -- in our filings if the

8  motion to dismiss is not granted.  So there's no question about

9  whether they'll be used.  They will be used.  But we're trying

10  to minimize costs on Mr. Findeisen that have been created by

11  this lawsuit.

12      And so you'll see, Your Honor, a lot of what's been

13  designated confidential goes exactly to those issues.  But the

14  *Binh Hoa* court basically gives us a lot of guidance.  It says,

15  you shouldn't keep things confidential just because the parties

16  want to keep things under wrap.  You shouldn't hide it from

17  public view for no discernible reason other than the party

18  wants it that way; that the public's right of access to

19  judicial records is a fundamental element of the rule of law.

20      And, Your Honor, once it's challenged -- and it doesn't

21  matter when it's challenged.  The fact that we're wanting to

22  challenge this now so we can use these documents doesn't change

23  the analysis of whether we come back in a month if the Court

24  doesn't dismiss the case.  What it does is it transfers the

25  burden to Mr. Paul.  And the burden is very clear.  He has to

1  show good cause for continuing to keep things from the public

2  view.

3      And it's interesting to file a defamation suit, to take a

4  citizen, not the New York Times, who's published the same types

5  of allegations, not the BBC, who published the same type of

6  allegations, not the Washington Post, but an individual who's

7  been praised himself in the media, and bring him to court and

8  force him to go through all this, and then say, I don't want to

9  show the public the documents that are relevant and go directly

10  to the defenses that he has and to the claims.  So it is their

11  burden, Your Honor.

12      And they mentioned the -- is it -- the *Oncology Tech* case.

13  And that was Judge Mathy, Your Honor, here.  And she talked

14  about the burden.  And what's important, Your Honor, she

15  recognized that the burden of justifying confidentiality of

16  each and every document lies upon, in this case, Mr. Paul.

17  Instead, what they've given is a conclusory declaration, a few

18  sentences, trying to protect 2,000 pages of documents.  And we

19  mentioned that in our response.

20      And that is not good cause.  Nor have they established what

21  Judge Mathy talked about, the need for a compelling interest to

22  keep from the public otherwise relevant.

23      And so, Your Honor, what we're talking about is, have they

24  met their burden?  And so what's the good cause standard?  The

25  cases that talk about good cause really say, is it national

1   security?  Is it trade secrets?  Is it a business plan?  Is it

2   proprietary?  No one's making that type of argument whatsoever.

3   There's no allegation.  It has to show particularized factual

4   showing of harm.  And there's no even attempt to show that,

5   none.

6           THE COURT:  Well, I have to press you a little bit,

7   Mr. Davis.  Look, I see that as very important for judicial

8   documents.  Transparency's essential.  But until it's -- you

9   can't, like, have this motion and say, well, because we're

10  having this motion as to whether it's confidential, now this

11  is -- now they're judicial documents.

12      Usually I make these determinations when I've got the

13  document in front of me.  And let me be very clear why.  Then I

14  know the context.  Is it really important?  Is it really

15  relevant?  Is it something that has to be -- should -- I mean,

16  is it something that needs to be done?  Should I have to redact

17  it or seal it?

18      It's very hard to do 125 documents and, as you say, 2,000

19  pages in advance as a -- just as a hypothetical matter, without

20  having them being presented to me in some context that I can

21  understand them.  So I'm concerned about that.

22          MR. DAVIS:  Yes, Your Honor.  And the answer to that

23  question and that concern is that it's not incumbent on us or

24  the Court to say, I have to find a reason to keep something

25  public, because the rule is disclosure.  That's why these laws

1    are so important.  That's why *Binh Hoa* is so important.  That's
2    why Judge Mathy had it right in hers.  It's not upon Your Honor
3    to say, well, I think I should keep this under seal.  The press
4    is entitled to it.  The public's entitled to it.

5        It's incumbent upon Mr. Paul, if he wants to conceal
6    something or to keep it under seal or designated confidential,
7    to show good cause.  That's precisely what they're trying to
8    do, is shift the burden.

9        So when Your Honor says, I don't know how to make that call
10   right now, Your Honor, you don't have to make that call because
11   it's incumbent upon Mr. Paul.  So he --

12           THE COURT:  Well, look -- okay.  So what you're saying
13   then, if I'm understanding it, is his claim, these are
14   personal, separate conversations, per se I should just overrule
15   it without looking at any of them.  I'm done.  He hasn't given
16   me a reason.  Because he hasn't given me a reason, we're done.

17           MR. DAVIS:  Not at all.

18           THE COURT:  But that's --

19           MR. DAVIS:  Not at all.

20           THE COURT:  That's what it sounds like.

21           MR. DAVIS:  Let me get through this, Judge, and I'll
22   show you.

23           THE COURT:  Okay.  About to say, you have to give me
24   something to where I can grab on to a particular statement and
25   see what you're talking -- otherwise, it sounds very

1  hypothetical to me.

2          MR. DAVIS:  It is, Judge.  And I'll say, first of all,

3  that when the burden is on the person trying to keep it from

4  the public, the burden is on -- as Judge Mathy said in, I

5  think, footnote 31 of the *Oncology* case, it's page -- it's

6  document by document.

7      But let's look at what they've designated, in answer to the

8  Court.

9          THE COURT:  All right.

10          MR. DAVIS:  So, first of all, the argument is, we just

11  did a limited subset.  The designated communications are

12  directly related to this litigation and no good cause.  I'm

13  going to give you a few examples, Judge.  Here's some examples

14  of what's been designated confidential.  Logan Paul designates

15  as confidential a communication in which he claims,

16  specifically about my client and Coffeezilla, "Bro, I've got

17  nothing to hide."  Okay.  That's directly about my client, the

18  person that's been sued, and it's Mr. Paul talking about, I've

19  got nothing to hide.  Let's keep it transparent.  But it's been

20  designated confidential.

21      Here's another example, Your Honor.  And the actual

22  document -- and that's why I've given the Court a notebook.  So

23  this is in tab 20.

24          THE COURT:  All right.

25          MR. DAVIS:  So these are in a strange format, Judge.

1   It looks like these were downloaded from WhatsApp.

2           THE COURT:  I looked at the sealed documents.  They're

3   very hard to follow.

4           MR. DAVIS:  They're very hard to follow.  I think this

5   is a metadata production of WhatsApp.

6       But here's an example, Judge.  So this is about

7   Mr. Findeisen.  This is about this case.  This is about why

8   this case was brought, Logan Paul saying, "Lawyering up,

9   suing" --

10          THE COURT:  Yeah.  I see it.

11          MR. DAVIS:  -- "this MFer into the ground."

12      So there's a reason why they didn't want to designate this,

13  quote, as confidential.  And there's a reason why Logan Paul

14  goes out, Your Honor, publicly and says, I'm suing

15  Mr. Findeisen.  But he wants to keep this from the public, his

16  actual communications about this lawsuit, about this person.

17      So this notion that counsel is using a very principled

18  approach -- and that's why I showed you, Your Honor, in the

19  previous slide this argument about, the only thing we're

20  designating, Judge, are communications that primarily concern

21  personal or business matters other than the CryptoZoo or

22  defendant's statement.  Well, that's not consistent with their

23  own designations.

