UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LOGAN PAUL,                        )
Plaintiff,                         )
                                   ) Case Number
vs.                                ) SA:24-CV-00717-OLG-HJB
                                   )
STEPHEN FINDEISEN and              )
COFFEE BREAK PRODUCTIONS, LLC,) San Antonio, Texas
Defendants.                        ) September 11, 2025
*****************************************************
MOTIONS HEARING
BEFORE THE HONORABLE HENRY J. BEMPORAD
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:
Ricardo G. Cedillo
Davis, Cedillo & Mendoza
755 E. Mulberry Avenue, Suite 500
San Antonio, Texas  78212
(210)822-6666; rcedillo@lawdcm.com

Jason L. Mays
Neiman Mays Floch & Almeida, PLLC
One Financial Plaza, 100 SE 3rd Avenue, Unit 805
Fort Lauderdale, Florida  33394
(305)434-4941; jmays@nmfalawfirm.com

Andrew Clay Phillips
Meier Watkins Phillips Pusch, LLP
919 18th Street NW, Suite 650
Washington, DC  20006
(847)951-7093; andy.phillips@mwpp.com


FOR THE DEFENDANT:
Jason Davis
Caroline N. Small
Davis & Santos, P.C.
719 South Flores Street
San Antonio, Texas  78204
(210)853-5882; jdavis@dslawpc.com

COURT RECORDER:   FTR GOLD

TRANSCRIBER:
Angela M. Hailey, CSR, CRR, RPR, RMR
Official Court Reporter, U.S.D.C.
262 West Nueva Street
San Antonio, Texas   78207
Phone(210)244-5048; angela_hailey@txwd.uscourts.gov


Proceedings reported by electronic sound recording, transcript
produced by computer-aided transcription.

* * * * *

*(September 11, 2025, 1:01 p.m.)*

&ast;   &ast;   &ast;

COURT SECURITY OFFICER:  All rise.

THE COURT:  Good afternoon.  Please be seated. Calling case number SA:24-CV-717, Logan Paul versus Stephen Findeisen and Coffee Break Productions, LLC.

Let me get announcements of counsel starting with counsel for the plaintiff please.

MR. CEDILLO:  Good afternoon again, Your Honor. Ricardo Cedillo for the movant and the plaintiffs, of course.

THE COURT:  All right, good afternoon.

MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis and Caroline Small are here on behalf of the defendants.

THE COURT:  Good afternoon to you as well.  We're set today on a number of motions.  The lead motion was a motion to transfer and stay proceedings in the case.  They've been filed by the defense.  I received yesterday a notice of withdrawal of that motion which I will tell you I'll grant the motion to withdraw the motion, however, I need to talk to the parties about this issue.  I'm concerned.  Independently of the motion, the Court has concerns, I want to address that first.

This is the concerns, I want to lay out what the concerns are that I have.  I already had a motion for protective order and also a motion to compel documents from the -- well, I guess I should back up.

There's two cases, as the parties know.  There is the Holland case pending in Austin, been referred by Judge Albright, as I understand it, to Judge Griffin in the Midland/Odessa Division to handle pretrial matters.  As I understand it, there have been no deadlines set in that case for discovery that I know of.  Then there's this case which is related to that case.  That case alleges -- it's a class action alleging fraud against in various ways on the part of Mr. Paul.  This case is a defamation case on the claims related to that by Coffee Break Productions and Stephen Findeisen.  We had a motion before the Court to get at, by plaintiff, to get at information from the lawyer in the other case, the plaintiff's lawyer in the Holland case.  We now have a motion from the defendants to actually depose some foreign persons who could be, as I understand it, class members in that case and I didn't even know about it.  And we have motions from both sides to get at what could be claimed to be privilege material from either the Coffee Break Productions and Mr. Findeisen or Logan Paul and his associates.

I'm very concerned that this case is becoming the discovery stalking horse for the class action case.  I'm worried that I'm going to be getting ahead of what looks to me to be it's the first styled case, more importantly the main case, and which if we have it turns out to be liability for Mr. Paul, a truth defense for the plaintiff, and if it turns

out there's no liability for Mr. Paul, that would directly affect this case as well.  So I'm wondering -- I will tell the parties the motion to withdraw, the transfer to withdraw, I'm not transferring this case to Judge Griffin, it would not be fair.  I've already had involvement in the case, he's got enough on his plate.  But I am considering staying some or all of the proceedings in this case while that case gets rolling.  I need to hear from the parties on it.  I'm concerned about it.  Judicial resources need to be economized, there is the danger of prejudice to both sides.

I'm very concerned, even though there's a voluntary agreement by these potential class members to subject themself to deposition, I'm concerned that that could be prejudicial to them.  I'm concerned with the team on the Logan Paul side that some of this information would be information that could be used in the other case, even with the protective order.  And the flip side, of course, anything that was disclosed by defendants in this case to Mr. Paul, how could he not use that in that case.  I'm worried.  I do not want to prejudice the parties, I need to hear from the parties as to how to address these issues.  It's separate from the motions in front of us. I'd like to start with plaintiff.

And Mr. Cedillo, I hope you understand what my concerns are and I'd like to hear your views.  I'd ask that you approach the podium, the recording is better from what I hear.

MR. CEDILLO:  Thank you, Your Honor.

THE COURT:  And thank you for addressing it if you can.  It's a little bit separate, but you see my concern.

MR. CEDILLO:  It will be quick, Your Honor.  I think there are some events in the class action suit that, quite frankly, I don't have the best knowledge of because I have not entered an appearance, I am not involved in that case.  But Mr. Andrew Phillips can tell you about a report and recommendation.  Jason Mays can tell you about a report and recommendation that is pending.  It is my understanding that the counts and the allegations in that -- there's a recommendation pending that they be entirely dismissed and I don't know if that will weigh in your concerns, but one of my colleagues can --

THE COURT:  Let me hear from your colleagues and I also want to hear from Mr. Davis and Ms. Small.

MR. CEDILLO:  Thank you, Your Honor.

MR. MAYS:  May I approach the podium?

THE COURT:  Yes.

MR. MAYS:  Thank you, Judge.  I appreciate the Court's concerns.  Jason Mays on behalf of plaintiff, Logan Paul.  So, I want to I guess just update the Court on the status of the class action.

THE COURT:  Sure.

MR. MAYS:  So, as of two weeks ago, the Magistrate

Judge in that case issued a report and recommendation 75 pages recommending that all 27 counts against Mr. Paul be dismissed without prejudice.  Contemporaneously with that, the Court entered separate R and Rs recommending that the case be dismissed against each of Mr. Paul's co-defendants as well. So, just for the Court's update as to where things stand, the class plaintiffs did not file objections to those R and Rs. Mr. Paul did on some small issues, even though all the claims are recommended to be dismissed against him, so at this juncture, we're waiting for Judge Albright to adopt or at least issue an order on the R and Rs.

What that means at the moment is that there are no actual pending claims against Mr. Paul in the class action proceeding, and so I would emphasize that.  I would also emphasize that the Magistrate Judge there made findings that we believe will make it difficult if not possible to replead fraud-based claims against Mr. Paul because they were based on alleged misstatements and omissions that the Court found to be puffery was the recommended finding, and any statements, any other statements by Mr. Paul that were alleged were made after -- the statements were made after the purchases of CryptoZoo products that are at issue in that case.  The reason that's important is because the idea of substantial overlap with this case is based on whether Mr. Paul intended to deceive.  That's the issue that the defendants when they raised

their motion cited as potential overlap.  And we believe that that's going to be -- even if the case is refiled, we believe that the issue of intent to deceive is not actually going to be an issue in both cases, so I wanted to start there.

I'd also like to add that the concerns raised by the Court in terms of referring to it as the main case, we disagree with the idea that there's that much overlap to them.  This is a case based on defamatory statements that were made after the class action was filed.  Yes, they relate to CryptoZoo, but they were made after the class action was filed.  The class plaintiffs have known about this case since the day it was filed in June of last year.  They're even further aware of the transfer motion because it was the topic of a motion to compel here in early last month when we came before Your Honor on the motion to enforce the subpoena to Mr. Holland.  And so, whether knowing about the case since last year or when it came before the Court on that motion, the class plaintiffs have not sought to be heard on the issue of whether it's proper to proceed on these issues before Your Honor.  And that's because they have been actually benefiting from the discovery that's been taken in this case, tens of thousands of pages related to the CryptoZoo matter that we have already produced, and the party depositions, in this case Mr. Paul and Mr. Findeisen, taken place in the past couple days, we are way advanced in this case.  And having not raised any issue about this case

proceeding ahead of the class action, we believe that the Court shouldn't be concerned either.