24          THE COURT:  Well, I'm just looking at this one, 6773.

25  Doesn't look to me like it's one of the ones they want

1    protected.  I'm just looking at the numbers.  Looks to me, it's
2    6790, 6762 --
3         MR. DAVIS:  If they've agreed to this one, if they've
4    de-designated --
5         MR. PHILLIPS:  I can confirm that, Your Honor.  We
6    de-designated this document, along with, apparently, many other
7    ones he wants to talk about.
8         THE COURT:  Yeah.  That's why I'm asking.  Now -- but
9    now, this other one, the first one --
10        MR. DAVIS:  Let me get to the first --
11        THE COURT:  -- that did look like it was covered.
12   That was 58 through 59, and it looks like in the original
13   motion they're asking to protect 45 through 60.  And that's why
14   I was asking your opposing counsel, look, which ones of these,
15   like -- yeah.  And you see why -- it's going to make this
16   extremely difficult for me either way, unless I have some sort
17   of working system by how we classify or not classify documents.
18        MR. DAVIS:  And I guess, Judge, if -- taking the
19   principle that they used, if there's a document that refers to
20   Mr. Findeisen or Coffeezilla, there's no reason for it to be
21   designated.  If that's what they used.  Maybe they overlooked
22   some, and that's fine.  But they should go back and produce, at
23   a minimum, those -- produce them without the designation.
24        THE COURT:  Right.  Redesignate them.
25        MR. DAVIS:  That's right.

```
1          THE COURT:  Let's -- yeah, declassify them,
2   de-designate them.  Let's use -- because I'll get confused if
3   there's something that hadn't been produced.
4          MR. DAVIS:  De-designate.  They have produced them.
5          THE COURT:  All right.
6          MR. DAVIS:  And look, I'll show you another one,
7   Judge.  And if these have been de-designated, then they can
8   tell me, and we'll skip over this one.  This is Paul 7299-302.
9   Again, these are documents and communications directly about
10  this lawsuit.
11         THE COURT:  Yeah.  I think those have been --
12         MR. PHILLIPS:  That has been de-designated.
13         THE COURT:  -- de-designated.  Yeah.
14         MR. DAVIS:  Then they can tell us if these are also
15  included.
16         THE COURT:  I'm just looking at the list.
17         MR. DAVIS:  The problem is, Judge, we send over
18  letters, and they de-designate some, and then we file some.  So
19  let's see.
20         THE COURT:  Well, no.  I know.  There was two sets.
21  And I've got the --
22         MR. DAVIS:  Right.
23         THE COURT:  -- motions in front of me now.  I've been
24  looking at the documents.
25         MR. DAVIS:  If these have been de-designated, I can
```

```
 1   pass on these as well.
 2           THE COURT:  Yeah.  You can -- I think they're all -- I
 3   mean, unless I'm misreading this, it looks like they're all
 4   de-designated.
 5           MR. DAVIS:  So just for --
 6           THE COURT:  21 wasn't, but 22, 23, 24, all
 7   de-designated, if I'm counting --
 8           MR. DAVIS:  Tab 22, Your Honor?
 9           THE COURT:  Yeah.  7622 --
10           MR. DAVIS:  So 7622, 7623.
11           THE COURT:  Yeah.  They're all --
12           MR. DAVIS:  -- 7624 are de-designated?
13           THE COURT:  Yeah.
14           MR. PHILLIPS:  Just for clarity, did you say -- what
15   tab did Your Honor think was not de-designated as --
16           THE COURT:  Oh, no.  I'm looking at the -- look, I'm
17   looking at the Bates numbers.  I'm not -- I'm sorry.  It was
18   Bates Paul_ZZ0000045 through 60.  It's a 15-page exchange, is
19   what it looks like.  Mr. Davis was relying on 58 to 59
20   specifically to show something, which I'm assuming, if 58 to 59
21   was one that -- it's got to be included in 45 to 60, if I'm
22   counting.  But maybe I'm wrong.  Yeah.
23           MR. DAVIS:  Judge, I think -- and, Judge, Your Honor,
24   these that we're talking about are also -- I think they're
25   included in their sealed appendix.  So if they've been
```

```
 1   de-designated, maybe they were just included by error in there.

 2           THE COURT:  Well, yeah.

 3           MR. CEDILLO:  No.

 4           MR. PHILLIPS:  No.  You do not have that correct.

 5   You're discussing --

 6           THE COURT:  Okay.  Well, wait.  Let's take -- okay.

 7           MR. PHILLIPS:  You're discussing -- you're discussing

 8   documents that we de-designated.

 9           THE COURT:  Okay.  Let's -- we'll take it step by

10   step.  I'll hear back from -- like I said, this is why I was

11   worried about trying to figure it out, as opposed to, like, a

12   document in front of me.

13      Go ahead, Mr. Davis.

14           MR. DAVIS:  So --

15           THE COURT:  But you see what my concern is.  And I

16   know that you're trying to address it, sir.

17           MR. DAVIS:  I do, Your Honor.

18           THE COURT:  Yeah.

19           MR. DAVIS:  So 7622, these are Bates numbers for the

20   record, 7623, 7624, I understand have been de-designated.

21           THE COURT:  As far as I can tell.  Uh-huh.  If not,

22   we'll revisit.

23           MR. DAVIS:  We have 7627, 7630, 7632.  And if those

24   have been de-designated, we get to move on from those, too.

25           THE COURT:  Move on.
```

```
 1              MR. DAVIS:  We had these on a list that were being --
 2              THE COURT:  No, no.  I understand.  Look, I'm not
 3    holding it against anybody.  There's a lot of documents, and
 4    there's two motions.  It's fine.  Also, the tabs may be -- as
 5    you may -- as you pointed out, the sealed -- the sealing part
 6    might be different than the listing part because the sealing
 7    part might include the entirety of an exchange, when it wasn't
 8    actually all --
 9              MR. DAVIS:  And that's --
10              THE COURT:  It's okay.  I'm not -- I'm not going to
11    get mad about that.  Don't worry.
12              MR. DAVIS:  No.  That's the difficulty, Judge.  If you
13    have a couple of exchanges that are designated within a larger
14    communication --
15              THE COURT:  Yeah.  It's fine.
16              MR. DAVIS:  -- it gets difficult.
17              THE COURT:  Yeah.
18              MR. DAVIS:  So we have 6762 through 6767.
19              THE COURT:  Now, that, I don't know.  I'm looking.
20    6762 is still on there.  Nothing else, just -2.
21              MR. DAVIS:  So is 6763 on there as well, Your Honor?
22              THE COURT:  Not that I can tell.  It doesn't look like
23    it.
24              MR. DAVIS:  If they'll -- if they'll represent --
25              THE COURT:  So maybe you've worked out some things
```

```
 1   that --
 2           MR. DAVIS:  We have.
 3           THE COURT:  Yeah.
 4           MR. DAVIS:  6765, 6766?
 5           THE COURT:  I'm looking right now.  No.  Just 62.
 6   Y'all might -- that one page -- look, we might have a page
 7   where there's a dispute, and you should -- it wasn't listed
 8   there, but that's all right.
 9           MR. DAVIS:  Let me show -- and we may be able to get
10   rid of a lot of these, Judge.  So if this is --
11           THE COURT:  Well, now 72 and 73 are protected.
12   They're still classified.  That's under -- there's a -- because
13   that's a series, 61 to 90.
14           MR. DAVIS:  Okay.
15           THE COURT:  So we can talk about those.
16           MR. DAVIS:  Okay.  So we'll talk about these.
17       (Sneezing)
18           MR. DAVIS:  Bless you.
19           THE COURT:  Okay.  Bless you.
20           MR. DAVIS:  So these are -- the ones that you're
21   looking at, Your Honor, are Paul 72, Paul 73, and I guess
22   within a bigger group of 71 through 74.
23           THE COURT:  Uh-huh.
24           MR. DAVIS:  So, you know, these are discussions, you
25   know, directly about -- as Your Honor can see on 73, about
```

1  Coffeezilla.

2      THE COURT:  Well, let me press you on that.  Sounds

3  like potential litigation with Coffeezilla.

4      MR. DAVIS:  Absolutely, Judge.

5      THE COURT:  Yeah.  Because it's about paying.  It's

6  some sort of judgment or what -- something -- I'm assuming

7  that's what that is, but I have a hard time reading these

8  things.

9      MR. DAVIS:  It is, Judge.  It apparently is, is

10  Mr. Paul talking about what his cut would have been.  It's

11  somebody talking to him, which I think is Mike Majlak saying,

12  "You're rich.  It's no problem for me, but I imagine

13  Coffeezilla would have a hard time paying that."  So it's

14  directly about this litigation with Coffeezilla, Your Honor.

15      THE COURT:  Or it sounds like it, anyway.  Uh-huh.

16      MR. DAVIS:  And so then there are other statements,

17  and we'll see if these have been de-designated, that are made

18  in the complaint.  And this is 253.  If that's been

19  de-designated, then we'll take --

20      THE COURT:  Nope.  It's still designated.

21      MR. DAVIS:  It's still designated.  So here's an

22  example, Your Honor.  Again, it goes -- it goes straight to

23  this lawsuit.  And so the idea that there was a -- kind of a

24  filter put on, that said if it mentions Coffeezilla, it's been

25  produced.  Here's an example -- another example of one that

1  hasn't been, you know, directly.  So this would be Paul 253.

2      And this is Paul 7785.  I'm going to have to look to see if

3  this is on the list.

4          THE COURT:  I'm sorry.  Say it again.  77 --

5          MR. DAVIS:  7785, Your Honor.

6          THE COURT:  Nope.  It's been de-designated.

7          MR. DAVIS:  Then, you know, Judge, I think -- I

8  understand this argument about, well, you're not filing

9  something yet.  It's really not the -- it's not the standard,

10  Judge.

11      But I also understand and will take it at his word, that we

12  tried to go back and produce everything that mentioned your

13  client, Coffeezilla or Mr. Findeisen.  And if they're willing

14  to go back and look at that, Judge, then maybe we'll be here

15  fighting over the rest when we file, if necessary, you know,

16  future filings, depending upon the Court's ruling.

17          THE COURT:  All right.  Well, let me ask you a little

18  more nuanced version of that suggestion.  I could imagine some

19  statements referring to your client, referring to Coffeezilla

20  in passing on -- like, opposing counsel suggested, maybe one in

21  a joking context.  But joking or not joking, the distinction

22  would be, to me, is talking about Coffeezilla in some general

23  sense for whatever reason, talking about the litigation in

24  another sense.

25      Also, talking about CryptoZoo, I'm concerned, because in

1  those circumstances, if you're talking about CryptoZoo, the
2  statements of Mr. Paul could be admissions by a party opponent.
3  And it'd be very hard for -- if they're admissions that are
4  being kept confidential, admissions are the sorts of things
5  that you absolutely would want to use -- I mean, they're real
6  easy to use in summary judgment and other documents and
7  cross-examination, all kinds of different ways.
8          MR. DAVIS:  Absolutely, Judge.
9          THE COURT:  And so those are the two things that I was
10 concerned about.
11         MR. DAVIS:  And, Judge, that was our primary concern,
12 because when we saw the position that was taken, that that was
13 the criteria, but then we saw certain things still being
14 designated, that didn't even fit into that own criterion, is
15 what prompts us to be here today.
16     You know, so if there was a totally unrelated, personal
17 communication between Mr. Paul and some friend about where
18 they're going to eat, obviously, if they want to designate that
19 confidential, they can, if we have to use it later.  But the
20 types of communications that Your Honor just described, that is
21 ones mentioning Coffeezilla directly or CryptoZoo, you know,
22 the burden was really upon them to show a compelling need to
23 keep those somehow confidential.
24     And it sounds like -- and I appreciate that.  It sounds
25 like they de-designate a lot of these.  And so maybe what we

1  could do is give them, you know, a list of other messages that

2  mention Coffeezilla, this litigation or CryptoZoo.  And if

3  they'll de-designate those, then I think that'll probably leave

4  a smaller subset to fight over, if ever, in the future.

5          THE COURT:  All right.  Well, let me hear from the

6  other side about that again.  And thank you, Mr. Davis.

7          MR. DAVIS:  And, Your Honor, I appreciate counsel

8  correcting us on some of those, because it's been a mix match

9  of --

10          THE COURT:  No, no.  Look, I'm not -- I'm not going to

11  hold that against you guys.  I was just trying to get to the

12  bottom of it.  But, you know, I did look at them as best I

13  could, but they were very hard to read in the context that they

14  were presented because they're these text orders with all this

15  metadata.  I did also keep the lists in front of me, so I was

16  ready on that.

17          MR. DAVIS:  Yes, Your Honor.

18          MR. PHILLIPS:  Thank you, Your Honor.  Just to start,

19  I want to be real clear on what our approach was.  Like, first

20  of all, I want to make a point, that I think all of the

21  documents that were even originally at issue when it was 253

22  documents, I believe, our position remains that those are all

23  still clearly within the scope of the protective order in terms

24  of what can be designated confidential.

25      But as to the suggestion that we were, you know,

1    unprincipled in our approach to de-designating, which we

2    voluntarily did, you know, again, our approach was not to

3    de-designate anything that mentions, you know, even in the most

4    remote passing, Coffeezilla or CryptoZoo.  That would be, like,

5    every document produced in this case, all the thousands of

6    communications we've produced, because they only get

7    produced --

8           THE COURT:  I would assume that's the scope of the

9    request for production.

10           MR. PHILLIPS:  Right.  They don't hit our search

11    terms.  So, you know, texts about going to dinner, those aren't

12    getting produced.

13        But what I think Mr. Jason demonstrated, as well as I could

14    have, is that where there were documents that really did focus

15    on Coffeezilla or the CryptoZoo project, where that was more

16    than just a passing discussion in a much longer chain, we did

17    de-designate those.  And I think he's illustrated that.

18           THE COURT:  Well, let me ask you about a couple of the

19    specific examples that we just went over.  One was talking

20    about money and how much -- how it would be very hard for the

21    defendant in this case to pay.  I don't know what they were

22    trying to -- I mean, I tried to read these.  I found it very

23    difficult.  So I don't know what the context was.  Is that to

24    pay something else?  Would that be to pay a judgment?  Pay for

25    attorneys?

1          MR. PHILLIPS:  Yeah.  So here --

2          THE COURT:  And so show some, you know, malevolent

3    reason for bringing the lawsuit or anything like that, you

4    know, those sorts of statements.

5          MR. PHILLIPS:  So the first one I had on my list

6    was -- I think it's tab 24.