The other thing I'd like to raise is that even if the case is refiled, that case is filed in February of 2023, it's a little more than two and a half years ago.  Even if it's refiled, we do not believe the claims will resemble what they did in this past plea, and so we don't even know the nature of any potential overlap.  It would take -- even if it survives dismissal, then there's a class certification stage.  Discovery in that case is stayed under the PSLRA until we get past all of this.  We suspect that if that happens at all, it's going to be years and years and years from now, and this case is already on a path to trial, it's set for trial in May of next year.  We believe that Mr. Paul's reputation every day that goes by that he's not able to attempt to vindicate his rights in this case, it's already proceeded almost to the point of completing discovery would be deeply, deeply highly prejudicial to him. So, those are my initial thoughts.

I don't believe that there's real danger of prejudice that would stem from this case proceeding to a trial.  I believe the class plaintiffs don't believe that there's any such issue either, otherwise they would have sought to be heard on the issue before Your Honor.  But those are -- I hope that answers the questions.

THE COURT:  Some, but I'll have to ask you some

questions about it.

MR. MAYS: Sure.

THE COURT: First of all, with regard to the recommendation of the claims against Mr. Paul be dismissed without prejudice, was there any timeframe that has been established for amending? Because without prejudice would suggest amendments would be available, though obviously you'd have a right to dispute them.

MR. MAYS: Yes, Your Honor. No timeframe was set because that would presumably be--

THE COURT: It has to go to the recommendation to Judge Albright.

MR. MAYS: -- premised on what happens with the R and R before Judge Albright. I should add, though, that the claims -- there is what we perceive is a very narrow window for amending as to Mr. Paul. The claims against Mr. Paul's co-defendants have been dismissed with prejudice, other than the two wrongdoers who never appeared in the case.

THE COURT: All right. My other question had to do with this idea of whether there's overlap or not. Overlap is part of the concern the Court has. The other part of the concern the Court has is that you're going to be talking to the same people who were involved in that case, and whether or not there is direct subject matter overlap or timing overlap, that's a hard line to draw once in the heat of deposition or in

the heat of discovery because you're going to-- I want all things having to do with everything that they said in this department.

I mean, I'm going to have to be very careful in framing or permitting or not permitting questioning and/or to say we're not talking about things that happened before the incidents in this case because that could play into the -- as you mentioned, we're only going to talk about stuff afterwards.

And what about deposing potential parties in the case, including Mr. Paul, who I know he's been deposed.  I have concerns about even if I -- how am I going to thread or how am I going to -- I don't know what the word is -- cabin the scope of discovery in this case to allow it to go forward to trial in May without pre -- starting to do discovery that's supposed to be stayed right now in the main case?

MR. MAYS:  Well, Judge --

THE COURT:  I'm sorry, not to call it the main case, the class action matter.

MR. MAYS:  Sure, and I guess what I come back to is I don't -- so there's no doubt that the class action relates to CryptoZoo and there's no doubt that the matter of CryptoZoo is also relates to the issues in this case, so I don't know that there's a way to parse in the manner that the Court is suggesting.  However, I don't believe that the issue of -- I believe the issue is out of the bag at this point.  Discovery

has proceeded from defendants, discovery has proceeded from plaintiffs.  We've taken I don't know how many depositions, but the parties' depositions have already been taken.  To the extent there was concern of sort of cabining the issues in the manner the Court suggests, I think that that is no longer possible.  I think that it's -- we're past that point.

THE COURT:  All right.  So, does that mean in for a penny in for a pound and I should just let whatever kind of discovery y'all want to do?  I like to let the attorneys drive on discovery, but does that mean I should just be, granted, you can talk to people in New Zealand or Portugal and, granted, you can get into all the stuff that Mr. Paul may not want to disclose that might be useful to the other side.  I mean, what it sounds like to me is let's roll, have full discovery like we're supposed to and not worry about that case.

MR. MAYS:  I believe from plaintiff's side, that's exactly right, and I believe from the class plaintiffs in the class action, proceed as well because they have known about this and have not raised any such concerns with the Court.

THE COURT:  All right, very well.  Thank you. Mr. Davis, let me hear from you or Ms. Small about this matter. I hope you see my concerns as well.

MR. DAVIS:  I do, Your Honor.

THE COURT:  I may be completely off base, but, boy, it seems like that every time I have a motion in front of me it

sounds like I'm talking about somebody from that other case.

MR. DAVIS:  It does, Your Honor, and we're kind of in an interesting situation.  Some things are uncontested, that's the first case that was filed.  This is the second case.  Among the allegations in the first case is that Mr. Paul allegedly committed fraud.  He has sued our client in the second filed case saying we defamed him by saying he committed a scam which the Court has found is more or less equivalent to fraud.  And so, therefore, one of the defenses of truth would be us establishing fraud, and so the overlap is clear.

Now, certainly as to the claims and the class certification issues, some of those aren't at issue here.  We withdrew our motion, Your Honor, because it became clear that there's lots of things happening in that case including this recent order, but precisely the order said, that report and recommendation in the class action case said with leave to amend.  I don't think on all of them, but I think the majority of them, including the fraud claims.

THE COURT:  And this is against Mr. Paul as opposed to against -- I think your opposing counsel is correct that some of the other people were dismissed with prejudice.

MR. DAVIS:  I'm just concerned with Mr. Paul since he's the plaintiff in this case.

THE COURT:  Got you, all right.

MR. DAVIS:  And I think there was a deadline under

Rule 12 of 14 days.  I think that was abated because of the objection to the R and R that was filed, I think by Mr. Paul's side.  And so that, as soon as Judge Albright rules on that, then there will be 14 days and we'll see whether or not the lawyer on the class action side amends.  I believe that he's going to.  I don't know how that's going to turn out, I am certain based upon my discussions with these gentlemen that they'll be filing another motion addressing whatever that amended complaint looks like.

THE COURT:  Either opposing leave to amend or to dismiss or whatever.

MR. DAVIS:  Absolutely, and so thinking about the discussion the Court just had with that side, if a motion is filed on an amended pleading and everything not related to fraud, you know, gets thrown out, then we would say we're off to the races here if the Court is concerned about that.  The first to file rule is discretionary.

THE COURT:  All these matters are a matter of discretion.  I'm just looking at the interest of justice and judicial economy.

MR. DAVIS:  And so if the Court was going to consider a stay, you know, I guess we could all wait and see what happens on the amended fraud claims.  If they don't get filed within that 14-day period, then that case is gone and this is the only live case and we're off to the races, I hope that

wouldn't be too long.  I haven't looked at the objections to the report and recommendation.  I don't know how voluminous or complex they are.

THE COURT:  Sounds like they're not on the full recommendation, in fact, most of the recommendation favored Mr. Paul.

MR. DAVIS:  I would think so.  I haven't kind of kept up other than the gist of kind of what's going on.  But if then there's an amended pleading filed, it would be within 14 days, they would file their Rule 12.  And then if the Court was considering a stay, we could see what's left.  And then that would eliminate, if that's successful, eliminate any overlap.  So, if the Court is going to consider a stay, we would suggest that that would be kind of a stay in stages because pretty soon we'll know whether the class action counsel is even going to try to amend.  Pretty soon we'll know whether that's successful or not.

But otherwise, if the Court is not going to issue a stay, then I would join the counsel and say discovery should be kind of wide open.  There's actually quite a lot of discovery left here.  I think there are ten depositions set to occur within the next several months.  The parties have been very cooperative about scheduling, we had a busy week this week with the principals.  But we have at least I think ten depositions left and a trial date in May.

THE COURT:  More motions have been filed since I set the hearing on these motions.

MR. DAVIS:  Yes, there's going to be some other discovery disputes as we go.  We did not file summary judgment, so there's no impediment in the sense of dispositive motions here, you know, prior to trial.

THE COURT:  From your perspective anyway.

MR. DAVIS:  From our perspective.

THE COURT:  Got you.  Let me hear back from plaintiff.  Thank you, Mr. Davis.  I'll be happy to hear from both of y'all.  Go ahead, Mr. Cedillo.

MR. CEDILLO:  Thank you, Your Honor.  Just perhaps not substantive, but taking to heart the best interest of the parties and judicial economy and so forth, if you are inclined to have a stay, there's a lot of benefits to that if it's nice and short and long enough to see just what happened with the class action because we could use that stay to perhaps increase our efforts to try to resolve both of them, the class action in Austin and this case.  We are set for mediation tomorrow.

THE COURT:  In that case or this case?

MR. CEDILLO:  In our case, in our case, Your Honor.

THE COURT:  All right, very well.

MR. CEDILLO:  Mr. Davis said we've had a busy week.

THE COURT:  That's a very busy week.

MR. CEDILLO:  All we've done this week is this case

and it just occurs to me as a practical matter that the Court's concerns won't be really fully addressed until we see what happens with whatever objections are pending that is abating the 14-day response, we'll get those taken care of, get the 14-days, we'll see what's happening.  If you wanted to abate this thing for like maybe three weeks or something like that, that might make sense.  Now, as to the substantive give and take --

THE COURT:  I have a question, though, for you, Mr. Cedillo.  Thank you for reminding me about the mediation.

MR. CEDILLO:  Yes, sir.

THE COURT:  I'm concerned, though, do you feel -- I mean, the depositions are going to be extremely helpful having talked to both sides will help y'all with mediation.