7          THE COURT:  All right.

8          MR. PHILLIPS:  And there was some confusion about

9    trying to find this one on the appendix, because tab 24 has the

10   Bates Paul 71 --

11         THE COURT:  Yep.

12         MR. PHILLIPS:  -- through, what is it?  74.  So three

13   pages.  The reason we were having trouble finding that is the

14   actual document is Paul 61 to 90.  It's a, gosh, 29-page --

15         THE COURT:  Yeah.  Right.  That's on the list.  Right.

16         MR. PHILLIPS:  But what the defendants have done is

17   they've clipped that 29-page (inaudible) into three pages, to

18   try to illustrate that is a communication all about

19   Coffeezilla.  What I think that actually illustrates is that

20   three out of 29 pages reference Coffeezilla, and the vast, vast

21   majority of that communication is obviously about something

22   else.  And that, again, is our point.

23         THE COURT:  Right.  But the three pages seem like it's

24   right about something important here.  So it's like, how do

25   they -- so, I mean, the idea being, look, you can wholesale, do

1  a giant document about a bunch of stuff, and they're going to
2  have to go through and say -- well, I guess they're doing it
3  right now.  And say, look, we object.  Maybe they need to go
4  through and object specifically to the subset of those pages
5  or -- I'm not exactly sure how -- I'm just wondering -- it's
6  the same question I had of Mr. Davis.  How am I going forward
7  at this time to resolve this sort of issue?
8          MR. PHILLIPS:  I think the -- I think the answer is,
9  there should be a purpose to all of this.  If the defendants
10  wanted to file this document and they wanted to file it with a
11  motion or whatever, and they came to us and said, "Hey, we want
12  to file this document you've designated as confidential.  Would
13  you de-designate it," we'd have to look at that.
14     At that point we'd be saying, all right.  Well, now it's
15  going to be a judicial record.  And so it's not just this
16  abstract -- well, it's not abstract from our perspective -- but
17  this sort of, you know, unparticularized concern we have about,
18  what is it they want to do with this stuff?  You know, are they
19  just trying to blast all of our discovery materials out onto
20  the internet?  What is it they want?  Because we don't know.
21     If we're in a context where they're going to file
22  something, I do think the approach for us is going to be
23  different.  And I said exactly this to Mr. Davis just the other
24  day when we were in depositions.  If you need to file
25  something, come talk to me, because now we're going to be

1    looking at having to justify, not the very low bar of

2    confidentiality under the form protective order, which we do

3    satisfy, plainly.  Now we're going to have to say, well, can we

4    really satisfy the sealing standard, which, as *Binh Hoa Le*

5    says, and we don't dispute, higher standard.

6        So to me the answer is that we shouldn't be doing this in a

7    vacuum, and we should be doing it in a concrete situation.

8    Because I can bet you anything, Your Honor.  They're not going

9    to want to be filing 125 documents, most of which have very

10   little, if anything, to do with this case.

11       At the most, we're probably going to be talking about one,

12   two, maybe.  And we can have that conversation and decide at

13   that time if we really think that that's a document we would

14   contend doesn't meet the stricter standard for sealing in this

15   court.

16           THE COURT:  All right.  And do you think, as a -- I

17   don't know if I would call it a compromise.  But as a -- taking

18   steps as we go through this, you think it's worth -- now that

19   we've got it at 125, and they're specific ones, many of which

20   you've de-designated, but some of which you haven't, that a

21   meet and confer would be appropriate to try to see if we can

22   resolve some of them in advance and see, you know, what's

23   really left and --

24           MR. PHILLIPS:  Sure.  We are always happy to have that

25   discussion.  Like I said, I mean, we, you know, emphasize the

1  point.  Like, this process began with us looking at their

2  letter and going -- me and Mr. Mays, in fact, went carefully

3  through all these documents and tried to whittle them down, and

4  got rid of more than half of them, you know, on our own

5  initiative, to try to narrow the issues.  So always happy to

6  have a good faith discussion about not having to come see Your

7  Honor.

8          THE COURT:  All right.  Very well.  Thank you.

9      Mr. Davis, I had one more question for you, too, that I

10  neglected to ask before.  I'm sorry.

11          MR. DAVIS:  Yes, Your Honor.

12          THE COURT:  I had asked opposing counsel -- I mean,

13  y'all can dispute this.  I'd asked opposing counsel, look, have

14  y'all -- the Logan filings in this case rely -- either the

15  complaint or any other filings in the case relied on any of

16  these documents, any portions of the documents that they now

17  seek to designate as -- continue to designate -- or preserve

18  the designation as confidential?

19      Because if they have, I'd be concerned.  And I don't know

20  if you know the answer to that.  Because the ones to which you

21  were referring, turns out most of those have been

22  de-designated.

23          MR. DAVIS:  No, Your Honor.  I don't think they've

24  referenced or relied upon anything they've designated.

25          THE COURT:  All right.

1          MR. DAVIS:  Our argument was really the opposite, that

2    they've said certain statements.  Some of the things that

3    they've designated contradicts --

4          THE COURT:  Might contradict those statements.  Yeah.

5          MR. DAVIS:  Yes, Your Honor.  But no, I don't -- I

6    don't think that they've actually referenced or are quoting

7    some documents that they're now --

8          THE COURT:  All right.

9          MR. DAVIS:  -- designating, Your Honor.

10      And, of course, to Your Honor's question, we're always

11    available to meet and confer, and will do so.

12          THE COURT:  Followup question, though.  I'm concerned

13    about -- I don't think it would apply.  The motion for judgment

14    on the pleadings, I'm supposed to be looking at the face of the

15    pleadings, both the answer and, of course, the complaint.  I

16    know that you have suggested in your response to this motion,

17    hey, some of the things they say in the complaint are undercut

18    by some of these other statements.  But it's not a situation

19    that that would be relevant to a judgment on the pleadings.  It

20    really is what you said before.  It could be relevant down the

21    road at the next set of whatever those motions might be.

22          MR. DAVIS:  That's right, Your Honor.

23          THE COURT:  All right.

24          MR. DAVIS:  Probably be a Rule 56.

25          THE COURT:  Could be.

1          MR. DAVIS:  And part of our motion for stay was that
2    discovery is irrelevant on the 12(c) motion, Your Honor.
3          THE COURT:  Right.  Or it could be -- like, there
4    could be discovery disputes, to which this would say, look,
5    because he said this, I get to talk to this person, or whatever
6    it might be.
7          MR. DAVIS:  Correct, Your Honor.
8          THE COURT:  All right.  I got it.  All right.  Very
9    well.  Thank you.
10        All right.  The parties may know it's my practice to
11   resolve motions right from the bench, if I can, and follow it
12   up with a written order.  On these two motions, the motions to
13   preserve confidentiality designations, one and two, they're
14   going to be granted in part.
15        I'm going to preserve those confidentiality designations of
16   the 125 documents identified, for now.  I'm going to require
17   the parties to meet and confer within the next 30 days and
18   submit a joint status as to those documents, to see which ones
19   have been resolved.  If there are some that have not been
20   resolved, I may need specific -- I may review them and -- try
21   to review them *in camera*, the sealed documents I have, to the
22   extent I can read them.  I may set it for another hearing
23   because I find it hard to read those documents when they're in
24   context.
25        So that's my ruling on that.  And I'll capture that in a

1    written order.  And I say 30 days.  I don't have the calendar
2    in front of me.  It'll be a day 30 days in the future.
3        Now let me turn to the next set of motions.  These motions
4    have to do with Mr. Sanford's client.  And those motions, as I
5    remember correctly, they were filed in the order, first, that
6    the nonparty, Mr. Kherkher, if I'm saying it correctly, filed
7    his motion to quash and protective order, and then plaintiff
8    filed a motion to compel.  But let me just make sure --
9            MR. SANFORD:  Sure.  Yeah.
10           THE COURT:  -- I got this before I hear from you.
11       The motion to compel is really directed to the defendants'
12   side of those conversations.  In other words, they're
13   conversations between counsel, third party counsel and the
14   defendant.  And so counsel's trying to preserve, say, hey,
15   quash this subpoena, to me.  And plaintiffs are saying, we want
16   to get it from the defendant, if I'm understanding where we
17   are.
18       Is that your understanding, Mr. Sanford?
19           MR. SANFORD:  Yes.  Although I read the discovery
20   request to have been submitted from Paul to Findeisen several
21   months before Kherkher was involved.
22           THE COURT:  Oh, no.  That's quite possible.
23           MR. SANFORD:  Yeah.
24           THE COURT:  No.  I can understand that.  Thank you.
25       Let me just check with plaintiff's counsel.  Is that -- am

1  I getting it right as to which way the motions are aimed?

2          MR. MAYS:  That is correct.

3      But just to clarify, Your Honor, were you suggesting that

4  the request to Mr. Kherkher was only seeking Mr. Findeisen's

5  messages?  I just wanted to clarify that that's not the case.

6          THE COURT:  No.  Well, I'm wondering -- I'm going to

7  be asking both parties the extent which -- how much of these

8  are duplicative of each other.  And so I need to know.

9      But the real reason I was asking is I usually take them in

10  the order filed.  And I was wanting to make sure if I

11  understood where we were, if I could.  I think I can take them

12  in the order filed.  I just needed to know.

13          MR. MAYS:  Understood.  Correct, Your Honor.

14          THE COURT:  All right.  So I was going to hear from

15  Mr. Sanford first, if I could.

16          MR. SANFORD:  I think that the lawyers would all agree

17  that they are perfectly duplicative.  I think that what has

18  been requested of Mr. Kherkher was also requested of defendant

19  *in toto*.

20          THE COURT:  Okay.  All right.

21          MR. SANFORD:  So if I may --

22          THE COURT:  No.  Go ahead.

23          MR. SANFORD:  -- Your Honor.  Let's just assume that

24  the following facts tell the story of how we got to where we

25  are.  Logan Paul and some friends launched a crypto

1  game/currency starting in 2020 or 2021.  It didn't work.

2      In 2022, near the end of the year, they were outed by an

3  investigative journalist online.  And in response to that

4  outing -- sorry -- Mr. Kherkher acquired -- or not "acquired."

5  What's the word?  Well, he acquired the information about the

6  lawsuit from this outing.

7      He socially knows the defendant in your case here, and they

8  developed an agreement and a relationship, by which

9  Mr. Findeisen would become a consulting expert, a

10  non-testifying expert for Mr. Kherkher.

11      Mr. Kherkher filed a lawsuit, which is not in front of this

12  Court.  But assume that for the purposes of what's at stake

13  here there is between a 22 and a $27 million fraud perpetrated

14  by Mr. Paul and his friends on Mr. Paul's fans.  And

15  Mr. Kherkher represents a class of people, or a proposed class

16  of people -- in fact, I think he actually represents a hundred

17  or 125 of those people prior to class certification.  They're

18  seeking to recover that money.

19      He has a relationship with Mr. Findeisen in which they are

20  exchanging communication with each other so that he can have

21  the best possible understanding to prosecute his clients'

22  claims against Mr. Paul.

23      Mr. Paul wants the communication between Mr. Kherkher and

24  Mr. Findeisen, but he doesn't want it for the reasons that have

25  anything to do with this case, because, as we pointed out in

1    our briefing on Page 8 of Document 80, in the --

2             THE COURT:  Other case.

3             MR. SANFORD:  -- in the case called Holland v.

4    CryptoZoo, Mr. Paul's lawyers said, in writing, they would go

5    to Mr. Findeisen in their litigation against him and get the

6    communication between these two men here.