MR. CEDILLO:  Yes, sir.

THE COURT:  Are you concerned that you would need to see if there's an amended complaint against your client in that class action matter to be able to resolve this matter?  Do you believe -- I mean, you see what I'm -- y'all have been working up, you're ready to go, mediators are hard to find, I don't want to stop the mediation, but I'm worried that it may not be as successful if it's a situation where you need more information.

MR. CEDILLO:  Your Honor, my secondhand understanding of the class action matter because I have not entered an

appearance, I have not done a deep dive, but my understanding is that based on the recommendations and the findings of puffery, I tend to think that I'm not afraid of what they're going to amend it to.  We have an existing recommendation that says that there is no fraud or scam which doesn't resolve anything in our case because we are claiming that he did defraud, he did defame us and, of course, as a public figure, it goes into --

THE COURT:  I understand.

MR. CEDILLO:  -- my motion to compel.  I don't want to get into that.  But in any event, Your Honor, my secondhand understanding is that with the puffery recommendation and so forth, we're not real concerned about what might get filed, it wouldn't be an amendment, it was dismissed without prejudice, so it would have to be filing something all over again against us.  We'll see how we got to play that.

THE COURT:  So you feel like you can go in this case to mediation, it won't impact upon you, you'll be able to talk to the other side and see if you can work it out.

MR. CEDILLO:  I think the mediation tomorrow is going to be real straightforward, Your Honor, because there's only one way to cure the damage that's been inflicted on our client and they're either going to want to do that or they're not and we're going to know that pretty quickly.  We're going to mediation because we were told to go to mediation and so we are

going to go to mediation.

THE COURT:  All right.

MR. CEDILLO:  But I think it's going to be -- we're going with an open mind and good faith, we want to get as far as we can on this, but we have deposed both parties and we understand they both have very, very strong positions.  So, Mr. Philbin has his hands cut out for him, but if anybody can do it, Don can.

THE COURT:  That's a great mediator.

MR. CEDILLO:  So we've got our fingers crossed.  But anyway, Your Honor, perhaps a stay if it's nice and short and sweet may not be a bad idea is just my two cents.

THE COURT:  All right.  Let me hear from the rest of the plaintiff's team and then I'll hear from you again, Mr. Davis.  I don't know, Mr. Davis, you were about to stand up and say, *Well, I don't want Mr. Cedillo to be there at the mediation.*

MR. DAVIS:  I always want him there.

MR. MAYS:  Judge, just comments on the timeline just because, again, the class action was filed in February 2023, it's been going on for two and a half years.  The motions to dismiss that we're talking about for which the R and Rs just came down have been pending for I think over a year.  There was almost a year between the class plaintiffs asking for leave to amend their complaint before that was granted, so when we talk

about a stay that would allow us to see how this pans out, we're talking potentially years.  And my concern is that if the Court's concern is judicial economy and fairness to the parties, that's not only unfair to Mr. Paul, it's unfair to defendants here as well.  I think the parties here deserve some resolution to this case that have been working very hard on over the course of --

THE COURT:  The Court won't impose any sort of indefinite stay or a stay that would have that sort of -- visit that kind of prejudice, I won't do it.  But I'm worried about getting deep into these discovery disputes if they're -- as I said, they sound like every time I'm having a discovery dispute, it's about somebody who's in that case.

MR. MAYS:  I understand.

THE COURT:  And so I'm just worried.  All right.  Mr. Davis, let me here from you, sir.  Eventually I will get to the actual motions before the Court one way or another, but these issues were in my mind all week while I was looking at the motion to transfer and stay and so they're still there.

MR. DAVIS:  Or Judge, you don't have to if there's a limited stay, we can all go home.  I was listening to Mr. Cedillo and I agree with him on some things which is I don't know the procedural postures, I don't know if the class action side is even objecting or responding to those objections because I don't have a flavor for what that fight is.  I guess

they haven't objected to the R and R --

THE COURT:  Yeah.

MR. DAVIS:  -- at all, and so I don't have a real understanding of the concrete timeline.  I agree with counsel, no one wants an undefined stay.

THE COURT:  You should have no concern about that. I'm not going to do it.  We move faster here than in Austin.

MR. DAVIS:  And so what Mr. Cedillo was suggesting was like if the timeline is in the near future and we can all get a little more information, then that would help drive it.  I don't know because the class action parties aren't before this Court.  Your inquiry, Your Honor, about mediation, it would be great if they could be -- I don't know if they even mediated in that case, I have no idea because I'm not involved, but that would be something useful because I do think it's obviously there's some overlap.  I'm sure there's some concern on both sides.

THE COURT:  All right.

MR. DAVIS:  But since they're not before you, that they can be compelled to mediate.

THE COURT:  All right.  Let me ask you one further question about this possible very limited stay to try to address this issue.  Yeah, one question.  You have right in front of me right now a motion for leave to take videotaped depositions of people who have been willing to come in, but

they're in foreign countries.  It sounds like they may be potential class members if that class went forward or maybe not, I don't know what your view is about that.

MR. DAVIS:  That's a good question.  Ms. Small is going to address that motion, but our --

THE COURT:  The reason I'm asking is would I stay any action on that motion from your perspective?  That's my question.

MR. DAVIS:  I think you might.  I would need to kind of confirm that.  My understanding in the beginning that the class did not include foreign citizens, but I may be wrong, so I don't have the answer directly to your question.  I have talked to those folks and I can speak to the factual assertions of them being willing to testify and wanting to do all that, Your Honor, and certainly the fact that they consider themselves victims.  I just don't know if they're within the class.  And counsel for Mr. Paul, because they may be involved in both cases, may be able to speak to that.  Otherwise, we can make a call to the counsel for the class folks and see, Your Honor.

THE COURT:  Figure it out.  All right, that was my question.  The flip-side question to Mr. -- thank you, to Mr. Cedillo was about their motion which was to compel production of communications kind of within the group of the Coffee Break Productions group and varied persons and there's

claims of privilege and so forth.  Do you think that's a motion that if I did a limited stay should we wait on that motion or do you think that motion is independent from these matters?  Do you see my question?

MR. CEDILLO:  I see the question, Your Honor.  I think you could do it either way and it would work out well.  If you want my preference, I'd like a ruling on this limited motion, it's very concrete, it has to do with whether or not the journalistic privilege is going to prevent us from doing this -- you're going to have to decide if our burden to prove defamation and actual malice, if the circumstantial evidence of the cases say I'm entitled to get to includes these two members of the editorial team.  The brief presentation I'm going to give you is going to summarize some of the things we learned yesterday in the defendant's deposition that I think will weigh on how you interpret the case law that we have cited in our briefing.

Having said all that, yes, I'd like to go forward and have them start producing that if we win.  Quite frankly, could this wait two, three weeks depending on how limited your stay is?  Yes, it could, Your Honor, quite frankly.  But if I have a vote in this, I'd say let's go forward with the motion.

THE COURT:  All right, very well.  Yes, Mr. Davis, yes, sir?

MR. DAVIS:  Your Honor, I received a little additional

facts.  Apparently as to the foreign witnesses, apparently they're represented by the same lawyer representing the class folks, not quite sure that they're class members, but Mr. Kerker who was here --

THE COURT:  Yeah, who was here and I quashed information.  I looked at stuff in camera on that case.

MR. DAVIS:  Correct, Your Honor, so he's confirmed that he represents them.  Now, we also have among the ten depositions in the future that's not a subject of any motion, we definitely have class members set.

THE COURT:  I kind of assumed, yeah.

MR. DAVIS:  Yes, Your Honor, and those will be set for depositions as well.

THE COURT:  And then there's -- I don't think I have them in front of me.  I think there's, as I mentioned, additional motions that have been filed.  One is to identify a whole number of potential third party -- responsible third parties.

MR. DAVIS:  That would be for designation at time of trial, Your Honor.

THE COURT:  Right.

MR. DAVIS:  And we would say that if the Court goes the way of the stay, then even if it's limited for several weeks which is fine, we all get a peak that everything should be stayed.  If we're not going to do the stay, then it's down

the road, but I did want to confirm that Mr. Kerker is representing the foreign folks, I'm just not quite sure if they're perspective class members.

THE COURT: All right, very well. Thank you. All right, appreciate the parties' presentations. It's a complex situation, hard to figure out the best way to approach it. I think this is what -- I'm looking at all the matters in front of me. I think this is what I'm going to do. I am going to stay almost everything for 30 days. I'm going to stay all the motions that are -- any sort of filings on the motions that will be delayed, any other proceedings in this case. There's, like, current motions that have recently been filed, parties don't have to respond to those, things like that, and I'm going to stay proceedings on the pending, the already briefed motion that was set for a hearing today for leave to take the videotaped depositions until I find out what happens on the amended -- if there's an amended complaint, how the judge resolves the objections to the report and recommendation.