7        I'm not sure what's up.  I think that they believe that

8    Mr. Kherkher has promised to pay Mr. Findeisen, and they want

9    proof of that.  Like, I'll give you a cut of this lawsuit if I

10   win it.  So they're just fishing around for something kind of

11   shady, or they really just are trying to harass Mr. Findeisen,

12   like it appears, from the text messages that the Court has

13   looked at today, was the plan all along from the case that

14   actually is in front of the Court.

15       We got a subpoena in late February.  We filed a motion for

16   a protective order and to quash the subpoena.  We have raised

17   the defenses of attorney work product and specified that this

18   is a non-testifying expert.

19       Mr. Findeisen was responding to the same request and

20   provided the written communication between these two men,

21   which, arguably, was not subject to that non-testifying

22   consultative expert witness relationship, which is from

23   December of '22 until January of '23, when Mr. Kherkher asked

24   him to become his consulting expert.

25             THE COURT:  Okay.  Wait.  You have to read me back

1    into that.

2            MR. SANFORD:  Yeah.

3            THE COURT:  So the communications are before the

4    expert -- consulting expert agreement?

5            MR. SANFORD:  There were some communications before

6    that.  And those, to my understanding -- and I'll let either

7    party correct me.  Those have been turned over, not by

8    Mr. Kherkher, but Mr. Findeisen and his attorneys, in response

9    to what I'm saying is a duplicative discovery request, as it

10   relates to Mr. Kherkher.

11           THE COURT:  So to your understanding, is there stuff

12   that Mr. Kherkher has that needs to be protected, or has it all

13   been disclosed?  You think there's some stuff still out --

14           MR. SANFORD:  There is nothing that hasn't been

15   disclosed from that window of time before the hiring --

16           THE COURT:  From that window of time.  All right.

17           MR. SANFORD:  And there is nothing that -- there is

18   nothing that has been disclosed from after that, because

19   Mr. Findeisen, through his lawyers, believe, and I think they

20   are correct, that the attorney work-product privilege asserted

21   here today by Mr. Kherkher is not Mr. Findeisen's to waive or

22   not waive.

23           THE COURT:  All right.  So that's -- the world of

24   documents then are the post-January '23 --

25           MR. SANFORD:  Exchange of messages, exchange of

 1  information.

 2          THE COURT:  -- exchanges, whatever -- okay.

 3          MR. SANFORD:  Exactly.

 4          THE COURT:  Let me ask, is there a consultation

 5  agreement that's been reached between the parties, and has that

 6  been disclosed or not disclosed?

 7          MR. SANFORD:  My understanding of the facts are that

 8  Mr. Kherkher prepared a written document, saying, I want to

 9  hire you for X dollars per hour, and Mr. Findeisen's response

10  was, I don't want your money.  I will do the work.  I will not

11  charge you, and thereafter laid into the work, lots and lots

12  of --

13          THE COURT:  Yeah.  But no other -- no formal

14  agreement?

15          MR. SANFORD:  No signed formal agreement where

16  Mr. Kherkher is obliged to compensate Mr. Findeisen.

17          THE COURT:  All right.  Anything signed by

18  Mr. Findeisen at all, to your knowledge?

19          MR. SANFORD:  No.

20          THE COURT:  Okay.  And I'll be clear.  Why I'm asking

21  is, the things that Mr. Findeisen says, again, just like I

22  asked the other side for Mr. Paul, they could be admissions by

23  a party opponent to the extent that they have some relevance to

24  the case.  And so I have to be careful.  I'm very concerned

25  about attorney-client privilege -- or attorney work-product

```
 1   privilege.  That's what this is here.  Though, I had one
 2   question about that.
 3        But on the other hand, if they're statements that -- even
 4   if it's an expert.  If it's statements that they're making,
 5   that are relevant to this case, I have to be considering that.
 6              MR. SANFORD:  Yes.
 7              THE COURT:  So that's why I was asking that question.
 8        But that was -- that related to the other issue.  As part
 9   of this expert consultation, did Mr. Findeisen have any
10   discussions with the parties themselves in the other case, in
11   other words, the plaintiffs in the fraud case, in Austin?
12              MR. SANFORD:  I am not in a position to answer on
13   that.
14              MR. KHERKHER:  (Inaudible).
15              THE COURT:  You don't think -- Mr. Kherkher says no.
16              MR. SANFORD:  Okay.  Yeah.
17              THE COURT:  So okay.  You see what that --
18              MR. SANFORD:  Yeah.
19              THE COURT:  Because that would be a little bit
20   different circumstance.  All right.  Very well.
21              MR. SANFORD:  Although, arguably, that would be
22   relevant only in the case called Holland v. CryptoZoo, which is
23   not before Your Honor.
24              THE COURT:  Oh, no.  No.  No.  I'm not --
25              MR. SANFORD:  And so it's -- yeah.
```

1    THE COURT:  No.  I'm not saying they should be -- no,

2 quite the contrary.

3    MR. SANFORD:  Yeah.

4    THE COURT:  I'm very concerned about disclosing them.

5    MR. SANFORD:  Yeah.

6 If you're going to disrupt the attorney work-product

7 privilege and you're in Mr. Paul's position, you need to

8 demonstrate a really, really good reason why you need it.  But

9 he went to another judge already and said he wanted that

10 information so he could resist the claims of the plaintiffs in

11 the Holland case.

12    So what he needs to do is take this exact same request to

13 the judge who's presiding over that attorney's work product.

14 And the privilege that Mr. Kherkher has is in front of this

15 Court.  But the actual result of the work product is in front

16 of a judge in Austin.  And this is not the correct place to ask

17 for that.  It's not your fight.  It's Judge Albright's fight,

18 in my opinion.  They could go ask Judge Albright to agree with

19 them that attorney work product just doesn't matter anymore,

20 and we want to see what's going on behind the -- behind the

21 curtain with this consulting expert.

22    They haven't done that yet.  Maybe they will later.  I

23 don't know.  But I think this Court is on very solid ground to

24 deny the request and let them go over there and take it up with

25 the judge who's got that case.  And it might be the better path

```
 1   for a court who doesn't want to put his finger on the scale of
 2   another judge's proceeding.
 3           THE COURT:  Well, two -- thank you.  Two questions.
 4   You seem to believe -- and I guess -- I mean, you've looked at
 5   their motion to compel -- that there's a perfect -- it's the
 6   same documents that we're talking about, a small set, and it's
 7   the same set at issue in both motions that are before me, to
 8   your understanding.
 9           MR. SANFORD:  That is 100 percent my understanding.
10           THE COURT:  Okay.  How many -- and, also, it sounded
11   like we're not talking about a lot of communications.  How many
12   pages are we talking about, to your understanding?
13           MR. SANFORD:  I think it's 16,000 lines of --
14           THE COURT:  That's something.
15           MR. SANFORD:  -- communication, but I --
16           MR. KHERKER:  (Inaudible).
17           MR. SANFORD:  Okay.  Well --
18           THE COURT:  Why don't you consult with your client.
19           MR. SANFORD:  Yeah.  I will.
20           THE COURT:  He'll tell you what his view is, because
21   he'll know.
22           MR. SANFORD:  Yeah.  It is contained -- that number is
23   in the argument presented by one of these three groups here.
24           THE COURT:  All right.  Well, I can -- I'll ask --
25           MR. SANFORD:  So I'll go study it and figure it out.
```

1          THE COURT:  That's fine.  And I'll go around the room,
2     and I'll try to find out the answer to that question.
3       All right.  Thank you, Mr. Sanford.
4          MR. SANFORD:  Thank you, Your Honor.
5          THE COURT:  I'm going to go around this way.  I'm
6     going to go to plaintiff since they can respond to that motion.
7     I'll ask you also to address your motion.  And then I'll get
8     Mr. Davis or his colleagues to respond to that part, if that's
9     okay.
10         MR. MAYS:  Very good.  Sounds good, Your Honor.
11      Good afternoon, Judge.  Just, again, for the record, my
12    name's Jason Mays.  I represent Logan Paul.
13      So the communications that are at issue are not work
14    product, and they're not protected expert consulting
15    disclosures.  And I'm going to explain why.
16      Now, by claiming these protections, what defendants and
17    Mr. Kherkher are trying to do is essentially wave a magic wand
18    and turn Mr. Findeisen, who is a third party, independent
19    witness, into an expert so that they can immunize his
20    communications from discovery.  And the Court should not let
21    them.
22      If there are specific issues, obviously, the Court can
23    interrupt me.  But I think it might be helpful if I provide
24    some context for the communications.
25      Sorry.  Just one moment, Your Honor.

1    So, Your Honor, at the -- at the end of 2022, defendants

2    released their three-part series on CryptoZoo.  And from there,

3    we know from the limited exchanges that counsel did reference,

4    between December 2022 and late January 2023, that there was

5    some communications that had been produced between Mr. Kherkher

6    and Mr. Findeisen that show that basically Mr. Findeisen put

7    Mr. Kherkher in touch with some of the sources he'd spoken to

8    for the investigation.  And about a month -- a little over a

9    month later Mr. Kherkher, on behalf of the Holland plaintiffs,

10   filed the lawsuit, in a complaint basically that repackages the

11   YouTube series in the form of a complaint.

12       And so now Mr. Kherkher and defendants claim that

13   Mr. Findeisen was engaged as an unpaid consulting expert, as

14   counsel said, which I'll come back to.  And in the meantime,

15   after --

16            THE COURT:  Well, I did have a question about that.

17   Mr. Sanford suggested that there was an exchange saying, "Look,

18   this is the proposed arrangement."  This is why I asked the

19   question.  And Mr. Findeisen said, "Look, I don't want to be

20   paid," which is fine.  But have you seen this exchange between

21   them?

22            MR. MAYS:  No, Your Honor.  And so we're learning

23   facts here today in argument --

24            THE COURT:  All right.  Go ahead.  I just was

25   wondering.  That's what I was wondering.

1          MR. MAYS:  Right.  No conferral by Mr. Kherkher before

2    his motion, unfortunately.  And there's a lot that we --

3    there's a lot of questions we have about this expert

4    engagement, that we're trying to piece together as well.

5          And so the case is filed -- the Holland case is filed

6    February 2nd.  Mr. Kherkher and Mr. Findeisen proceed, in the

7    months that follow, to continue publishing content about the

8    case, including content that includes their thoughts on the

9    case, including, as the Court can see, February 6th,

10   Mr. Kherkher publishes a YouTube video talking about different

11   thoughts that he has on litigation strategy in Holland.

12         In the meantime, a couple months later, in a recorded

13   conversation that we've obtained in discovery, Mr. Findeisen

14   tells one of the sources from his own investigation that he has

15   no affiliation with the Holland case.  In fact, he has -- he

16   said, to use his exact words, he's discussed with counsel but,

17   quote, not in an official capacity.  He has no stake in the

18   case.