I will be asking the parties to provide me a joint advisory as to the status of the case in 30 days and then I'll reset. And what I'll do is I'll set up another hearing and reset deadlines as is appropriate for this case and so forth once we have that. I am, however, going to hear argument on the one which I thought was somewhat separate from that case which was the motion to compel production of communications to

and from Harry Bagg and Ed -- I am not going to be able to say his last name-- Leszczynski.

I'm not saying I'm going to rule on it, but if there is additional information that's been provided, I at least want to hear what that additional information is, get a response from Mr. Davis about that, see if I need supplemental briefing in light of that new information that y'all just obtained.  I also would want to -- part of that advisory that I'll need from the parties will be an advisory as to obviously as to the outcome of the mediation in this case or whether there will be further mediation in the future.  So, that's why I'm going to stop everything else, I'm going to try to just focus on this one motion and just I want to hear from the parties to see if I can rule now or if I need supplemental briefing.  If I do, I'm going to stay that too.  I'm going to let y'all get your business taken care of with the mediation in this other matter before I make y'all do more work on the case, but y'all are here, y'all are ready and I want to try to resolve as much as I can in the case, so I'm going to hear on that motion.

Mr. Cedillo, that means I think I'm going to hear from you, sir.

MR. CEDILLO:  Thank you, Your Honor.  I think the high-tech people are going to put something up on the screen.  It's a very short number of slides, Your Honor.  I do have a hard copy if the Court wants to have one to keep as a souvenir

from the hearing today.

THE COURT:  Did you provide a copy to opposing counsel?

MR. CEDILLO:  Yes, of course, Your Honor.

MR. DAVIS:  Thank you.

MR. CEDILLO:  I wouldn't use it if I didn't give them one.  And Your Honor, given what I know the Court has announced it's going to do, I'll be happy to answer any questions on the legal briefing that we've given you, but I think that I might be able to give the update that you want from what happened with this short PowerPoint.

THE COURT:  All right.

MR. CEDILLO:  And Your Honor, the *Why we're here* slide that I'm leading off with, in the briefing we saw the subject communications.  They're basically these five I think You Tube presentations that were made by the defendant.  There were three that were done in December of 2022, Your Honor.  The *Investigating Logan Paul's Biggest Scam,* that's what they called it, that got 10 million views.  That was the first one in December of '22.  The second one with 5.8 million views was entitled *The Biggest Fraud in Logan Paul's Scam.*  The third one, Your Honor, is at the bottom with 8.6 million views, that was called *Ending Logan Paul's Biggest Scam.*  And then the other two that make up the subject communications that are what we want to inquire about among his editorial team, both in June

of 2023, I believe the first one was about Logan Paul's quote/unquote refund with the heading *It's Not Great,* that got 5.4 million views, and then the second one in June of '23 entitled *No Refunds* got six-point -- 6 million views.

Now, what we want, Your Honor, we are seeking the communications with the editorial team.  And I'm not going to emphasize what you've already read, but obviously when you're talking about the journalistic privilege, the cases that are cited by both parties and distinguished by us, the ones they cite, they deal with the First Amendment protection and the right to keep a source confidential.  Let me emphasize, Your Honor, we're not talking about confidential sources.  We're not talking about a source that gave this defendant, who claims he's a journalist, information so he could perform some kind of journalistic task.  We're talking about Mr. Bagg and Mr. Liszczynski who were part of the editorial team.  That was identified yesterday or confirmed yesterday by the defendant in his deposition.

THE COURT:  Can you tell me a little bit more about that?  How did that go in the deposition?  That's the main thing I was wondering about.

MR. CEDILLO:  Yes, sir.  I think this slide will tell you.  He testified yesterday that they would Workshop the titles to the videos that I just ran you through, specifically with Mr. Bagg.

Now, one of the six factors under 23.024, the relevance burden that we to have meet and so forth, in their reply I think they only raised that there were three of them that we could not meet, they claimed, and I know the Court will be very familiar with all the arguments, but one of them they claimed was relevance, Your Honor.  Well, Mr. Findeisen yesterday told us that he would Workshop these titles that we saw, the ones that we saw just now about *Investigating Paul Logan's Biggest Scam, The Biggest Fraud in Logan Paul's Scam, Logan Paul's Scam Isn't Over.*  Those were titles that were Workshopped.

And then there are something called thumb takes or something, I'll talk to you about that too that also were part of the Workshop.  For example, these were the titles specifically, Your Honor, that I just ran you through, somebody got together and said, well, what are we going to call this thing.  We want the internal communications.  That's circumstantial evidence, Your Honor, but as the cases teach us, that is the way you prove actual malice.  If I knew that what I'm putting down isn't true and I'm putting it down anyway because that's what's going to generate 10 million views or 5.8 million views or 8.6 million views, Your Honor, in an industry where the more views you get, the more money you put in your pocket, what were the discussions like, what is the circumstantial evidence among this editorial team.  These

aren't confidential sources.  This isn't a journalist trying to find out facts that he can report on.  We learned that yesterday, Your Honor.  The same was done for the other two, *Logan Paul Scam Isn't Over, Logan Paul's Refund,* all that.  And we have a dispute over whether it's a refund or a buyback, the parties disagree.  That's why *refund* is in quotes and they know we don't like calling it or Mr. Paul doesn't like calling it a refund, so that's what they call it and so forth, but somebody chose that and we want to dig into that.

He also testified, Your Honor, that there were certain decisions made to clip portions of our client's statements that were going to be used in specifically one of these videos, the refund video and he said that that could have been made by Mr. Bagg, one of the people we want discovery on.  And here is the example, Judge, that was the subject of the deposition yesterday, it's a short quote.  He's quoting Mr. Paul, *"As far as the game itself, unfortunately it will not be released, I personally spent $400,000 to have it developed and after its completion in early 2023 and some further diligence, unfortunately there are too many regulatory hurdles."*  And then the yellow starts.  *"Hurdles that would need to be cleared that I did not originally understand and would ultimately delay this buyback even further."*

Well, he stopped it at hurdles, and he was questioned about that.  And he said that was a decision that could have

been made by his editors which are these folks that we want to depose.  Those are examples, Judge.

He also testified yesterday that the graphics on the You Tube thumbnail that displayed, Your Honor, an absolutely fake purported text message on a phone that was absolutely fake and that was something that could have been made by the editorial team.  What am I talking about?  I guess these are like teasers, you know, to entice people to spend 31 minutes of their lives to watch --

THE COURT:  Click bait or whatever the phrase is.

MR. CEDILLO:  Yeah.

THE COURT:  I'm not -- I don't do any of these things.

MR. CEDILLO:  I'm learning a whole new.

THE COURT:  Unless it involves the Spurs, I almost never click on anything.

MR. CEDILLO:  That's right.  This one at 8.6 million in December of '22, they -- supposedly he's claiming that he can leak a text that says, *You want a scam?  Yup.*

Now, there has to be discussion around deciding how to create this, what to create and the decision to pull the trigger and say let's go ahead and run it, and the decision was made, Your Honor.  And we think the request, given this new information, the request is very, very proper.  There is, there is the word "scam" there is the word "fraud" in the very titles.  He's accused of operating a scam.  He made a

distinction or tried to yesterday, I tried to follow it in his deposition that, *Well, the result was that people were hurt and that's why I can call it a scam because people were hurt.*

And I don't think that's going to be very persuasive in any jury that we pick, but that doesn't matter. What we're looking for here isn't to prove our case. What we're looking for here is to get the evidence of what was the state of mind. Did he have intentional purpose in deciding to make the statements that he did, and he can try to run away from it as much as he can, but he called him scammer, he called him running a scam, he said the biggest fraud that was part of the scam. He used those words over and over again, making the accusation, and I think that if we get to his editorial board and get into the give and take between them, which is highly relevant, I think that we're going to find out. And the rest of this, Judge, goes to legal argument. Happy to answer any questions that you might have on that.

THE COURT: Yeah, my two questions aren't -- I'm going to be asking Mr. Davis about how the journalistic privilege would show the interest, the public interest would outweigh your need for the information in the case. But I'm concerned about two things with regard to your side of this argument, Mr. Cedillo. First one is the alternative means of obtaining the information. Have you sought the information from Mr. Bagg or Mr. Leszczynski and is there some reason you can't?

MR. CEDILLO:  Your Honor, this Court in all my appearances always had the big picture, judicial economy and resources and so forth.  Your Honor, the law shouldn't make me do something that's futile, and we make that argument in our reply.  If we go to these people, they're going to raise the same privilege.  They're going to say, oh, no, it's covered by the journalistic privilege.  It's not.  I mean, even if you want to spot him that he's a journalist, which I don't think so, I don't think you do a hit piece to run on You Tube and that makes you a journalist any more than you do a dance and you put it on TikTok.  That doesn't make you a journalist either.  But if you want to spot him that he's a journalist, you take a look at the factors that the State statute tells us that we have to comply with, and Your Honor, it makes no sense for me to go try to take their deposition and get the same objection raised.  He's got them, he was part of it, he's a party, I can go and try to get it from him.  Well, we saw how that worked out, we were rebuffed at everything.  He says, oh, go look at the privilege log.  Well, the privilege log has all kinds of stuff in very, very general terms and it tells us nothing.