19         And so, as the Court can see, each of the statements, and

20   they're bolded in red, that are underlying my client's libel

21   claims in this case, June 29th, June 30th, January 5th, were

22   made at a time where now he's claiming that his communications,

23   his private communications are protected from discovery because

24   he was supposably a pro bono expert during this time period.

25         So what they're asking the Court to do is preclude

 1  discovery into his private communications about the exact
 2  topics that he's making statements about publicly and that form
 3  the basis of this case.
 4       And if the -- if the Court looks at the redacted
 5  communication string, actually, that accompanies our motion, in
 6  some instances we're talking about back and forth that took
 7  place on the exact same day as the communications that are at
 8  issue.  And the Court will also see from their -- I think
 9  counsel got confused about the scope, the volume of materials
10  we're talking about.  He said "16,000."  16,000 refers to the
11  length of defendants' privilege log in this case, because these
12  aren't the only communications that defendants are withholding.
13  In fact, they've produced almost zero communications between
14  Mr. Findeisen and third parties about CryptoZoo or plaintiff,
15  because if they're not work product, they're investigative
16  privilege, they're journalist privilege, they're whatever else
17  it is.
18       And so the point, Your Honor, is that plaintiff has to be
19  entitled to discovery to prove his claims in this case.  And
20  the claims, the libel claims require demonstrating that when
21  Mr. Findeisen made these statements at issue, he did so with
22  actual malice.  And the way you prove actual malice is to show
23  evidence of what Mr. Findeisen actually believed and understood
24  at the time he made the statements.  The way to do that is
25  through his contemporaneous communications, which are at issue

```
 1   here.  He's trying to withhold all of them.  We've received
 2   basically no third party communications.
 3        And so why these communications specifically, though, with
 4   Mr. Kherkher?  We believe Mr. Findeisen targeted Mr. Paul
 5   because of his celebrity status, because of his disdain for
 6   him, because he believed that by publishing on Mr. Paul, he
 7   would be increasing his own profile in the process, and that
 8   part of this, which shows actual malice, is that he facilitated
 9   this lawsuit, repeating false accusations that Mr. Paul had
10   engaged in fraud in order to perpetuate this narrative, give
11   his own content momentum and keep the false narrative alive.
12        So I submit these are very relevant to the case.  The
13   context should put to rest the idea that this is just some
14   harassing content -- harassing subpoena for content that only
15   has to do with the Holland case.
16        What counsel mentioned, by the way, the filing that he's
17   referring to, there was no -- discovery hasn't commenced in the
18   Holland case.  It's a PSLRA case.  It's in the motion to
19   dismiss stage.  And discovery would only commence after --
20            THE COURT:  I had a question about that.  Is it a --
21   sometimes in those cases you'll have a bifurcated discovery
22   practice.  There'll be discovery over the class certification
23   issues before you get to merits discovery.  To your
24   understanding -- I don't know -- Judge Griffin, I thought, had
25   the case referred to him.  Has either Judge Griffin or
```

1    Judge Albright talked about how that structure is going to be
2    in that case, to your understanding?
3            MR. MAYS:  I don't believe we've gotten to that stage
4    yet, Your Honor, is my understanding.  But discovery -- no
5    discovery has taken place in that case.
6        And what counsel is referring to, about plaintiff making
7    some notion about wanting to seek discovery from Mr. Kherkher
8    in that case, the context for that was a reference to the video
9    that Mr. Kherkher posted on January 4th, 2024.  That was around
10   the time that the Holland plaintiffs moved to amend their
11   complaint.  And plaintiff raised -- opposed the motion to amend
12   for failing to confer, and noted in that -- in that opposition
13   that there seemed to be prioritizing of generating publicity
14   over the -- over the lawsuit rather than conferral, something
15   to that effect.  It was docket entry 62 in that case.
16       So there was no shooting down of discovery that overlaps
17   with what's being sought here.  There's no movement on
18   discovery front at all.  And for the reasons that I've stated,
19   Your Honor, it is very, very relevant to this case.  I think
20   Mr. Kherkher and his counsel are sort of making themselves the
21   main character, as though the intent behind these discovery
22   requests are him, when, in fact, that's not the case.
23           THE COURT:  Well, I have to ask you -- I mean, I
24   recognize what -- and I pointed this out, that Mr. Findeisen's
25   statements could be very relevant to the case.  On the other

1    hand, y'all represent -- Mr. Kherkher's the opponent and, you

2    know, opposing party in that other case.  And so this -- I'm

3    very fearful that -- even if discovery hasn't started then, is

4    that this could be a backdoor way to get some discovery before

5    the discovery process even starts or it's been controlled in

6    any way by the Court, that you're getting right to some

7    documents from the attorney on the other side.

8        Imagine -- flip it around.  Imagine if they were asking for

9    your documents and that, you know -- or one of your colleagues

10   who wasn't on that case, and asking for their documents with

11   Mr. Paul, and there'd -- be of great concern.

12        MR. MAYS:  I completely understand.  We are very

13   mindful of the -- of the posture.  But it doesn't mean that my

14   client can't obtain the discovery he needs that goes to the

15   element of his claims.  We just have to find a way to do it in

16   a way that protects everyone's interests, if possible.

17        And so, in fact, the same reasons that I've just laid out

18   are reasons why, even if the Court finds that these materials

19   are work product or consulting expert disclosures -- and in

20   some ways I think the parties' briefs are like ships in the

21   night, because in our view they haven't even responded to the

22   reasons that we raised why they're not at all and that these

23   rules don't even apply, but to the extent the Court disagrees

24   and finds they are, we still have a substantial need for these

25   materials for the case anyway.  And that's the standard,

1  substantial need for the materials and no other way to get them

2  or their equivalent by any other means --

3          THE COURT:  Well, that was --

4          MR. MAYS:  -- and they should be compelled anyway.

5          THE COURT:  Actually, that anticipated my next

6  question.  Isn't the other means, to get them from plaintiff

7  instead of getting them from Mr. Kherkher?

8          MR. MAYS:  Well, so --

9          THE COURT:  And that was -- that was my question for

10  Mr. Sanford.  Are they identical in your request to compel, or

11  do they really cover the same documents?  You suggested perhaps

12  not.  And that was -- I wanted to hear from you on that.

13          MR. MAYS:  No.  Let me correct myself if I created

14  that impression.  They do -- they are seeking the same

15  documents.

16          THE COURT:  Okay.  All right.

17          MR. MAYS:  I understood the Court -- it's irrelevant.

18  I was misinterpreting the Court.

19          THE COURT:  Happens all the time with -- I'm hard to

20  understand.

21          MR. MAYS:  And so, Your Honor -- so I think that

22  addresses -- I sort of went -- I took things in reverse and

23  explained to the Court context for the communications, why

24  we're seeking them and why, even if they are work product, the

25  Court should compel them anyway.

1    But, Your Honor, these are not -- a party -- so moving on

2    to the substance, a nonparty cannot invoke the work-product

3    doctrine.  Per many cases that we cited within the circuit and

4    elsewhere and federal treatises, a nonparty cannot invoke the

5    work-product doctrine to protect materials that were prepared

6    for them in another case, when they are not a party to the case

7    before the Court.

8    And so -- and so Mr. Kherkher does not even have the

9    ability, per the case law that we cited, to even raise a work

10   product assertion as a basis for not producing materials in

11   this case.  And so we raised all these authorities in our

12   response.

13   And the only way that counsel or Mr. Kherkher addressed

14   that in their reply was one line that said that the *Lee* case we

15   cited was dicta.  But we cited maybe ten cases and a treatise.

16   The *Lee* case itself cites five more cases within Fifth Circuit.

17   One of those cites the Fifth Circuit itself, saying that you

18   have to be a party before the case.  This is -- this is not

19   some crusty, obsolete principle.  This is, you have to be a

20   party before the case to raise the issue.

21   THE COURT:  Tell me, in those cases, are they cases

22   where there's been a subpoena sought from an attorney -- not

23   from the other party, but from the attorney for the party?

24   Because it's like, you, attorney, give me your client's stuff.

25   And that's of concern, when attorneys usually don't like when

1  they get told to give their client's -- up their client's
2  stuff.
3      Now, a nonparty other person, you know what?  I'm hearing
4  you.  That's the distinction that I'd like to -- and I'm going
5  to have to focus in on in trying to resolve the issue.
6          MR. MAYS:  Sure.  And to be candid, Your Honor, I
7  would have to doublecheck to see if the --
8          THE COURT:  Fair enough.
9          MR. MAYS:  -- nonparties were attorneys.
10         THE COURT:  All right.
11         MR. MAYS:  And so what the case law says, and I can
12 circle back, is work product must be prepared for a party in
13 the case, which also means that defendants cannot raise the
14 work product assertion because there's one thing that --
15         THE COURT:  Oh, no.  I'm fine with you on that.  I
16 would press Mr. Davis if he's going to say this is their
17 work -- how could it be?  I don't understand how that would
18 work.
19         MR. MAYS:  Right.  Okay.  So --
20         THE COURT:  Yeah.  I agree with -- I mean, I think --
21 I'm hoping that's not where we're going to -- the hill we're
22 going to die on today.  We'll see.  You never know.
23         MR. MAYS:  Okay.  Well, I mean, part of the issue,
24 Your Honor, is that we don't actually know either what hills
25 we're going to die on because the briefs were just -- just did

1   not address each --

2          THE COURT:  Well, you know, there's -- and they're

3   going -- that's why I started my question, which way they were

4   pointing at.  Again, as with the other claim, we have the two

5   sets of documents, I'm not holding that against any parties.

6          MR. MAYS:  Right.  And so, you know, no cases cited in

7   which a nonparty, attorney or otherwise, work product assertion

8   was sustained as a basis for withholding discovery.  We submit

9   that, for that reason alone, the Court should find that there's

10  no work product assertion to sustain here and overrule it.

11         THE COURT:  All right.

12         MR. MAYS:  But in any event, if the Court looks behind

13  the hood, it's not actually work product because neither

14  Mr. Kherkher, nor the defendants have actually substantiated

15  that the communications we're talking about, through a proper

16  showing, actually qualify as work product.

17     So the description offered of the materials basically

18  tracked the language of what work product is.  They say, this

19  is -- this is prepared for the primary purpose of preparing for

20  litigation at the direction of counsel, but without any more

21  that would allow us to actually test whether that's the case.

22         THE COURT:  Can I ask you a question about that?

23         MR. MAYS:  Of course.

24         THE COURT:  I was looking at -- you had attached to

25  your motion to compel -- not the response but the motion to

1    compel -- a declaration by Mr. Findeisen that I was relying

2    upon in trying to articulate which documents were which.  And I

3    was -- I thought that he had -- in that statement had

4    specifically talked about the documents.

5        Are the documents that we're really -- it looked to me like

6    communications labeled as 104 and attachment 105.  I'm not

7    exactly sure.  I thought those were the documents we were

8    talking about.  And there may be some additional ones.  I just

9    want to get my hands on exactly what documents we're -- to your

10   understanding, we're talking about.