He then, Your Honor, seemingly agreeing with us when we filed our motion to compel and said your privilege log amounts to a waiver because you haven't done it the way the federal rule and the case law says you're supposed to do it, he

then said, okay, here it is again. And all he did was give me the words of the statute without giving me any indication. So I've tried getting it from him who is a party to the communication. I don't believe that it's judicially efficient or practical for me to go try to get it from these two guys. One of them is in England, the other one I think is in Australia. And I'll be faced with the same objection. Let's tee up the objection as we're doing here now and I think it's very simple, if I'm entitled to this kind of evidence, and I believe the cases clearly say that I am, this is the only way that I'm going to prove that he had actual intent, which is a high burden and I'm supposed to be able to get to it. The U.S. Supreme Court says even when there is journalistic privilege involved, the cases we cited say that I'm entitled to get it because it's weighing the balance that you were referring to. So for that reason, I don't think I should have to do it in two strikes when I can just go to one.

THE COURT: The other question, I think you alluded to it briefly there, this series of agreements and then third-party review that was conducted as to the materials that went back and forth and there's a declaration of counsel, Mr. Phillips saying, look, you know, we weren't bound by that in any way to make -- to not seek particular information. But with regard to the question of actual malice, I'm wondering what's your -- I mean, usually people engage in those sorts of

agreements to try to preclude motions like the one that's in front of me from coming to court. I want to hear your views on it, sir. And like I said, I think you alluded to it, at least impliedly.

MR. CEDILLO: Your Honor, I think actually that's a head-fake, Judge. Not to be disparaging, but I think that they're missing the point on that. Number one, the areas of the third-party review were two very concrete and very, very specific. And if you take a look at what they were supposed to do, which I think they did to some extent, you can see why it doesn't cover the information that we want. And I'm trying to find it so I can quote directly to you, Your Honor, the two areas that it was supposed to be. One was *that there was a lack of bad faith or fraudulent intent on the part of Paul as it relates to the CryptoZoo Project,* or the second one, *defendant's own documents, notes, drafts or outtakes that would show that the defendant expressing an acknowledgment, belief or understanding that Paul acted in good faith or with a lack of bad faith and/or fraudulent intent.*

That's from Mr. Philip's declaration. And you take a look at that, Judge, and I think the question you ask yourself was or should be is this review intended to identify all materials relevant to the actual malice inquiry that we have to engage in to meet our burden. And I think the answer to that is no, Your Honor. The subject communications that we're

showing you here, we never agreed in the limited review that was done up there that that was all we were ever going to try to look for and look at.  And if you take a look at it, Judge, with the understanding that the essential element of actual malice is this intent, that's what the cases tell us, the state of mind at the time of publication is the information that we're going to be getting.  And the state of mind at his actual publication is not going to be something that a limited review or third-party review of the first one or the second one is necessarily going to delve into.

THE COURT:  Can you repeat the second one to me again? I was looking for it myself.  That's the one I'm concerned about.  Obviously, the part about Mr. Paul, I don't see how this would be relevant to that at all.  It's the second.

MR. CEDILLO:  *Defendant's own documents, notes, drafts or outtakes that would show that the defendant expressed an acknowledgment, belief or understanding that Paul was acting in good faith or with a lack of bad faith and/or fraudulent intent.*

THE COURT:  That's the one I'm wondering about because, for example, you showed on one of the PowerPoint slides where the -- the language was highlighted that about that there were regulatory hurdles, that I would need to be cleared, that I did not originally understand, ultimately delay this buyback, that that was edited out in a way that would be

prejudicial to your client.  That sounds like drafts going to the question of whether there was a fraudulent intent or otherwise.  It sounds like it's within the scope of the second one that you just mentioned, unless I'm misunderstanding.  That's my concern, and I'm happy to hear what you have to say.

MR. CEDILLO:  Well, except, Your Honor, that if the limited review was based on Mr. Findeisen expressing the acknowledgment, belief or understanding that Paul acted in good faith, what was the discussion about?  Says, well, let's take that out because it really shows that he's got good faith and that's not going to sell the video, I'm going to edit out the stuff that says things that tell me that he was acting in good faith.

And instead, what is the discussion?  What is the circumstantial evidence around it?  Did these guys push back?  Did they say, well, wait a minute, I think this is going to make it sound like he knew what he was doing and it doesn't tell the whole story.

A third-party review where it was limited to Mr. Findeisen acknowledging that Mr. Paul acted in good faith, when he took out something that would prove that so that he could sell the video he was doing that the refund is not great and that the biggest fraud in the scam, I mean, that goes against the message of all of his videos.  And if there's circumstantial evidence to prove that, that's what we need to

be able to prove actual intent, Your Honor.

THE COURT:  All right.

MR. CEDILLO:  Did that answer your question?

THE COURT:  Yeah, but it may not have answered it the way you wanted it to.  It makes me worry that that's exactly what's in the third parties' -- I think that leaves you, to my mind, that leaves you to the fallback argument which is your more global argument that says, look, we went through this third-party review, that doesn't limit our ability to seek discovery, which was the larger point that you were making, as I understood.

MR. CEDILLO:  Yes, sir, we are making that.  We never --

THE COURT:  The more narrow point I'm concerned about because it sounds like there is some overlap between what the third-party reviewer was doing and what you're asking me to look at now, but I think your argument is that you're entitled to do that.

MR. CEDILLO:  And not only am I entitled to it, Your Honor, I do see -- and let me make one more shot at trying to clarify it.

THE COURT:  Sure, thank you.

MR. CEDILLO:  When you have a third-party review that says show me something that proves a point, he's not going to look for something that he omitted or didn't -- if it showed

the opposite.  If you're asking me to find something where Mr. Findeisen says that Paul acted in good faith, that doesn't necessarily cover a statement where he says let's do it this way because it will really make him look bad.

THE COURT:  All right.

MR. CEDILLO:  That's the point, the bigger point I'm trying to make.  A third-party review is going to be focused on this is what I'm supposed to look for.  It's almost like a search term, and the fallacy of search terms, Your Honor, is that sometimes when the opposite is being done that would prove the point, the search term doesn't pick it up because that search term wasn't there.  I've had that happen in a bunch of cases.  And that's why we never agreed that this was the only bite we were going to have.  This is part of their argument that we're getting two bites at the apple.  Well, that's not the case.  We just don't think that the two points were intended to encompass the kind of circumstantial evidence that I think we are entitled to delve into to meet our burden of actual malice.

THE COURT:  Very well.  Thank you, sir.

MR. CEDILLO:  Thank you, Your Honor.

THE COURT:  I think I'm going to hear from Ms. Small at this time?

MS. SMALL:  Yes.  May I approach?

THE COURT:  Yes, please.  And I'm happy to hear any

response you want to make to Mr. Cedillo and I would be very interested in any responses to the questions I had.

MS. SMALL:  Certainly.  So, I think what I'll try to do is I have responses to your questions, responses to Mr. Cedillo's statements, but I'll try to take a step back to kind of get us organized because there's been a lot of production in this case.  The tainting review itself was complicated and took over several months, so I want to make sure we're talking about facts and what's been provided, what's been reviewed and what the agreement was.

THE COURT:  All right.

MS. SMALL:  So, back in April, defendants filed their second motion to compel in this case seeking, quote, *any documents, notes, drafts or outtakes in our possession that would demonstrate Paul's good faith intentions or lack of bad faith intentions.*  They define it as --

THE COURT:  So, plaintiffs filed that motion, not defendants.

MS. SMALL:  Did I say defense?

THE COURT:  Yes.

MS. SMALL:  Sorry, Your Honor.  The plaintiffs filed this motion.

THE COURT:  Got you.  That's the other case, not this case.

MS. SMALL:  Sorry?

THE COURT:  I'm kidding.

MR. DAVIS:  That's the overlap, Your Honor.

THE COURT:  Thank you, Mr. Davis, for picking up on my irreverence.  I'm sorry, ma'am.

MS. SMALL:  So anyway, docket 77 was Mr. Paul's motion to seek communications as well as anything internal, the outtakes and notes, the drafts, and they defined it as the, quote, malice evidence.  We saw that, we had really good actually productive conversations, Mr. Phillips and I, Mr. Davis, and we reached an agreement.  We said how do we balance this, right?  They weren't really contesting that the information was privileged, but we weren't really contesting that it would show -- we were contesting it would show malice. So we thought of the taint team idea, a neutral third party could come in, look at everything that we've withheld under a claim of privilege and decide does it meet this criteria.  So the criteria we decided on -- may I approach, Your Honor?

THE COURT:  Yes, you may.  You've got something to provide me?  So long as Mr. Cedillo knows what you're talking about as well.

MS. SMALL:  I'm going to give him a copy.

THE COURT:  Okay, very good.

(Pause.)