11            MR. MAYS:  Right.  So I believe I can provide clarity

12   on that.  So 104 and 105, my recollection is that refers to the

13   email exchange from the end of January that counsel for

14   Mr. Kherkher referred to, in which a draft or actual agreement,

15   I don't know, was presented to Mr. Findeisen.

16            THE COURT:  And then Mr. Findeisen responded as -- at

17   least as far as we know, as was described by Mr. Sanford?

18            MR. MAYS:  Right.

19            THE COURT:  Okay.  Got you.

20            MR. MAYS:  And the other -- the only other piece

21   that's at issue in the motion is the redacted text string,

22   which is Exhibit 2 to the motion to compel.

23            THE COURT:  So it's really like --

24            MR. MAYS:  So that would be 62-2.

25            THE COURT:  I saw -- you know, I have a hell of a time

1    reading those things.  I saw there was a lot of redactions.
2    That's the stuff that you were wondering about?
3              MR. MAYS:  Correct.  62-2.
4              THE COURT:  Yeah.  Got it.
5              MR. MAYS:  And everything after January 26th is
6    redacted.  So everything from that point forward, according to
7    defendants and Mr. Kherkher, are work product.
8              THE COURT:  Got you.
9              MR. MAYS:  And so we have a conclusory description of
10   these materials.  Mr. Kherkher, as -- what I believe everyone
11   agrees is the privilege holder, hasn't submitted a declaration
12   himself or any other evidence, which is his burden to do.  They
13   haven't provided the actual engagement agreement.  And as the
14   Court can see from the interrogatory responses that we've
15   propounded to defendants, which were attached to our reply at
16   69-1, they've also objected to providing any information about
17   the engagement itself, including the scope of services that are
18   even provided, like an expert.  An expert in what?  What is he
19   actually doing for the case?
20      So there's no way to actually test the work product
21   assertion.  And for that reason, Your Honor, we submit that it
22   hasn't been substantiated, and the Court should overrule it.
23             THE COURT:  All right.  Last question.  Then I'll get
24   to the third party in this exchange, if I could.  It looked to
25   me from that redaction -- I'm doublechecking now -- that

really, the work-product privilege claim -- I hope I'm reading
this correctly -- this really goes until February 9th, and then
maybe it changes back.  But then a lot of the privilege claim
is a -- there's two claims.  It's work product, plus
journalistic privilege.

    And so I'm wondering, even if I were to -- and, I mean,
there might be some that come later that are not -- that are
just work product.  I didn't go through all the details of each
one.  But I'm wondering, if I do -- you see what my question's
going to be.  Even if I say, you know, you're right.  These
things shouldn't be work product.  But then there's this other
privilege.  How do I address that issue?

            MR. MAYS:  Right.  So the journalistic privilege would
have to be a fight for another day.  So if the Court were to
grant our motion, then the portions that related to work
product or the consulting expert privilege, which I need to
address, would be unredacted.  And then the other portions
would --

            THE COURT:  The journalist -- the parts that have a
dual privilege claim could remain redacted at that point,
subject to --

            MR. MAYS:  Right.

            THE COURT:  -- some later fight.

            MR. MAYS:  Right.

            THE COURT:  And that would be, I gather -- doesn't

1    matter which -- does it matter in that context which person?

2    Because, you know, we say, well, Mr. Kherkher doesn't have a

3    journalistic privilege.  It's like the flip side of the other

4    argument you just made, you know, that --

5              MR. MAYS:  Right.

6              THE COURT:  -- your guy's a party, but Mr. Kherkher's

7    not a party.  So we get -- so there's no work product.  Then

8    you'd say, well, Mr. Kherkher's not a journalist, so there's no

9    work -- I mean, really?

10             MR. MAYS:  Right.  It would -- it would be for -- I

11   think -- I think Your Honor's idea is correct as to how the

12   argument might proceed.

13             THE COURT:  All right.  Okay.  You see why -- thank

14   you.  You see why I was asking the question, sir.

15             MR. MAYS:  And so I'm mindful of, you wanted to hear

16   from everyone.  So I just -- I do want to say, on the

17   consulting expert --

18             THE COURT:  Yeah, sure.

19             MR. MAYS:  -- 26(b)(4), which is other basis for

20   withholding these materials, the Advisory Committee notes to

21   that -- to Rule 26(b)(4) make clear that it does not apply to

22   experts who came into an expert engagement with knowledge of

23   the subject matter that they will be offering their expertise

24   on.  And Mr. Findeisen's declaration makes clear that that's

25   the case here.  And they actually did not respond to that.  So

1    for that reason alone, and others as set forth in our briefs,

2    the consulting expert disclosure privilege is inapplicable.

3           THE COURT:  All right.  Very well.  Thank you.

4     Mr. Davis, I don't know if it's you to respond on these

5    things.  I'm happy to hear from you as well.  And I'll go --

6    and I'll go all the way back around the room.

7           MR. DAVIS:  Sure.  No, Your Honor.  This will be

8    brief.

9     I mean, I think we agree on one thing, is the privilege

10    holder is Mr. Kherkher.  But I do think that the affidavit of

11    Mr. Findeisen has established, you know, the attorney work

12    product and consulting expert.  But it's Mr. Kherkher's

13    privilege and, therefore, we've put that on our log.

14     The other issues, Your Honor, are going to be for another

15    day, on the journalistic.  So that's basically all we have,

16    Your Honor.

17           THE COURT:  Well, let me just ask you, two things

18    about the privilege is -- let's assume I grant Mr. Kherkher's

19    motion to quash.  They still have the motion to compel from

20    you.  So, you know, Mr. Kherkher, he doesn't have to disclose

21    anything.  But your guys made some statements.  And so, you

22    know, you see why -- that part is his.  But I could grant that.

23    That doesn't -- does that -- how does that directly resolve the

24    plaintiff's motion to compel you to give them your clients'

25    statements?

1          MR. DAVIS:  It's an interesting issue when you have

2   two pending suits.  So it's kind of like -- and I've never seen

3   this before, in 30 years.  But I've never seen kind of a

4   cottage industry, I'm going to sue your consulting expert over

5   here.  And I know that's not the reason for the suit.  But I'm

6   going to sue them over here and try to get information that I

7   cannot get and have not tried to get directly in the suit

8   that's pending.

9       And so, Your Honor, I think if you found that the

10  consulting expert and attorney work product covers these

11  materials, it applies to both.  It doesn't -- it doesn't answer

12  the rest of the questions which would be those that we're not

13  claiming, or at least Mr. Kherkher's not claiming kind of

14  attorney work product, that may fall under some other privilege

15  that will be decided in this case, like on the journalistic

16  privilege, Your Honor.

17         THE COURT:  That's the one I was thinking.  That's the

18  one I saw in there.

19         MR. DAVIS:  Sure.  You know, and the motion, it ended

20  up working out on those other issues.  The reason why that

21  motion isn't set today is that they subpoenaed a couple of

22  sources who produced those -- that information independently,

23  you know.  And so we'll have another day here, or that'll get

24  worked out without need to come back to the Court.

25      But I don't think that if the Court found that there's

1  consulting expert or attorney work product protection, then
2  somehow it loses that just because they have sued for it in a
3  different proceeding.
4          THE COURT:  All right.  And then, can you -- the last
5  question is, you may have the best grip -- Mr. Kherkher, too.
6  But you may have the best grip on exactly what's the -- how
7  many documents are we talking about?
8          MR. DAVIS:  I was trying to answer that question by
9  looking --
10          THE COURT:  Because 104, 105, how many pages are they?
11 How many -- I see this large redaction.  But how many of it's
12 really just the work product redaction and not some other sort
13 of redaction?
14          MR. DAVIS:  I don't have the log in front of me.  I
15 think we've listed it by the number of pages.  But if I can
16 consult and maybe get that number.
17          THE COURT:  Yeah.  Sure.  No.  Go ahead.  Thank you,
18 sir.
19     (Discussion off the record)
20          MR. DAVIS:  Maybe I'll leave it for Mr. Kherkher, Your
21 Honor.  But I know we've put it on our log, you know, and where
22 we've claimed this, and we've, you know, stated very plainly,
23 you know, it's not our privilege to waive.
24          THE COURT:  And I'll be frank.  I did not -- it may be
25 before me.  I did not look at the log specifically.  I looked

1   at your client's declaration, which I found helpful in kind of

2   identifying what we were talking about.

3           MR. DAVIS:  Yes, Your Honor.

4           THE COURT:  All right.  All right.  I'll come back

5   around.

6       Mr. Sanford, it sounds like maybe your client gave you some

7   information as to how many documents we're talking about.

8           MR. SANFORD:  Your Honor, without having the PDF, I

9   don't know the exact --

10          THE COURT:  I'm not going to hold you to it.  I'm just

11  trying to get my hands kind of generally around what we're

12  talking about.

13          MR. SANFORD:  Your Honor, I very much appreciate what

14  counsel for plaintiff said as soon as he got up here, when he

15  said something along the lines of, this is a strategy to

16  immunize this independent witness.  And he pointed at

17  Mr. Findeisen.

18      You know where he's a potential witness or he's an

19  independent?  In the Holland v. CryptoZoo case.  He's not a --

20  he can't be immunized as a witness in this case.  He's the

21  defendant.

22      Now, I personally think that the lawsuit is crazy because I

23  saw text messages on this screen, within the last 90 minutes,

24  from Logan Paul that say, the game is dead.

25      So whatever Mr. Findeisen said or didn't say, if they are

1    thinking that they'll find malice by invading the
2    attorney-client privilege -- I'm sorry -- the work-product
3    privilege, I just think it's preposterous because --
4            THE COURT:  Yeah.  I don't think you want to say
5    "attorney-client privilege."
6            MR. SANFORD:  That's right.  But here's what we've
7    got --
8            THE COURT:  That might -- that might not work out well
9    in this context --
10            MR. SANFORD:  Mr. Kherkher --
11            THE COURT:  -- unless I'm misunderstanding the
12    circumstance.
13            MR. SANFORD:  Mr. Kherkher has sued Mr. Paul for this
14    game that didn't work, took a lot of money from a lot of
15    people.
16            THE COURT:  Yeah.
17            MR. SANFORD:  He's taken it on a contingency basis.
18    He only wins money -- Mr. Kherkher only wins money if it's true
19    that the game was a scam or is dead, to use Logan Paul's words,
20    whatever.  The idea that they have this compelling need to get
21    into the attorney work product in an unrelated case to find
22    information --
23            THE COURT:  Well, can you really say "unrelated case"?
24            MR. SANFORD:  I'm sorry.  In a different case.
25            THE COURT:  All right.  Fair enough.  Yeah.