MS. SMALL:  This is the actual kind of memorandum of understanding that was provided to the taint team as agreed by

both parties.  It says very clearly in the first paragraph, Your Honor, *This document review is being jointly requested by the parties for the purpose of resolving a pending motion.* That pending motion, the one over here, for internal documents, communications and outtakes, number 77.  *We want the neutral third party to review documents withheld by defendants based on a claim of qualified journalistic privilege.*

If you go down to the bottom of the first page, again it references the April 9th motion to compel, that's docket 77, and continues on page two.  You'll see at the first full paragraph the two categories the team was instructed to look at that Mr. Cedillo read.  And it includes, as you heard, number two, any communications, documents, notes, drafts, audio, videos in which Findeisen expressed an understanding or belief that Paul had good intentions or that Paul lacked bad faith intentions.  Again, going to the malice.

Now, importantly, Mr. Cedillo mentioned search terms. We told the taint team this is not a search term operation.  We told them very explicitly, if you see in the last paragraph the sentence that begins *"With respect".*

*"With respect to communications between Mr. Findeisen and others, the reviewer will need to determine if what was conveyed in sum and substance if there was a lack of bad faith of fraudulent intent regardless of whether those exact words or phrases were used."*  The second -- excuse me, the last sentence

ends, *"In sum and substance, if the materials reflect, quote, Findeisen expressing an acknowledgment, belief or understanding that Paul acted in good faith or lack of bad faith regardless of whether those terms were used."*

So, in response -- part of this agreement we produced over 16,000 files to the taint team.  This was not a limited review.  They got those files in April, they concluded their review in June.  It was extremely thorough.  What did it include?  It included the 1100 pages of texts they're seeking to compel today.  Those are four entries on our privilege log that have been on our privilege log since day one and they reviewed them.

What else did they review?  They also reviewed -- and the communications that are at issue today are a series of text messages between Mr. Findeisen and his editorial team.  The taint team also got --

THE COURT:  Can I pause --

MS. SMALL:  Absolutely.

THE COURT:  -- on that point?  And this goes a little bit to what Mr. Cedillo was saying.  These gentlemen are far away somewhere.  Was the kind of -- if to the extent there was, like, artistic editorial work on the things, was it mostly done by text or was there places where they were on Zoom putting stuff together on a screen?  I was just wondering do you know what the process-- I don't want the details, I'm just wondering

about the process.

MS. SMALL:  I know it, they know it, and the taint team knows it, because the taint team was also given the outtakes or the draft audio that our client makes.  So, when he sits down to record a video, he talks to the camera and he'll say, *Oh, no, scratch that, let's make it this,* and he's talking into the camera when he's recording, he's talking to the editorial team.  Okay?  So, he'll say things like *, Make this bigger*, or *cut that out*, or *highlight this.*

THE COURT:  So they're in realtime watching these drafts or later watching the drafts and then reviewing them?

MS. SMALL:  I'm not certain that it's realtime.  My understanding is I think the cut or the draft gets sent to the editorial team, they watch it, review it, they're listening to all the notes to the team and cut it up.

THE COURT:  Oh, so he makes notes in realtime, then they do the work.

MS. SMALL:  In realtime, yes.

THE COURT:  I got you, all right.  Thank you.  I just was kind of wondering how it worked.

MS. SMALL:  No problem.

THE COURT:  Go ahead.

MS. SMALL:  So I know that, but they also know that because the taint team reviewing some of those outtakes and they had all of them for all of the videos at issue in this

case as well as the three part series that's not at issue.  The taint team had all of those outtakes where our client's talking directly to the editorial team.  And the taint team said, you know what, some of these are responsive, some of these comments to Harry Bagg and Ed Leszczynski are responsive.  And so, what does that tell us?  It tells us that he's not in there saying direct quotes, there's not the word malice, it wasn't a hit on a search term.  It tells us the taint team did exactly what they were supposed to do which is decide is this responsive, is this not and that they had the wherewithal to decide which showed the malice that they're looking for or may show malice that they're looking for and which didn't.  The fact that we're here today just means they didn't like the result.

Now, we would never have agreed to this procedure had we known that this -- we would be back here in court.  We filed I believe several joint advisories for extensions of time on this motion telling the Court we were working through things, the withdrawal that the plaintiffs filed, that the plaintiff filed for docket number 77 says very specifically *We have resolved the motion,* period.

So, then we get this motion filed, and we even confer after it's filed and say I don't know if you realize this, but the stuff you're looking for has already been reviewed by the taint team.  They said, *No, we stand by it.*  So, that's where we are in terms of the taint team, Your Honor.

THE COURT:  All right.  I have an in-the-weeds question on the taint team.

MS. SMALL:  Yes.

THE COURT:  This is very helpful for me to look at the document.  There's two sets of issues.  There's information communication by Findeisen showing an expression of understanding or belief that there were good faith intentions or a lack of bad faith, but then there's also part one which is did anybody tell Findeisen that they lacked good faith or that he was acting in good faith or that he really had a lack of bad faith, and not using those words, but reflective of that.  That seems like more of what would maybe happen here.  Is it to your understanding did the taint team look at that?  Were those some of the things that say -- when you said it's responsive, are there responsive statements just like Findeisen or there were responsive statements disclosed from Mr. Bagg or Mr. Leszczynski?  If you see my question.

MS. SMALL:  I do.  I think it's two parts, but to answer one question, did the taint team follow this protocol?  I think we can only assume yes, so they were looking at both prongs.  When they identified the responsive materials, and I think there was four or five out of 16,000, they didn't identify which prong that was responsive to.

THE COURT:  All right.

MS. SMALL:  Does that make sense?

THE COURT:  The stuff that was responsive, were there statements made by Bagg or Leszczynski or is it just statements made by Findeisen?

MS. SMALL:  It's statements made by Findeisen to Bagg and Leszczynski.

THE COURT:  Yes, with nothing coming back.

MS. SMALL:  Correct, correct.

THE COURT:  All right.  You may not be able to answer this question without spilling into the stuff that you're claiming.  To your knowledge, when we're talking about these 1100 texts, are there lots of statements from Bagg and Leszczynski or is it mostly statements they got from Findeisen or some of each?  You see--

MS. SMALL:  I do.

THE COURT:  I just want to see if that reception stuff happened as opposed to the statements, and I'll be very clear why.  Statements made by your client is going to be an admission, that's coming in.  Statements made by somebody else may or may not come in depending on the circumstances.

MS. SMALL:  Well -- and this gets to exactly why we decided to do the taint team procedure in the first place because we were looking at our privilege log with 16,000 items, hundreds of hours of video, hundreds of hours of audio, and at least in this case for Bagg and Leszczynski, 1100 pages of texts.  They know we don't have the budget that Mr. Paul does

and we said we don't want to take the time to go through and comb through every single page and parse out what's privileged and what's not, let's just have the taint team do it and they graciously agreed to pay for it, so I cannot tell you, Your Honor, that I have parsed through every 1100 -- every page of the 1100 texts.

THE COURT: Fair enough. I kind of don't want to make you do that if I can avoid it.

MS. SMALL: I brought it for you if you want to review it in camera, but I don't want to ask you to do that either.

THE COURT: Doesn't sound like that's going to happen.

MS. SMALL: Having flipped through it very generally, I can tell you it's text messages back and forth.

THE COURT: As text messages usually are. Go ahead. Thank you, ma'am.

MS. SMALL: So, that's where we are on the taint team, but I do want to address this notion that we've kind of learned something new recently. This is not at all new. So, at document 62-1 --

THE COURT: Okay.

MS. SMALL: -- we served with our first privilege log back in February a declaration of our client to accompany the privilege log. And the reason we did that is because, again, we worked in good faith with the other side to really create a -- what ended up being an over 500-page privilege log to make

it kind of helpful and break it down into different categories, and so, along with the actual privilege log itself, we provided a declaration.  And may I approach, Your Honor?

THE COURT:  Sure.

MS. SMALL:  What I've handed you is a copy of our privilege logs.  Do you have that, Your Honor?

THE COURT:  Yes.

MS. SMALL:  Okay, perfect.  So, at ECF 62-1, it was a declaration of our client that we served simultaneously on the other side to explain what this privilege log means.  And it explains the various codes, so you'll see that in his declaration at paragraph nine, Mr. Findeisen swears what code A means.  He says it was a journalistic privilege being asserted for, quote, investigative work product.  *"The items coded to this category broadly include work product I have prepared from information, for example, my draft written commentary, originals and retakes of commentary and non-substantive editing files."*  B, big B was defined as a journalistic privilege being asserted for investigative materials and communications.  *"The items coded to this category broadly include materials I obtained from online or other sources and internal communications with my team about the investigation and reporting."*

So, that explains what items one, two, four and five are in the column privilege code, exactly what type of

privilege is being asserted.  We went further and identified a subcategory to further explain the type of documents that were contained in each entry on the privilege log.  And the ones I've highlighted, one, two, four and five are the communications at issue with Mr. Bagg and Mr. Leszczynski and they all bear the subcategory little (e).  And in Mr. Findeisen's declaration, he says, *"Items in this subcategory are my communications with third parties as part of my investigative process and/or communications I received while acting in my capacity as a journalist.  These include communications with third parties and sources and communications with my team members regarding the reporting on Logan Paul CryptoZoo and the production of the same."*

So, I want to put that out there because this has been addressed.  There's been an argument that we didn't somehow log these.  We've logged them since February, we've given the details behind them, so I want to address that because I know waiver was briefed in their papers.