1          MR. SANFORD:  In a different case, to find information
2    where the attorney, who only gets paid if he wins, secretly
3    knows that the game is fine and, you know, it's words, it's not
4    a scam, everything's great.  That's preposterous.  If I'm
5    wrong, it's Judge Albright's problem because, as you have
6    pointed out, all of the cases, at least as I've read them, that
7    the plaintiff has cited in this case about why a nonparty can't
8    assert work product was they're nonlawyer --
9          THE COURT:  That's why I asked the question.
10         MR. SANFORD:  -- assertions, as I read them.  And the
11   reason is that everyone knows that you go back to the judge
12   who's presiding over the issues to which the work-product
13   doctrine touches and ask that judge.  But it hasn't happened
14   here.  It can.
15         THE COURT:  All right.  Very well.  Thank you,
16   Mr. Sanford.
17      I still wanted to -- think I've got a sense of where the
18   parties are.  But I did have a question, not for Mr. Sanford,
19   but for the counsel for the parties in my case.
20      And that is -- it goes to -- it goes to Mr. Sanford's
21   point.  I'm concerned about -- you know, I know there was a
22   motion to stay discovery pending the judgment on the pleadings.
23   But I'm wondering how -- isn't it a danger if this case gets
24   ahead of the other case?  In other words, isn't whether or not,
25   like, there was a fraud, what if it turns out there -- you

1  know, the judge were to rule in that case there is no fraud,

2  it's dismissed, for whatever basis?  It would seem to be -- it

3  would impact significantly on this case.

4      Vice versa, if the judge or a jury were to find in favor of

5  the plaintiffs in that case, it would seem to impact very

6  strongly on this case because ultimately we're going to be

7  getting to this question of, you know, whether or not the

8  statements were false or there was intent, as was very well put

9  by defense counsel, malice -- actual malice and either intent

10 or recklessness as to the truth or falsity of the statements.

11 All that stuff, isn't that going to be impacted by that other

12 case?  And I'm worried we're getting ahead of that case.  And

13 this is a small example of that, that could be a much bigger

14 example going -- as we go forward.  And so I wanted just

15 generally to hear from the parties on that issue.

16     I know it's not directly here.  But, Mr. Cedillo, I see

17 you're standing up.  I'm happy to hear from you on that, sir.

18          MR. CEDILLO:  If I could address it quickly, Your

19 Honor.

20          THE COURT:  Yes, sir.

21          MR. CEDILLO:  It goes both ways.

22          THE COURT:  No.  I know.

23          MR. CEDILLO:  If a jury in this case found that there

24 was libel and he was defamed and he had malice and so forth,

25 that may be pretty dispositive --

```
1              THE COURT:  Because his statements were false, yeah.
2              MR. CEDILLO:  -- in the other one.
3              THE COURT:  Yeah.  Yes.  Yes.
4              MR. CEDILLO:  If I'm not misinterpreting the Court's
5    concern, if the Court is concerned that that other case could
6    dispose of this one and you're thinking that maybe that's a
7    reason for a stay, well, this case could dispose of that one.
8    And so maybe they ought to think about a stay.  You know,
9    what's up and who's at bat and who's pitching and where did the
10   ball get hit?  And we're in play here, and you have issues
11   before you here.  They are the ones suggesting that maybe that
12   might have an impact over there.
13             THE COURT:  Well, I mean, they could impact on each
14   other.  But, you know, the normal rule with that, Mr. Cedillo,
15   is the first filed.  That's how we usually do those things.
16   And that's the first filed, if I understand correctly.
17             MR. CEDILLO:  When --
18             THE COURT:  I actually just saw a little screen
19   that -- it's still in front of me right now.  Their case came
20   up first.  And y'all happen to be in both cases.  Not you.  I
21   don't know if you're in it or not.
22             MR. CEDILLO:  I'm not -- I'm not in the Austin case
23   either.
24             THE COURT:  They'd be smart to have you in that case.
25   But no, I think you're --
```

1          MR. CEDILLO:  I'll see what I can do.

2          THE COURT:  I know some of your colleagues are so --

3    yeah.

4          MR. CEDILLO:  I'll see what I can do, Your Honor.

5          THE COURT:  Yeah.

6          MR. CEDILLO:  Your Honor, I think it's a separate

7    analysis of whether or not there is a relation.  I think the

8    argument could be made, but no one's made that yet.

9          THE COURT:  I understand.

10          MR. CEDILLO:  Okay.

11          THE COURT:  Perfectly fair point.  That's -- it's just

12    hard for me not to think about it as we're talking about that

13    case in the context of this case, and vice versa.  So thank

14    you.

15      Yes, Mr. Davis.

16          MR. DAVIS:  No, Your Honor.  Along those same lines,

17    we all believed and were informed that the government was going

18    to intervene, and we filed a motion to stay given what was

19    pending, SEC investigation and the Eastern District of New York

20    criminal investigation.  And so you have kind of multiple

21    layers here.  And I'm not sure if that's going to happen now.

22    We were -- we were informed that wasn't imminent, so we did

23    produce items that were previously on the log under law

24    enforcement.

25          THE COURT:  Yeah.

1          MR. DAVIS:  You know, so we'll look into the motion to

2     abate.  But I agree with Mr. Cedillo, it's kind of -- we have

3     both --

4          THE COURT:  I have this in another gigantic case, just

5     along the same lines, out of Austin, where we have SEC and --

6     in that case both.  The SEC's resolved, but there are criminal

7     charges going forward --

8          MR. DAVIS:  There's nothing pending that we're aware

9     of other than --

10         THE COURT:  I'm not holding that against anybody here.

11         MR. NEIMAN:  Your Honor, there's nothing.  There's

12    nothing pending right (inaudible).  There's nothing active

13    right now with the SEC.  This is Mr. Davis attempting to kind

14    of conflate -- put stuff in the public record.

15         THE COURT:  It's not -- it's not -- no, no.  I'm

16    not -- I don't have that in front of me.  I'm not going to

17    consider that.  I can't consider that part right now.  So --

18         MR. CEDILLO:  It isn't true.

19         MR. NEIMAN:  It's not true, Your Honor.

20         THE COURT:  Yeah.

21         MR. DAVIS:  Well, of course I can show you the records

22    showing that what we were just -- we were notified that they

23    decided not to intervene.  Whether that means they closed the

24    investigation, that's fine.  But I don't think they're going to

25    contest there was an investigation.  And that -- but, Your

1    Honor, that's not before the Court today.

2         THE COURT:  Well, I guess I'm -- let me just game out

3    a little bit of this, if I can.  Do you know, Mr. Davis, if

4    there's been -- this is probably for the defense.  Do you know

5    if there's -- were depositions in that SEC investigation?  Were

6    there other -- was there discovery done in that investigation?

7    Am I going to hear battles about getting into those documents

8    and who has to -- I've been down this road before.  I'm just

9    wondering, do you have any knowledge of that at all?

10        MR. DAVIS:  I do, Your Honor.  In fact, in the

11   production we received, there was a search warrant conducted on

12   Mr. Logan Paul's phone out in California.  There was an

13   investigation being performed in the Eastern District of

14   New York, a grand jury investigation.  There was an active SEC

15   investigation specifically with regards to Mr. Logan Paul's

16   cryptocurrency.

17        THE COURT:  Well, again, those all may be -- I'm just

18   wondering, are you seeking to get some stuff that hasn't been

19   disclosed --

20        MR. DAVIS:  We are --

21        THE COURT:  -- to your understanding?

22        MR. DAVIS:  We are, Your Honor.  We've sent out *Touhy*

23   letters, as the Court's familiar with those.

24        THE COURT:  Yes.

25        MR. DAVIS:  And we'll see.  I think we're getting

```
1    responses now.  We may have to file -- you know, Your Honor's
2    familiar with the proceedings, to try to get some of that
3    discovery in this case if it proceeds.
4            THE COURT:  I got you.
5            MR. DAVIS:  So that is a discovery issue that's not
6    currently before the Court, but it may be.
7            THE COURT:  Not before the Court.  I'm not going to
8    resolve it.  No.  And I want to hear from the defense, too.  My
9    only question is, is this going to be a headache where --
10   because getting the documents -- y'all can't even disclose
11   those things without permission, half the time, from the SEC or
12   whoever.  I'm not -- if there is -- even if there are
13   documents, I'm just -- was just -- now that I started thinking
14   about it, it's like, oh, my gosh.  There's a lot of different
15   cases going.
16       But let me hear -- let me hear briefly from --
17           MR. DAVIS:  Sure.
18           THE COURT:  -- from the plaintiff on this issue?
19           MR. NEIMAN:  Your Honor, I'm concerned -- I'm
20   concerned this was done in order to create public records of
21   all these extraneous proceedings by the government, that are
22   not accurate.  We're not aware of any active government
23   (inaudible) --
24           THE COURT:  That solves that.  Yeah.
25           MR. NEIMAN:  Clear as day.
```

1    THE COURT:  That's fine.  And no, I'll note that.  I

2    mean, I don't -- I have no -- I'll note for the record, I have

3    no evidence in front of me of any active investigation.

4    MR. NEIMAN:  I don't know if we could seal this

5    portion of the transcript, also, Your Honor, to keep that out

6    of the public --

7    THE COURT:  Right now we don't have a transcript.  So

8    we'll see if y'all -- if we -- if someone orders a transcript,

9    I'll be happy -- I mean, there's redaction rules and sealing

10   rules.  I'm happy to consider it at that time.

11   MR. NEIMAN:  Okay.  Please.

12   THE COURT:  Yeah.  Anyway.  So I'll go -- I'll reel it

13   back to this particular case.  In this particular case,

14   Mr. Davis, you can't confirm for me then exactly what documents

15   we're talking about that this dispute of -- do we have -- I

16   mean, there's the redacted email chain that I can look at.

17   MR. DAVIS:  You're referring --

18   THE COURT:  And there's two other documents, right?

19   MR. DAVIS:  You're referring now to the Kherkher

20   documents, not the law enforcement?

21   THE COURT:  The documents they're trying to get from

22   their motion to compel and they're trying -- and Mr. Kherkher's

23   trying to quash.

24   MR. DAVIS:  Your Honor, I know we have them on our

25   log.  And so I can --

```
 1            THE COURT:  All right.  So you can identify --
 2            MR. DAVIS:  -- produce all of those documents for in
 3    camera if we needed to, Your Honor.
 4            THE COURT:  Yeah.  In the unredacted form or whatever?
 5            MR. DAVIS:  Yes, Your Honor.
 6            THE COURT:  All right.  Very well.
 7            MR. DAVIS:  Offer it as a redacted form and an
 8    unredacted form.
 9            THE COURT:  Right.  Got you.  Well, I think the
10    redacted form's attached to the plaintiff's motion, a large
11    number of them.
12        And then -- so last question.  Have you seen this exchange
13    about the engagement, you know, typically, like, "I want to
14    hire you to be a consulting expert.  I'm not going to be paid,"
15    that engagement, that exchange between the parties, because
16    typically those engagement type conversations are disclosed
17    almost every time.  So I just don't know if you've seen them.
18            MR. DAVIS:  They are, other than it's a consulting
19    expert, Your Honor, and sometimes they're not, in that context.
20    But we're happy to produce that to the Court, also.
21            THE COURT:  Got you.
22            MR. DAVIS:  You know, I think everything but being
23    paid.  Mr. Findeisen just refused to accept payment since he
24    was being consulted with and didn't want to be paid.
25            THE COURT:  That's fine.  All right.
```

1          MR. DAVIS:  But we can produce that, Your Honor, also

2    for *in camera*.