And then finally, Your Honor, I want to address kind of what is the statutory privilege because Mr. Cedillo seemed to focus on this notion that the privilege only protects sources, and of course it's much broader than that.  So, the Texas statutory privilege at Civil Practice and Remedies Code 22.023 includes, quote, *any confidential or nonconfidential information, document or item obtained or prepared while acting*

*as a journalist.* And in the definitions, the journalist includes not only the journalist himself, but a person who supervises or assists in the gathering, preparing and disseminating of news. So, I don't think there's a serious challenge, at least in their papers, that Mr. Findeisen is a journalist, at least they haven't argued that in this motion or that the editorial team were assisting in that process. The question is did they get over the balancing test over the privilege, and that has already been decided by the taint team, Your Honor.

THE COURT: All right, two questions. One having to do with the last thing that you mentioned, the statute 22.023. Isn't part of your argument that there's supposed to be a relevantly high burden on them to pierce this privilege or do you believe that the burden is on you to show the privilege in this matter?

MS. SMALL: The burden is on us as the privilege holder to establish the privilege. They're not contesting the privilege, their briefing is on here is why we overcome it.

THE COURT: Isn't that burden on them then?

MS. SMALL: A hundred percent.

THE COURT: Okay. Yeah, that's what it seemed like. The other question is I know you're saying, look, we went through this whole process, we didn't intend to go through that process with the third-party review and then get ourselves into

a motion.  But the fact of the matter is the third-party review probably solved all but four of the 16,000 entries on the -- or whatever gigantic amount of information, we're just down to this, so it seems like the --

MS. SMALL:  Are we?

THE COURT:  Well, I don't know.  It seems like the third-party process -- if we are down just to this, it seemed to have served a great function and it seems like you could say, hey, look, the third party cleared out a giant amount of information, but there's some we're still fighting about.  That happens sometimes and I'm wondering -- and in those circumstances, I mean, I'm doing this in a -- it's not y'all's case, but I have a giant securities litigation case right now where I'm mediating the discovery disputes and if I can't get them resolved, you know what, the next judge gets to hear them in Austin.  I mean, that does happen sometimes, so it doesn't strike me automatically that y'all would agree to this solely for the purpose of avoiding any motion, but instead to narrow, tremendously narrow some of the issues the parties might have. I want to hear your response on that.

MS. SMALL:  Perhaps that would have been true if they hadn't filed a specific motion asking for these exact type of documents, but they already had.

THE COURT:  And withdrew that motion, specifically saying it was resolved.

MS. SMALL:  Withdrew that motion saying it was resolved, so this wasn't an abstract discovery dispute.  This was a specific request, a specific motion that was resolved.

THE COURT:  So, to press you on the issue, it's not so much we never would have gotten into this and gone through this whole process had we known as opposed to we went into it, you know, hoping that it would revolve it and then you told us it was resolved, so why are we here now.  That's what it sounds like.

MS. SMALL:  Well, yes, but --

THE COURT:  I may be cutting in a little nuance, but that's the question I'm going to ask the other side in a moment.

MS. SMALL:  That's a hundred percent true and I have the contemporaneous e-mails before we even got to the taint team memorandum of understanding, there was an agreement that we would produce everything on the privilege log, they would pull down the motion.  That was the agreement.

THE COURT:  All right, very well.  Thank you. Mr. Cedillo, happy to hear you in rebuttal, brief rebuttal on some of these issues.

MS. SMALL:  You know what, I did want to make one other point, I'm sorry.

THE COURT:  Wait one second, Mr. Cedillo, there's one other point.  That's fine, Ms. Small.

MS. SMALL:  Because you're reminding me, Judge, that you had a question to Mr. Cedillo about one of the text messages that Mr. Findeisen was questioned on in his deposition, the one where it ended at regulatory hurdles and then kind of went on.  That was not part of the taint team process.  They've had that, that wasn't a privileged communication, they've had that from the beginning, so I wasn't sure if the two were being conflated, but I did want to make that.

THE COURT:  Okay, all right, very well.  Thank you.  Yes, Mr. Cedillo, let me hear from you.

MR. CEDILLO:  Just a couple of quick points, Your Honor.  Number one, I want the Court not to have the wrong impression.  All this work with the third-party review and so forth, you would think that, oh, well, both parties went through a whole lot to get to this whatever.  One thing was missing from the story line is that it cost them nothing.  We paid for all of it.

THE COURT:  It wasn't missing.  They mentioned that they were very happy that you paid for the whole thing, so I don't think they're disputing that, Mr. Cedillo.  That's fine, sir, go ahead.

MR. CEDILLO:  Now, we never -- and you look at this agreement, and I think a fair reading of the exhibit, the memorandum, it's what you do when you're looking for direct

evidence.  But Your Honor, circumstantial evidence is a lot broader than a direct statement where you have a smoking gun where the defendant says, *I know that what I'm publishing is false.*  Well, yeah, it would be great if they found that and they gave it to us, that would be wonderful, that's direct evidence.  It's an admission, we'd get it out of him anyway, etc., etc.

Circumstantial evidence, things that he's hearing, things that are being said between the two members of his editorial team after they've talked to him may or may not have been part of what these people looked at, but they're in his possession.  And things that would show bias on his part, that the content that he's putting on You Tube is driven by a bias he has.  His financial motive, no, let's not do this because we'll get more clicks if the headline reads this way.  That is circumstantial evidence between the two of them who have gotten their instructions from their boss that they're working for. That is not included in the description of what the objective is to try to get.  Plain old-fashioned, you know, he don't like the guy, animus, he's doing this because, yeah, that will really rile him up or I want to do it because I don't like the guy.  Circumstantial evidence would establish all that.

You don't get to say, well, I'm a journalist, so I can be protected.  The balancing test comes in and says, well, yeah, maybe we're going to spot you you're a journalist, and we

are spotting him that he's a journalist for all this. I gave you personal opinion. Forget it. Assuming he's a journalist, then that doesn't -- and the case they cite about the guy that wanted a hearing to clear his name before a school board, the Court is very, very clear in that case, it said you being a journalist doesn't outweigh the need that we have.

We have the burden to prove actual malice. We can do that through circumstantial evidence. We do not think that the privilege log gives us any idea of what this is. And you look at the (a), (b) and (e) designations that are in the log, Your Honor, and none of that ends up, I think, outweighing our need to meet our burden through circumstantial evidence which the Court said that we are able to obtain.

And the concept, Your Honor, that because we went through a process that tried to make a headway on getting as much that we could agree on and be penalized for that by saying, well, that was your only shot to get it when we still have to meet the burden of actual malice. I don't think there's any agreement that we've ever entered into that said that this was the only way we were going to agree to try to obtain it.

THE COURT: Well, let me ask you about that. I was making your argument for you on that point to Ms. Small, but then I also made -- *(inaudible)*-- which is like, then why did you tell me it was resolved? If the matter is resolved, it's

resolved usually is what that means.  I usually don't get to unresolve resolved issues, that's kind of how we go forward.  I wanted to hear from you on that.

MR. CEDILLO:  Your Honor, litigation is a dynamic thing.  You end up finding out or having a new reason to suspect that there's something more there.  We continue working the case.  Judge, I have never had a lawsuit where I stopped thinking about something that I think that the judge has already decided.  I go home and I start thinking about how I can undo it or, wait a minute, what did I miss.

THE COURT:  I don't think I want you in my cases anymore, Mr. Cedillo.  I'm kidding, very happy to have you here.

MR. CEDILLO:  I learned that from Mr. Davis, by the way.  But in any event, Your Honor, we go where we need to go to serve our client's best interest and when we look and we develop and we learn and we see the timeline more clear and we see what we are not being told by the information that we are getting and we take a look at the possibility that, well, wait a minute, relying on journalistic privilege when, in fact, may not really apply to his team.  What was he investigating?  He wasn't investigating anything.  He was trying to figure out how to write the head, the lead, to get more clicks, and we got nothing about their strategy, their business, their business plan.  We learned a lot of that stuff and how he works in the

deposition yesterday, and we wrote this motion to compel before we heard his deposition.  And when we heard his deposition, I'm giving you some of the highlights just as they relate to this guy, but Your Honor, this is a moving, dynamic process.