3          THE COURT:  All right.  Got you.  All right.  Very

4    well.  Thank you.

5      It's complex issues, and I opened cans of worms that I

6    didn't really mean to.  There's nothing else pending.  It's

7    just the matters that are in front of me right now.  But I just

8    have started to worry that I was going to be facing other

9    motions in my case.

10     With regard to these two motions, which is the motion by

11   Mr. Kherkher to quash the subpoena to produce documents and the

12   motion to compel the production of documents, this is how I

13   will resolve those.  The motion to compel the production of

14   documents will be granted in part.  Those documents are to be

15   produced to the Court for *in camera* review, unredacted.  I'm

16   going to look at them and decide whether or not they need to be

17   disclosed at this time.

18     And because of that ruling and I'm going to be looking at

19   these same documents, and everyone seems to agree they're the

20   same documents, the motion to quash is denied as moot because

21   there's not going to be any need to get any documents from

22   Mr. Kherkher because I'm going to look at those documents.

23     Now, this does not address all the other privilege claims

24   and the other issues.  I need to go around to make sure I'm

25   correct about that.  I'll start with plaintiff.  I would

1    otherwise quash the motion, but if I'm getting the documents in
2    front of me and I'm deciding it, I think that resolves the
3    issue.  But I want to hear -- these are -- this is plaintiff's
4    discovery request, so I want to hear from them first.
5            MR. PHILLIPS:  Yeah.  Thank you, Your Honor.  The one
6    point I wanted to make is as to the journalist privilege that
7    you asked about.
8            THE COURT:  Oh, yes.
9            MR. PHILLIPS:  That's not necessarily on the table
10    today, but it will be immediately on the table.  In fact, it
11    doesn't even need to be on the table if Your Honor resolves the
12    work product, the consulting expert privileges in plaintiff's
13    favor, in other words, says that those don't protect the
14    communications.  Mr. Kherkher has no basis to not produce the
15    entire unredacted chain because he can't assert the journalist
16    privilege.  So I would want to keep our subpoena to him open as
17    to that issue.
18            THE COURT:  Yeah.  Okay.  Well, yeah.  The motion to
19    quash it is moot then.  I'm not going to quash the -- I'm not
20    quashing the subpoena.  I'm leaving it as moot for now until I
21    get this part resolved.  That part may still be out there.
22    We'll find out.
23            MR. PHILLIPS:  Well, I would just ask Your Honor --
24            THE COURT:  Well, you know what?  I have a question
25    for you.  But go ahead.

1          MR. PHILLIPS:  Oh, I would just ask Your Honor not to

2     deny it --

3          THE COURT:  No.  Okay.

4          MR. PHILLIPS:  -- because the effect of that is going

5     to be, we're just going to have to file another motion and come

6     back here and do this again.

7          THE COURT:  I see.

8          MR. PHILLIPS:  And I think if I were Your Honor, I

9     would hold the motion to quash open because, again, if Your

10    Honor resolves the motion to compel in our favor, then attorney

11    Tom Kherkher needs to produce those communications in full, if

12    they're going to rely on journalist privilege.

13         THE COURT:  Even if they're relying on the journalist

14    privilege.

15         MR. PHILLIPS:  Because he can't.

16         THE COURT:  I understand.

17         MR. PHILLIPS:  Yeah.  Yeah.

18         THE COURT:  But I do have a question about that.

19    Here's my question.  Do you know -- is there some part of this

20    long chain that there's just the journalist privilege

21    interposed to, or is it always concomitant, if I'm saying the

22    word correctly, journalist privilege and the -- and the

23    work-product privilege?  It matters because there's -- I don't

24    know how -- the journalist privilege, I'm going to need another

25    motion on if that's part of it and it's freestanding.  It's a

```
 1  long -- lots of redactions.  It's long.  I can't promise you
 2  I've looked at them all.
 3         MR. PHILLIPS:  Yeah.  I don't think so, Your Honor.
 4  If that were the case, I'd say that, you know, that should just
 5  be granted as to us right now because, again, Mr. Kherkher
 6  can't assert the journalist privilege, and there's a subpoena
 7  to him seeking these communications.  But I don't believe there
 8  is any stand-alone journalist privilege.
 9         THE COURT:  You think -- okay.  Well, then that --
10  good.  So then if I -- all right.  I got it.  I think I got
11  the -- I think I got how this is going to work.  If I find that
12  there is a privilege for Mr. Kherkher, I still have to decide
13  if there's some privilege for Mr. Findeisen to raise on the
14  case that would be separate from it.
15     And I won't deny the motion as moot.  I won't quash.  I'm
16  going to, I guess, keep it under advisement while I look at the
17  other motion.  That seems like the best way to handle it.
18  Though, I'm happy to hear objection -- nodding from the
19  plaintiffs.  I'm happy to hear any objection from the defense
20  or from Mr. Kherkher if they think there's some other way I
21  should try to handle that issue while I look at these
22  documents.
23         MR. DAVIS:  I think that makes sense, Your Honor.
24         THE COURT:  Yes.
25         MR. MAYS:  One point of clarification is, Your Honor
```

1  said that it would be granted in part and then discuss the *in*
2  *camera* --
3          THE COURT:  Like, because I'm going to look at them,
4  I'm not going to -- that's the part that's --
5          MR. MAYS:  But with status to the --
6          THE COURT:  Yeah.
7          MR. MAYS:  -- the email communication, as well, that
8  related to the transmission of the expert agreement, or was
9  that separate?
10          THE COURT:  Okay.  104, 105 and this long thing that's
11  redacted, that's it, right?
12          MR. PHILLIPS:  Correct.
13          THE COURT:  I just got to know what I'm looking --
14  those things that I thought were all agreed to as there's a
15  world of documents, those are the ones I'm looking at.
16          MR. MAYS:  Understood.  Thank you.
17          THE COURT:  Okay.  I don't -- yes.  Am I saying them
18  correctly?  I'm not sure.  But do all the parties recognize the
19  documents I'm talking about?  That sounds right to plaintiffs?
20  Yes?
21          MR. MAYS:  I think everyone understood but me, Your
22  Honor.
23          THE COURT:  Well, okay.  Well, no.  I'm concerned.
24      Does that make -- I mean, I'm going to be having to ask
25  you, Mr. Davis, to produce the documents.  I'm not going to ask

```
 1   Mr. Kherkher to do it.
 2           MR. DAVIS:  Sure.
 3           THE COURT:  I want you to produce the documents since
 4   you're the party in this case.  Does that sufficiently
 5   designate the documents, that I can look at the right ones?
 6           MR. DAVIS:  Yes, Your Honor.
 7           THE COURT:  Great.
 8       And two weeks?
 9           MR. DAVIS:  Sure, Judge.
10           THE COURT:  Great.  Yeah.  That'd be fine.
11           MR. DAVIS:  Thank you, Judge.
12           THE COURT:  Yes.
13           MR. SANFORD:  Am I -- am I understanding the Court
14   correctly that the Court is holding in abeyance a ruling on the
15   Kherkher motion to quash because the Court is going to examine
16   whether --
17           THE COURT:  The same documents.  Yeah.
18           MR. SANFORD:  -- the documents that are received *in*
19   *camera* would substantiate granting or denying the motion?
20           THE COURT:  Correct.
21           MR. SANFORD:  Okay.
22           THE COURT:  Well, yeah.  I'm going to look at it and
23   see if they are -- if I find them to be work product documents
24   that can't be disclosed in the context of this case.  That's
25   what I'm going to try to decide.  But that would protect
```

1  Mr. Kherkher.  And I want to make it clear that, to the extent

2  there's any ethical issue, Mr. Kherkher's counsel, you know, as

3  parties, he needs to try to interpose his work-product

4  privilege.  And so I note that for the record, that he has, so

5  that there's not any concern about that in the future.

6          MR. SANFORD:  Thank you.

7          THE COURT:  That's important.  Like I said to the

8  other side, if you're the attorney, you're going to also say,

9  "Wait, wait, wait.  I'm not giving up my client's stuff without

10  somebody -- some judge telling me."  I'll be the judge that

11  tells you, if I decide that.

12      All right.  I think that's everything before me.

13          MR. NEIMAN:  Your Honor, just one point.  Maybe this

14  is me being a little dense.  And apologies for jumping --

15          THE COURT:  Yeah.  Get in line.  I'm the first in line

16  on that one.

17          MR. NEIMAN:  The request to both Mr. Kherkher,

18  Mr. Findeisen were the same.

19          THE COURT:  Yes.

20          MR. NEIMAN:  But the responsive documents that they

21  each have may not be the same, meaning one could have retained

22  certain documents that the other one hasn't.  So I guess maybe

23  if the Court's going to review *in camera*, maybe -- our ask

24  would be that both parties present documents to the Court to

25  review.  So if they are the same, then so be it.  But for all

```
 1  we know, one has preserved for a longer period or a shorter
 2  period --
 3              THE COURT:  Yeah.
 4              MR. NEIMAN:  -- and there may be more documents.
 5              THE COURT:  All right.  I'm not going to get two sets
 6  of productions.  I'm not doing it.  I will ask Mr. Davis to
 7  confer with Mr. Sanford to make sure that the documents are the
 8  same.  If they're not, you'll need to explain that to me in
 9  the -- in the ex parte production.
10              MR. SANFORD:  And just to be clear, Mr. Kherkher has
11  lots and lots and lots of documents that he didn't get from
12  Mr. Findeisen or give to him.  And those are work -- they are
13  work product in another case called Holland v. CryptoZoo, which
14  is why I think the Court is correct to tell him, don't do
15  anything now.  Let's see what the defendant in this case --
16              THE COURT:  But the scope of the motion to compel to
17  defense, any -- I want to make sure that that scope, that set
18  that you're holding on to is the same.  If there's more, that
19  would be -- in the exchange between them, that someone has the
20  exchange and the other one doesn't, I need to know.  I need to
21  know if we're not really looking at the same documents.  But
22  y'all can confer about that and report back to me.
23              MR. DAVIS:  Yes, Your Honor.
24              THE COURT:  All right.  Okay.  I think that's
25  everything for today.  I appreciate the parties' presentations.
```

1  It's an interesting case, a lot of moving parts.  But hopefully
2  I'll get some of them resolved today.  I'll try to get a
3  written order out today.  And as I mentioned, there's that
4  judgment for -- on motion for judgment on the pleadings that
5  Mr. Cedillo was so eager to argue the stay on -- against the
6  stay on.  I'm going to get that -- we're going to get that out
7  this week.
8              MR. DAVIS:  Yes, Your Honor.
9              THE COURT:  So it will get resolved as well.
10             MR. CEDILLO:  Thank you, Your Honor.
11             THE COURT:  That concludes this hearing.  We're in
12  recess.  Thank you.
13  * * *
14      (3:17 p.m.)

-oOo-

I, court approved transcriber, certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording of the proceedings in the above-entitled matter.

Date:  3/30/2025      /s/ Chris Poage
                      Approved Transcriber