THE COURT:  I can understand that from y'all's perspective, but you have to understand from the Court's perspective too, it's like, look, I set these things for a hearing.  I set the motion to stay and transfer for a hearing. I get ready on these things, the Court invests its efforts in trying to get down to the bottom of these issues so I can give you answers on the merits, and if something is told to me that it's been resolved, I move on to the next issue.  And it may be that y'all would want to revisit it, but wouldn't you say that it's resolved subject to anything we learn later or, Judge, we have to ask reconsideration now because we learned something later.  I didn't get that from this motion.  I got from this motion that this had been thought about for a while and we're still fighting about it.  That's my concern.

MR. CEDILLO:  And Your Honor, your concern is valid, obviously, and very, very well taken.  I think at 47 years I've always depended on the overriding objective of Courts to get things right, the overriding objective of Courts to make sure that justice has been served and I've never had a good judge afraid to change his or her mind or look at things with a fresh set of eyes after a decision has been made if justice required

it.  And from all my experience, with all of the judges in these courts in the Western District, the San Antonio Division, I've never been reluctant to go to a judge and say, you know, I need something else, and then let him or her make that call, magistrates or judges.  And so I was, quite frankly, asked, you know, should we be coming again?  I said our Courts want to get it right.  If we have a good argument, they'll listen to us. So, I said file it, and I still stand by that and I understand the Court's concern and I'm not disagreeing with it, but I think we're right on this, Judge.  We do have a very high burden.  When you look at what the statute says you're supposed to do in balancing, I think we come out ahead on that.

THE COURT:  All right, very well.  Thank you.  The Court is going to take a short recess and I'll be back.

COURT SECURITY OFFICER:  All rise.

*(2:21 p.m.)*

                              *   *   *

*(2:45 p.m.)*

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.  Back on the record in SA:24-CA-717.  The Court has carefully considered the motion to compel production filed by the plaintiff in this case and I think I can rule, though I will say my ruling to my own ear is more convoluted than I would want it to be and in one way tentative, but I will give you my ruling.  I'm going to deny

the motion without prejudice at this time, and I'll explain why. The parties did not really argue a lot about the law in this issue, particularly the statutory journalistic privilege. The parties did cite it. The fact of the matter is there's very little law directly on that privilege. It was passed, as I understand it, in 2009 and have been very few cases that have interpreted it. But I think the burdens are clear, there has to be a burden to raise the privilege and then a burden to overcome it. There are a number of factors, six total factors that the parties have identified, the Court's greatest concern in this case is the issue whether the privilege -- the movant's interest outweighs any interest in the gathering or dissemination of news. That's Texas Civil Practice and Remedies Code 22.024, subsection four. That's the thing that I'm thinking about the most and it does tie into the procedural and factual issues that the parties raised.

The procedural question is this, the parties attempted to address many of the issues that would be raised by way of journalistic privilege by way of third-party review. It was reported to me in a motion to withdraw, the original motion to compel, which I think was docket entry 26 which was on this very similar issue that this had been resolved. I hear Mr. Cedillo's point that maybe that can be changed, but this motion presented to me right now does not show me new things that would require some sort of reconsideration of that. I'm

not saying it's the whole point of a Rule 54 motion for reconsideration because the Court did not rule, it was withdrawn.  But there has to be some basis for reconsidering the viewpoint that the parties took before.  I have not had that basis presented to me and it has to be a basis that meets 22.024, subsection four, that the need outweighs the journalistic privilege.  If that was resolved before, I've got to have some significant reason why it hasn't been resolved now and I haven't seen that significant reason here, and that's why the motion is denied without prejudice.

Mr. Cedillo has mentioned that things happened at the deposition or other discovery has been obtained that may change the balance of what was done earlier.  I don't see that before me sufficiently to overrule, to step back from that position earlier and that means that the burden has not been met by the plaintiff to overcome the privilege in this case.  So that's my somewhat convoluted explanation, but the fact of the matter is I'm going to take the privilege seriously and I believe Mr. Findeisen is a journalist in this context, including his team.  It's pretty clear from the statute, it applies both to the people who assist him and the editors above him such as there may be, though this is not that particular circumstance and I'm going to need more evidence, more proof before I would reconsider the decision as to those four disputed issues with regard to the communications, I've gathered they're text

communications with Mr. Bagg and Mr. Leszczynski.  So I've looked at it very carefully, that appears to me to be the appropriate way to handle it now.

I will not require, Mr. Cedillo, for you to rush out and file that motion quickly because I'm going to stay everything for 30 days while the parties move forward.  If after that period of time, we hear that, in fact, Mr. Paul is completely out of that case up in Austin or we hear that he's been brought back in and that y'all are litigating that, I'll need to know about that.  Also we'll have to hear what happened in the mediation, and then if necessary I'll consider that along with the other motions that have been filed.  I'm going to stay proceedings on all those matters so that the parties do not have to spend their resources filing motions and responses to those motions until such time as I hear what's going on in the other case.  And then what I'll do is as soon as I get the advisory, I'll order an advisory and the 30 days will be October 10th.  As soon as I get that advisory, I'm going to be setting it for another status conference.  I'll have everybody in and we're going to talk it all the way through about scheduling for the motion, whatever we have, scheduling for the motions or responses, time to file motions to reconsider if that is necessary, so I think that's the way to handle it.

I'm going a little slowly here because I hear, Mr. Cedillo, as if this case is going forward, malice and

intent are going to be key, so he's got to get that evidence, but I'm also hearing that both that there's a journalistic privilege and that the parties tried to resolve this once. I'm going to have to hear what changed, so that's the Court's view. But I appreciate the parties' presentations. I hope that the parties understand that though I've been maybe somewhat facetious or humerus during the argument, I take the issues here very seriously and I'm very appreciative of the arguments that have been made by the parties because I have very good counsel on both sides in this case, makes a big difference to the Court. When it's a difficult issue, it's that kind of counsel that make the difference, so that's the Court's ruling.

Let me go around to see if there's anything further the parties need to address, of course I'll start with plaintiff.

MR. PHILLIPS: Yes, Your Honor.

THE COURT: Yes, sir.

MR. PHILLIPS: Sorry, Mr. Phillips on behalf of the plaintiff.

THE COURT: Mr. Phillips.

MR. PHILLIPS: Mr. Davis and I -- I'll come up to the podium. Not really argument, more discussion.

THE COURT: I'm happy to have it. Look, we're here, if there's things I can help move forward, let's find out.

MR. PHILLIPS: Mr. Davis and I were discussing during

the Court's recess the mediation and whether we think it makes sense to go forward tomorrow.  We're all here, we're happy to do it.  I think there's also a sense that, as we've been discussing here today, there's some moving pieces including with the class action that certainly could affect discussions in different ways, so we're kind of wondering does it make sense to push that off a little bit if we're staying the case in light of the class action.  And so, we were discussing doing that, but we want the Court's blessing to do that if we're going to do it because we do have a mediation deadline of tomorrow.

THE COURT:  All right.  Mr. Davis, does that sound right to you too, sir?

MR. DAVIS:  Yes, Your Honor, we've conferred and we respectfully request maybe a 90-day bump on the deadline to mediate.  We're also going to kind of coordinate and see if we can get all the parties including those up I-35 possibly to attend the same mediation.

THE COURT:  I'm perfectly happy to bump the deadline. I don't want a situation, though, where that means everything gets -- I mean, we need to be moving forward in the case.  I think the parties have both described, you know, we're pretty far advanced in this case and we got a trial setting that I don't want to move.  I don't think the judge is going to be willing to move the trial setting.  So, I am worried if it goes

too far down the road, especially if we're waiting for those people in Austin, it may take a while to get them to come in with you guys.

MR. DAVIS:  Maybe what we could do, Judge, is get a 60-day bump on the deadline and then we'll take a shot, these two parties, if we can't get them to join us, but by then at least we'll know what hopefully the preliminary developments on the class action side.

THE COURT:  I'll delay the -- if the parties are in agreement, I'll delay the deadline for mediation to 60 days. I'm hoping Mr. Philbin is okay with this too.

MR. DAVIS:  We'll call him.

THE COURT:  I don't want y'all to lose your mediator is my concern.  That's a good mediator and it may be hard to find one quite as good to resolve the case.

MR. DAVIS:  We may have to pay a cancellation fee which we'll be happy to do, Judge, we'll split it.

THE COURT:  All right, very well.  So then I'll grant that motion for the 60-day extension.  I will require the parties in their joint advisory on the 10th to tell me what's going on with regard to the mediation in addition to what's going on with the litigation up there.  And then at that point if we need to start going forward again, we'll start going forward again.

MR. DAVIS:  Very well, Judge.

MR. PHILLIPS:  Thank you, Your Honor.

THE COURT:  Anything further from the defense besides that?  All right.  I'll try to get an order out.  It will be a brief one that captures just the essence of the ruling that it was denied without prejudice for reconsideration based on new evidence obtained by Mr. Cedillo, and setting those deadlines as I described.  I will look forward to hearing from the parties again sometime in the future, and we're in recess.

*(2:54 p.m.)*

*       *       *

* * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Date:

/s/ Angela M. Hailey

_____
Official Court Reporter
United States District Court
262 West Nueva Street
San Antonio, Texas  78207
(210)244-5048