# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

LOGAN PAUL §
§
       Plaintiff, §
§
      v. §   Civil Action No. 5:24-CV-00717
§
STEPHEN FINDEISEN and COFFEE §
BREAK PRODUCTIONS, LLC, §
§
      Defendants. §
§

---

**REPORT OF JAMES C. SPINDLER**

---

### I.   Introduction and summary of opinions

#### A. Scope of engagement and qualifications

I have been asked to provide this report in the litigation captioned as *Logan Paul v. Stephen Findeisen and Coffee Break Productions, LLC*, Civil Action No. 5:24-CV-00717, currently pending in United States District Court, Western District of Texas, San Antonio Division.

I have been asked to address certain matters of securities markets, trading, and regulation as they pertain to this case. In particular, I have been asked to consider questions including:

- Whether the CryptoZoo offering was consistent with and would constitute an unregistered and illegal public offering of securities;
- Whether CryptoZoo's founders allocations and lockups of $ZOO were misrepresented, and whether Paul was in possession of information indicating these misrepresentations;
- Whether various discussions and records of conversation between Paul and other CryptoZoo insiders could be characterized as deceptive or manipulative;
- Whether Paul's history with at least two other crypto tokens indicates a history and pattern of attempted manipulative and deceptive activity; and
- Whether Paul's partial rescission offer would clear him of culpability under accepted securities practice relating to the CryptoZoo offering.



EXHIBIT

1

D 004901

My expertise extends to the matters covered in this report. I am a Professor and the Hart Chair of Corporate and Securities Law at the University of Texas School of Law and a Professor at the University of Texas McCombs School of Business. I hold an A.B. *magna cum laude* from Princeton, a J.D. *magna cum laude* from Harvard Law School, and a Ph.D. in economics from UCLA, with concentrations in microeconomics and asset pricing, and where I was a National Science Foundation Research Fellow. I serve as a referee for a number of peer-reviewed journals. My academic research addresses areas including cryptocurrency, the securities industry, and capital markets, and my articles have appeared in leading law reviews and peer-reviewed economics journals. My teaching covers areas including capital markets, cryptocurrency offerings, securities trading, and securities trading structures. I regularly consult on subjects including the securities industry, securities disclosure, and economic issues.

In addition to my academic positions at University of Texas, I have taught as a professor or visiting professor at the University of Southern California, University of Chicago, and University of Virginia. Before entering academia, I practiced in corporate law, credit, and securities with Cravath, Swaine & Moore LLP in New York and Hong Kong.

My c.v. is attached to this report as Exhibit A.

### B. Documents reviewed

I have reviewed the documents received from counsel as listed in the attached Exhibit B. To the extent that I have relied upon other sources or documents for this report, I have cited them herein.

## II.    The Crypto Zoo offering by Paul and others constituted an illegal offering of unregistered securities

It is my opinion that the offering of Crypto Zoo tokens, in which Paul took part, was consistent with and constituted an unregistered and illegal offering of securities. The securities registration requirements are designed to protect investors – particularly, unsophisticated investors – by limiting most investment products from accessing the public markets. By publicly promoting Crypto Zoo to the public as a money-making venture, Paul engaged in illegal offers and sales of securities.

### A. Securities registration requirements

Federal and state securities regulations are designed to protect investors from unethical securities operators, defective or deficient disclosure, and manipulative acts and practices. Federal securities law requires registration of securities offerings and securities professionals absent an exemption, and exemptions are generally unavailable for transactions involving unsophisticated persons. Under federal law, a combination of disclosure requirements and substantive controls combats fraud and deceptive practices.

D 004902

Federal law requires that offerings in the United States[1] be registered with the Securities and Exchange Commission ("SEC"), unless they qualify for an exemption from registration. The SEC registration process ensures that adequate information is made available (via a prospectus) about the securities being sold and the promoters of the offering. The intent of the SEC registration and disclosure process is that all material information about the issuer is made available such that investors (even otherwise unsophisticated ones) are able to make an informed investment decision. For offerings that do not provide proper disclosure, or for activity that appears designed to deceive or manipulate investors, the SEC can refuse to approve any registration statement or order a stop to the offering activity. State securities laws, known as blue sky laws, generally mandate similar processes and restrictions, with equally or more severe liabilities for violations, as well as the added requirement of merit-based review by the state securities examiner to ensure a minimal level of quality and safety.

The definition of what counts as a "security" is intentionally broad to capture a wide range of activity. As noted by the Supreme Court in *Reves v. Ernst & Young*, "Congress... did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment."[2] Regardless of the terminology employed or the formalities of the transaction, the economic substance of the transaction controls. As the Court stated in *Tcherepnin v. Knight*, "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality."[3]

Courts and the SEC have utilized the Howey Test for an "investment contract" in determining whether crypto offerings constitute securities.[4] An "investment contract" is one of the terms comprising the Securities Act's definition of a security.[5] The concept of an investment contract has been used doctrinally to capture any investment vehicle that is not explicitly named in the statutory definition but which, from the perspective of economic reality and the policy intent behind the Securities Act, ought to fall under the aegis of securities regulation. The *Howey* investment contract test has four factors, which are: (i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits; and (iv) arising from the efforts of others.[6] *Howey* is best understood as a functional test that examines economic realities regarding whether it makes economic sense to apply the securities laws. As *Howey* and other cases have stressed, economic substance is the most important issue: "The Supreme Court has repeatedly emphasized that economic reality is to

---

[1] Regulation S provides an exemption for offers and sales occurring outside of the United States. See Securities Act of 1933, Rule 901.
[2] *Reves v. Ernst & Young*, 494 U.S. 56 (S.Ct. 1990).
[3] *Tcherepnin v. Knight*, 389 U.S. 332, 336 (S.Ct. 1967).
[4] See Framework for "Investment Contract" Analysis of Digital Assets, Securities Exchange Commission (July 5, 2024), http://sec.gov/about/divisions-offices/division-corporation-finance/framework-investment-contract-analysis-digital-assets; *SEC v. Coinbase, Inc.*, 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024); Order, SEC v. Terraform Labs, 23-cv-1346, ECF 51 (July 31, 2023) at 29 – 42.
[5] *See* Sec. & Exch. Comm'n v. W. J. Howey Co., 328 U.S. 293, 297 (1946).
[6] *See id.* at 298-99. The original formulation included "solely" from the efforts of others, but the word "solely" has been elided by subsequent case law.

D 004903

govern over form and that the definitions of the various types of securities should not hinge on exact and literal tests."[7]

## B. The Crypto Zoo tokens are securities, which Paul offered to the public in violation of U.S. securities law

Paul's offering of CryptoZoo tokens and NFTs fits the Howey Test definition of a security.  The offering was made to the public, and there does not appear to have been any applicable exemption from registration.  Thus, this offering of securities was required to be registered, and the failure to do so was a violation of federal and state law.

Applying the Howey Test factors indicates that $ZOO was a security.  The factors are (i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits; and (iv) arising from the efforts of others.  In applying the Howey factors, I first note the following from the record about CryptoZoo and its offering of $ZOO and NFTs:

- Paul publicly marketed Crypto Zoo on Youtube as "a really fun game that makes you money."[8]  The Crypto Zoo offering comprised of $ZOO tokens, "Base Egg NFTs", "Base Animal NFTs", "Hybrid Egg NFTs", and "Hybrid Animal NFTs." The $ZOO tokens could be purchased with cryptocurrency and used to purchase Egg NFTs, which would eventually hatch. The subsequent Base Animal NFTs or Hybrid Animal NFTs would then generate a yield of $ZOO tokens, which could be collected by forfeiting the relevant Animal NFT. The yielded $ZOO tokens could then be sold and converted into cash.

- Crypto Zoo was marketed widely to the public.  From the Crypto Zoo Whitepaper, which was publicly available and described the project in detail:

---

7. Williamson v. Tucker, 645 F.2d 404, 418 (5th Cir. May 1981) (citations omitted). In *Forman*, the Court reasoned that, "[b]ecause securities transactions are economic in character[,] Congress intended the application of these statutes to turn on the economic realities underlying a transaction." United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975). As the Fifth Circuit stated in construing the securities definition, "courts should disregard 'legal formalisms' and, instead, focus on the substance of the deal—'the economics of the transaction under investigation.'" Sec. & Exch. Comm'n v. Arcturus Corp., 928 F.3d 400, 409 (5th Cir. 2019). Similarly, the *Tcherepnin* Court held that' "in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336 (1967). Construing these holdings, the decision of whether an instrument falls within the securities definition is primarily one of economic usefulness, and encompasses factors such as the risk borne by the purchaser, the economies of scale in obtaining and disclosing information, the degree of informational asymmetry, the relevance of investor rights and entity governance, and the various inputs into project success.

8 Logan Paul Announces Date for NFT Project:  CryptoZoo, Impaulsive Clips, Youtube (August 18, 2021), https://www.youtube.com/watch?v=rqrH7TbruZA&t=283s at 4:45.  See also MELLINA_00000736 at 740 ("THE NFTS PROVIDE A YIELD IN A TRADING TOKEN ON THE BLOCKCHAIN (THEY'LL MAKE MONEY").

D 004904

"CryptoZoo offers an inclusive ecosystem, open to less tech-savvy users. Through gamification, low barriers-to-entry, and investor-friendly yield mechanics, the game makes blockchain technology accessible to a broad consumer base, including new participants to the cryptocurrency and NFT space."[9]

- Paul's Youtube introduction of CryptoZoo also noted its appeal to children, who were "addicted" to the game aspects of it, and the "catalyst for a lot of young people getting into crypto…. [T]his is a very simple easy way to get involved, have some fun, and… start… building your portfolio."[10]

- The CryptoZoo Whitepaper indicates that CryptoZoo was designed to "allow[] users to earn $ZOO tokens (that are openly traded)," indicating that a secondary market in $ZOO was contemplated and an attractive feature of the investment.

In applying the first Howey factor, regarding the investment of money, I note that purchasers of $ZOO were investing money.  The $ZOO tokens were purchasable on a public market, where they could be transacted.

The second prong, of a common enterprise, is satisfied because the fortunes of the CryptoZoo investors would be inextricably tied to the fortunes of the CryptoZoo venture – the development and success of the gaming system and the desirability of CryptoZoo's tokens and NFTs.  While there was some individual variation in the potential profits accruing to investors, investors' fortunes were linked in that their profits would scale with the price of $ZOO.  As the game was conceived, the NFTs potentially yielded different amounts of $ZOO; it appears that investors were essentially buying lottery tickets that paid out $ZOO tokens based on set probabilities.[11]  The $ZOO tokens were, in turn, described as the "fuel" on which CryptoZoo transactions took place, and sales of $ZOO provided the opportunity for investors to profit in real-world currency.[12]

The third and fourth prongs, the expectation of profits arising from the efforts of others, are satisfied as well.  The efforts of CryptoZoo's promoters and developers were integral to its potential success:  much of the game remained to be developed, it would require ongoing operational management, and promoting the game and the tokens would play an important part in establishing value for the tokens and NFTs.  Paul indicated that these efforts were significant and costly, stating "we have a massive team behind it and are probably out of pocket like a million."[13]  The $ZOO tokens had a significant amount of secondary market trading activity, indicating that investors

---

[9] CryptoZoo Office Whitepaper, https://cryptozoo-1.gitbook.io/cryptozoo/
[10] https://www.youtube.com/watch?v=rqrH7TbruZA&t=283s  at 6:18, 7:20.
[11] See https://cryptozoo-1.gitbook.io/cryptozoo/eggs:  "Each base egg may be held unhatched for sale at auction, or immediately hatched to reveal a Base Animal.  The NFT animal hatched from a Base Egg is determined by a blockchain-based probability factor, so each egg has the same probability of hatching an animal with any given rarity. Eggs will hatch animals grouped by different rarity tiers."
[12] See CryptoZoo Office Whitepaper, https://cryptozoo-1.gitbook.io/cryptozoo.
[13] See https://youtu.be/rqrH7TbruZA?t=100.

D 004905

would reasonably anticipate being able to monetize their investments.[14]  The value of all of these things depended upon the efforts and ability of the promoters and developers to construct, market, and operate the CryptoZoo platform.

In sum, it is my opinion that the offering of CryptoZoo's $ZOO tokens and associated NFTs constituted an offering of securities.  CryptoZoo's offering materials were publicly available, and it appears that sales to unsophisticated individuals were anticipated  and seen as a feature of the offering.  I have seen no evidence of registration nor of an attempt to comply with any exemption from registration, nor do I believe that an exemption from registration would have been available in this case.

## III.    Misrepresentations regarding allocations and lockups

An important aspect of many tradeable assets is the volume of the assets that will be released into the marketplace.  As a matter of economics for most assets, greater supply leads to lower prices.  In the case of the $ZOO token, which was the fuel on which the CryptoZoo game and investing platform ran, the more $ZOO tokens were released and actively traded, the less valuable they would generally be.

Further, it is typical in offerings of securities that the founders, promoters, and other insiders will "lock up" their holdings upon a new issuance, meaning that they agree not to sell their holdings until some specified time in the future.  Typical initial public offering (IPO) lockups, for instance, will lock up the insiders' shares until 180 days after the IPO.  Such lockups are believed to have at least two effects:  reducing the supply of tradeable securities and selling pressure (and hence supporting the price), and acting as a show of faith on the part of the insiders that they are willing to bear the long-term economic risks of the issue.[15]  Thus, the existence of a lockup or similar provision is of material interest to investors, and it may significantly affect the prices at which the asset trades.

In this case, the publicly available Whitepaper, which was used as marketing material for the offering, indicated that the founder and insider shares would be locked up.  The record indicates Paul had reviewed the Whitepaper.[16]  The White Paper states, in part:

>     Total $ZOO Tokens: 2,000,000,000,000
> - Game wallet: 1,000,000,000,000
> - Circulation: 1,000,000,000,000
>   - 500,000,000,000 available to public

---

[14] See Crypto Zoo Whistleblower Complaint at D 004030 ("most trading was done on a secondary market known as pancake swap. There are aggregators of this data like CoinmarketCap.com which collect historical price data and volume. Estimated $ZOO Trading Volume: $467,430,058"); https://coinmarketcap.com/currencies/zoo/historical-data/.

[15] See Alon Brav & Paul Gompers, The Role of Lockups in Initial Public Offerings, 16 Review of Financial Studies 1 (2003).

[16] See PAUL_CZ00004315 ("Taking out of white paper[.]  I'm meticulously going through R[ight] n[ow."]); PAUL_CZ00004349 (Paul posting on Twitter, "I'm very proud of this white paper. Anyone who's interested in this game should read it.  Consider it our blueprint.  Egg sale tomorrow.").

     o 500,000,000,000 allocated to development, marketing, and
      founders
       ▪ Locked for 6 months from allocation
       ▪ After 6 months, 10% of allocation unlocked per
        month for next 10 months

   I note that this 6 month lockup tracks typical and customary practices in securities offerings, in which insider shares are locked up for a 6 month (180 day) period.

   In reality, however, the CryptoZoo insiders, including Paul, either had additional allocations that were not disclosed or were not, in fact, actually locked up. This is revealed by the following documents.

- A set of meeting minutes notes that the five founders "bought in" at "100k" each (except for one founder, who bought in at "20k"). Further on in the minutes, "Team Splits" are listed for the founders that do not correspond to the buy in amounts.[17] This suggests that there were at least two sets of allocations.
- In a text message chain, Paul and other CryptoZoo insiders coordinate a plan to trade $ZOO.[18]
- Another text message chain discusses "RULES FOR SELLING." Discussion includes minimizing market impact and limiting sales to those that cause no more than a 3% market impact (apparently per trade), and no more than a 10% daily market impact, as well as coordinating sales among the various insider participants, including Paul.[19]
- A text exchange between Paul and another insider, Jake "Crypto King" Greenbaum, shows Paul apparently concerned over the large sales occurring.[20] The response from Jake notes that "we all planned on starting selling above 300 mil[ion dollar market capitalization]," and went on to describe the $ZOO token as an instrument for speculation.

   From an economic perspective, a reasonable investor would want to know whether the CryptoZoo insiders were covertly trading and planning to sell CryptoZoo's $ZOO token in a coordinated fashion. The description of the lockup in the Whitepaper appears to be materially false, as it misrepresented both the amount of tokens insiders controlled and the intent of the insiders to remain locked up. Paul's messaging conversations with the other CryptoZoo insiders indicate that he had reviewed the Whitepaper and was also an active part of the planned covert selling efforts. Hence, it appears that Paul was aware of and a part of these deceptive representations and planned manipulative activities.

### IV. Conversations between Paul and other CryptZoo insiders indicate manipulative trading activity

---

[17] See D 004049 at 50, 53.
[18] See PAUL_CZ00004159.
[19] PAUL_CZ00004207.
[20] PAUL_CZ00004224.

D 004907

As discussed above, the White Paper indicated that CryptoZoo's insiders would not trade during the first 180 days. As also discussed above, Paul and the CryptoZoo insiders discussed ways in which to trade, and to coordinate their trading, in order to profit from their $ZOO token holdings and to conceal their activity.

This is reflected in the following:
- The meeting minutes mention the founders "trading in Circles."[21] It appears that the founders took turns buying $ZOO in specified amounts, as part of a concerted effort to boost its market capitalization.
- The meeting minutes also contain "RULES FOR SELLING." These state: "1. No selling until 200M market cap and don't impact the market more than 3%. And not impact the market more than 10% in a day[.]" This coordinated activity appears intended to artificially support the price of $ZOO, and to allow the CryptoZoo insiders to profit by covertly selling once a certain price had been achieved.
- A text chain discusses the "RULES FOR SELLING."[22] One participant writes the following in an effort to coordinate insiders' sales: "That means 3 sales a day, no more than 3% a sale. But we can't all be doing that daily. So we need to break it up with which days who can sell etc."[23] Again, this coordinated activity appears intended to artificially support the price of $ZOO and to allow for covert sales, in contravention of the publicly represented lockup of insider holdings.
- A text chain discusses the need to trade from new wallets (presumably to avoid detection).[24]

Overall, it appears that Paul and the other CryptoZoo insiders engaged in a coordinated effort to inflate the price of $ZOO through coordinated purchases and planned to covertly sell down their interests, contrary to what was publicly represented regarding the insider lockups.

## V. The available evidence suggests that Paul participated in prior manipulative schemes involving $FUCKELON and SFI

A text chain between Paul and others discussed an apparent plan to pump and dump the crypto token $FUCKELON.[25] The exchanges include the following:
- "Wait are we buying fuckelon"
- "Cuz I'll buy it and then tweet it and ig it"
- "get in quick y'all cuz ima tweet"
- "About to start shilling it to the low key squad lmk when you guys back up"
- "Were all gonna tweet"
- "10pm everyone tweet"
- "Hahahah fuck Elon is rocketing"

---

[21] D 004050.
[22] PAUL_CZ00004207
[23] Ibid.
[24] See PAUL_CZ00004159.
[25] See BENTOV_0038629.

D 004908

- "Next 24 hours everyone blow this shit out of the water"
- "This fuck Elon coin is about to go nuts"
- "Hahahaha this was the most uncoordinated pumps in the history of pumps"
- Paul texted a picture of a "pump and dump" meme.

Overall, this text exchange suggests that Paul and his associates undertook a coordinated plan to accumulate positions in $FUCKELON, inflate its price through their social media activity, and then sell out their positions for a profit. This is known as a "pump and dump" scheme.[26] The participants actually utilized this terminology in the exchange cited above.

Additionally, I have reviewed a text chain in which Paul appears to have participated in a pump and dump scheme targeting Saffron Finance (trading as $SFI), in which Paul was offered payment for tweeting to pump the stock.[27] The offer to Paul was put thusly (by Jake "Crypto King" Greenbaum):

> "Send 1 tweet related to SFI tomorrow. 11 SFI ($30k) is the "thank u". I can't counter with anything or say no/yes outright. Any tweet about the SFI news u can even RT one of the articles or SFI tweets. Anything SFI related that speaks to Coinbase investing."

Paul replied, "Yeah I'd be down for that".

Subsequently, Greenbaum advised Paul that his wallet could be publicly observable.

Paul prepared and apparently sent the following tweet:

---

[26] See 'Pump and Dump' Schemes, Securities Exchange Commission (August 7, 2006), https://www.sec.gov/rss/your_money/pump_and_dump.htm.
[27] PAUL_CZ00005570.

D 004909



Paul then complained that his new wallet address had become publicly observable, and Paul and Greenbaum discussed possibilities of an anonymous wallet

D 004910

system.  Greenbaum noted that "Good news is now everytime u buy something 100 idiots will jump in after u.  Problem is when u sel, so will all of them."  Paul responded, "fuck yeah lol will just take their money[.]  Well how do I get into a wallet they can't track[?]"  Paul subsequently asked, "Can I dump this SFI?  Privately lol".

As with $FUCKELON, this appears to have been an attempt to manipulate the price of $SFI, pumping up its value.  Paul also indicated his desire to privately "dump" his $SFI holdings.  This would constitute manipulative trading practices.  Additionally, the undisclosed receipt of compensation to hype a security is a violation of U.S. securities law.[28]

## VI.    Paul's offer of rescission would not obviate his misdeeds or potential legal exposure

It is my understanding that Paul subsequently offered to partially buy back some of CryptoZoo investors' assets.  It is also my understanding that Paul claims he did not make money on CryptoZoo, and that he was in fact defrauded by his co-founders.[29]

While undertaking a rescission offer may lessen damages that are ultimately owed to plaintiffs, it does not eliminate the legal liabilities that may attach regardless of damages.  For instance, even illegal securities offerings in which the investors do not lose money are still violations of U.S. law and are subject to public enforcement actions by the SEC, Department of Justice, or other applicable state enforcement agencies.  Further, manipulative or deceptive acts and practices, as well as violations of the anti-touting provisions, can lead to significant legal exposure even if investors are not damaged.

Further, it is my understanding that Paul's rescission offer was only a partial one, and did not cover all of the assets that investors may have purchased in the CryptoZoo offering.  Finally, I note that Paul's rescission offer came only after Findeisen's investigative report, with Paul saying that Findeisen's report "catalyzed" Paul's response.[30]

I reserve the right to supplement, modify, and/or amend this report as and if additional information is provided. I understand that discovery is ongoing and only one deposition has been taken (the transcript for which is not yet available), and I may have additional opinions based on that and future depositions and discovery. This

---

[28] See https://www.sec.gov/newsroom/press-releases/2022-183 (describing the anti-touting action against Kim Kardashian for promoting $EMAX without disclosing compensation paid to her).
[29] See Jessy Edwards & Abraham Jewett, Logan Paul Sues Co-Defendants in CryptoZoo Class Action Lawsuit, Top Class Actions (January 10, 2024), https://topclassactions.com/lawsuit-settlements/money/cryptozoo-class-action-claims-company-conducted-nft-fraud-scheme/ ("Paul claims Ibanez and Greenbaum, the latter of which goes by the moniker CryptoKing, misrepresented their abilities and sabotaged the project for their own financial gain.").
[30] See Thank You Coffeezilla, TheOfficialLoganPaul, Youtube (January 13, 2023), https://www.youtube.com/watch?v=hAjggQvFc20.

D 004911

report reflects a summary of my preliminary opinions and the bases for the same. I will make myself available for a deposition upon reasonable request to provide further details and explanations for my opinions and bases for them.

Signed this 16th day of March, 2025.

James C. Spindler

12

D 004912

# Exhibit A

D 004913

**JAMES C. SPINDLER**

University of Texas School of Law
727 E. Dean Keeton Street
Austin, TX 78705
jspindler@law.utexas.edu

## EMPLOYMENT

UNIVERSITY OF TEXAS SCHOOL OF LAW
    Professor and Hart Chair in Corporate and Securities Law, September 2018 to present
    Sylvan Lang Professor of Law, September 2010 to September 2018
    Courses:  Federal Income Tax, Corporate Tax, Capital Markets and Financial Intermediation, Securities Regulation, Business Associations, Commercial Transactions, Corporate Finance Seminar, Workshop in Business Law & Economics

MCCOMBS SCHOOL OF BUSINESS, UNIVERSITY OF TEXAS AT AUSTIN
    Professor, September 2011 to present

UNIVERSITY OF SOUTHERN CALIFORNIA GOULD SCHOOL OF LAW
    Associate Professor of Law and Business, April 2008 to August 2010
    Assistant Professor of Law and Business, August 2005 to April 2008
    Appointment by courtesy, USC Marshall School of Business

UNIVERSITY OF CHICAGO LAW SCHOOL
    Visiting Professor of Law, Spring 2010
    Visiting Assistant Professor of Law, July 2004 to June 2005
    John M. Olin Fellow in Law and Economics and Lecturer in Law, July 2003 to June 2004

UNIVERSITY OF VIRGINIA SCHOOL OF LAW
    Visiting Professor, September 2004

CRAVATH, SWAINE & MOORE LLP
    Associate, New York and Hong Kong, 2000 - 2003
    Practice focused on securities law, syndicated debt, and international corporate finance

## EDUCATION

U.C.L.A. DEPARTMENT OF ECONOMICS, Ph.D. 2010, C.Phil. 2008, M.A. 2007
    National Science Foundation Graduate Fellowship
    Concentrations:  Asset Pricing, Microeconomics

HARVARD LAW SCHOOL, J.D. 2000
    *Magna cum laude*
    John M. Olin Prize in Law and Economics
    Teaching Fellow, Department of Economics

PRINCETON UNIVERSITY, A.B. 1997
    *Magna cum laude* in Politics, certificate in Political Economy

D 004914

**PUBLICATIONS, PRESENTATIONS, AND GRANTS**

PUBLICATIONS

| | |
|---|---|
| 2025 | Shaq and the Future of Crypto Regulation, forthcoming *William & Mary Law Review* |
| 2024 | The Economics of ESG Governance and Disclosure (with Jeffrey Meli)*, 43 Review of Litigation* 373 - 402 |
| 2021 | The Promise of Diversity, Inclusion & Punishment in Corporate Governance (with Jeff Meli) 99 *University of Texas Law Review* 1387 - 1422 |
| 2019 | Optimal Deterrence When Shareholders Desire Fraud, 107 *Georgetown Law Journal* 1071 – 1103 |
| 2018 | Insider Trading and the Coasian Firm, Revisited, 71 *SMU L. Rev.* 967 - 985 |
| 2017 | Vicarious Liability for Managerial Myopia, 46 *Journal of Legal Studies* 161 – 185 |
| 2017 | We Have a Consensus on Fraud on the Market – And It's Wrong, 7 *Harvard Business Law Review* 67 - 114 |
| 2017 | Taking Systemic Risk Seriously in Financial Regulation, 92 *Indiana Law Journal* 1559 |
| 2012 | Hidden Costs of Long Term Compensation, 13 *Journal of Theoretical Inquiries in Law* 623 – 642 |
| 2011 | Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?, 13 *American Law & Economics Review* 359 – 401 |
| 2011 | Integrity and Innovation in the Public Capital Markets:  A Survey of the Securities Law Literature,  *Research Handbook of Law, Innovation and Growth*, Robert Litan (ed.), (Edward Elgar Press) 45-66 |
| 2011 | Making the Next Financial Crisis Worse, One Regulation at a Time, Forbes.com |
| 2011 | Mandatory Long Term Compensation in the Banking System – and Beyond?, 34 *Regulation* 42 – 48 |
| 2009 | How Private is Private Equity, and at What Cost?, 76 *University of Chicago Law Review* 311-334 |
| 2007 | IPO Liability and Entrepreneurial Response, 155 *University of Pennsylvania Law Review* 1187-1228 |
| 2007 | Why Shareholders Want Their CEOs to Lie More after Dura Pharmaceuticals, 95 *Georgetown Law Journal* 653-691 (reprinted in *Securities Law Review 2008*, Donald C. Langevoort (ed.)) |
| 2006 | Conflict or Credibility:  Analyst Conflicts of Interest and the Market for Underwriting Business, 35 *Journal of Legal Studies* 303-325 |
| 2006 | Is it Time to Wind Up the Securities Act of 1933?, 29 *Regulation* 48-55 |
| 2005 | Corporate Heroin:  A Defense of Perks, Executive Loans, and Conspicuous Consumption (with M. Todd Henderson), 93 *Georgetown Law Journal* 1835-1883 |
| 2005 | Communication by Other Means, 28 *Regulation* 48-53 |

WORKING PAPERS AND FORTHCOMING

- Do SPACs Solve a Lemons Problem in the IPO Market? (with Jeffrey Meli)

- Banker Mobility & Long-Term Compensation (with Jeffrey Meli)

D 004915

- <u>Informative Wages and Employer Learning</u> (with Jeffrey Meli) available at https://ssrn.com/abstract=4038925

- <u>The Effect of Salary History Bans on Wages, Learning, and the Gender Pay Gap</u> (with Jeffrey Meli) available at https://ssrn.com/abstract=3767958

- <u>Long-term Incentives to Underperform in the Short Term</u>, available at http://ssrn.com/abstract=2640172

- <u>IPO Disclosure, Underpricing, and Litigation Risk</u>, revise and resubmit, available at http://ssrn.com/abstract=1396818

GRANTS AND AWARDS

Workshop in Business Law & Economics 2018-2019

NASDAQ OMX Capital Markets Grant 2013-2014

Southern California Innovation Project, February 2009 – February 2010
    Principal Investigator, *The Securities Act and Entrepreneurs' Cost of Public Capital*

Southern California Innovation Project, February 2009 – February 2010
    Principal Investigator, *The Impact of Securities Law Reform on Entrepreneurial Effort*

McDermott, Will & Emery Research Award, June – August 2007

McDermott, Will & Emery Research Award, June – August 2006

James H. Zumberge Faculty Research and Innovation Fund, July 2006 – June 2008
    Principal Investigator, *Do Mandatory Disclosure Rules Result in Better Information for the Marketplace?*

SELECTED PRESENTATIONS

- <u>University of Texas Director-Executive Summit</u>, *SEC Update with Commissioner Hester Peirce*, November 2024
- <u>European Association of Law & Economics Annual Meeting</u>, *Banker Mobility and Long Term Compensation,* September 2024
- <u>Harvard Law School Culp Colloquium</u>, *Chapter 13 Light Touch Bankruptcy*, May 2024
- <u>Law and Economics Theory Conference</u>, *Informative Wages, Salary History Bans, and Inequality*, November 2023
- <u>University of Texas Law School Faculty Colloquium</u>, *Informative Wages, Salary History Bans, and Inequality*, September 2023
- <u>European Association of Law and Economics</u>, *Informative Wages, Salary History Bans, and Inequality*, September 2022
- <u>University of Texas Law School Orientation</u>, *Crypto, Reinventing the Wheel, and You*, August 2022
- <u>Barclay's Flipside</u>, *The Promise of Diversity, Inclusion, and Punishment in Corporate Governance*, April 2022
- <u>University of Texas McCombs School of Business, Salem Center</u>, *Reconsidering Insider Trading*, March 2022
- <u>Federal Reserve Bank of Atlanta:  Conference on Racial Inequality and Disparities in Financial Markets</u>, Commentator on *Hidden Performance:  Salary History Bans and Gender Pay Gap*, October 2021
- <u>European Association of Law & Economics</u>, *Informative Wages, Salary History Bans, and the Gender Wage Gap*, September 2021

James C. Spindler – Page 3 of 8

D 004916

- University of Texas Law Review Symposium:  Governance Wars, *The Promise of Corporate Diversity, Inclusion & Punishment in Corporate Governance*, January 2021
- University of Texas McCombs School of Business, Conference on Regulation Best Interest, Moderator for *How will the rules impact the use of technology in delivering advice?*, February 2020
- Texas Law Review Symposium, Moderator for *Remedies in Complex Litigation*, January 2020
- UCLA Securities and Corporate Law Conference, *Banker Mobility and Long-Term Compensation*, October 2019
- American Law and Economics Association Annual Meeting, *Salary History Bans and the Gender Wage Gap*, May 2019
- Northwestern Law School Faculty Colloquium, *Salary History Bans and the Gender Wage Gap*, January 2019
- Law & Economic Theory Annual Conference, *Salary History Bans and the Gender Wage Gap*, December 2018
- Sixth Annual Corporate and Securities Litigation Conference, *Insider Trading and the Coasian Firm, Revisited*, October 2018
- Loyola Annual Institute for Investor Protection Roundtable Conference:  Lehman 10 Years Later—Lessons Learned?, *Reputational-related (Mis)Statements – Actionable or Aspirational?*, September 2018
- American Law and Economics Association Annual Meeting, *Optimal Deterrence When Shareholders Desire Fraud*, May 2018
- Fifth International Conference in Law and Economics, *Optimal Deterrence When Shareholders Desire Fraud*, April 2018
- AALS Section on Law & Economics Annual Meeting, *Misreporting and Compensation under Incomplete Commitment*, January 2018
- USC Corporate Law and Social Science Workshop, *Optimal Deterrence When Shareholders Desire Fraud*, November 2017
- Fifth Annual Corporate and Securities Litigation Conference, *Optimal Deterrence When Shareholders Desire Fraud*, October 2017
- Fourth International Conference in Law and Economics, *We Have a Consensus on Fraud on the Market – and It's Wrong*, June 2017
- American Law and Economics Association Annual Meeting, *We Have a Consensus on Fraud on the Market – and It's Wrong*, May 2017
- Law & Economic Theory Annual Conference, *Long-Term Incentives to Underperform in the Short Term*, December 2016
- Harvard Law School Law & Economics Workshop, *We Have a Consensus on Fraud on the Market – and It's Wrong*, September 2016
- Canadian Law & Economics Association Annual Meeting, *We Have a Consensus on Fraud on the Market – and It's Wrong*, September 2016
- National Business Law Scholars Annual Meeting, *We Have a Consensus on Fraud on the Market – And It's Wrong*, June 2016
- Midwest Finance Association Annual Meeting, *Long-term Incentives to Underperform in the Short Term*, March 2016
- Federalist Society Academic Section, *Some Fallacies in the Securities Law Literature, and Why We Should Care About Them*, January 2016
- European Association of Law and Economics Annual Meeting, *Long-term Incentives to Underperform in the Short Term*, September 2015
- European Assocation of Law and Economics Annual Meeting, *Structural Implications of the European Banking Union*, September 2015
- Duke University School of Law, *Less Agency Cost, More Long Term Compensation… and More Fraud?*, November 2014
- European Association of Law and Economics Annual Meeting, *Reputation and Corporate Fraud*, September 2014

D 004917

- <u>National Business Law Scholars Conference</u>, *Reputation and Corporate Fraud*, June 2014
- <u>American Law and Economics Association Annual Meeting</u>, *Why Bank Regulation Failed and Will Continue to Fail*, May 2014
- <u>US Markets Texas Institutional Investor Forum</u>, *What U.S. Funds Need to Know About Shareholder Actions in the United States and Beyond*, November 13, 2013
- <u>European Association of Law and Economics Annual Meeting</u>, *Why Bank Regulation Failed and Will Continue to Fail*, September 2013
- <u>European Association of Law and Economics Annual Meeting</u>, *More Long Term Compensation and… More Fraud?*, September 2013
- <u>Austin Bar Association Section on Business, Corporate and Tax</u>, *Recent Trends in Mergers and Acquisitions*, June 2013
- <u>American Law and Economics Association Annual Meeting</u>, *More Long Term Compensation and … More Fraud?*, May 2013
- <u>University of Texas Mergers and Acquisitions Institute</u>, *Recent Trends in Mergers and Acquisitions*, October 2012
- <u>National Business Law Scholars Conference</u>, *More Long Term Compensation and… More Fraud?*, June 2012
- <u>Global Finance Conference</u>, *Hidden Costs of Long Term Compensation,* May 2012
- <u>Section on Securities Regulation:  Annual Meeting of the American Association of Law Schools</u>, *Hidden Costs of Mandatory Long Term Compensation*, January 2012
- <u>Tel Aviv Law School and Journal of Theoretical Inquiries in Law Conference:  Back to the State</u>, *Mandatory Long Term Compensation for Banks – and Beyond?*, June 2011
- <u>Canadian Law and Economics Association</u>, *Endogenous Compensation in a Firm with Disclosure and Moral Hazard*, October 2010
- <u>University of Chicago Law School Faculty Workshop</u>, *The Effects of Managerial Short-termism on Compensation, Effort, and Fraud*, May 2010
- <u>Conference of Empirical Legal Studies</u>, *IPO Underpricing, Disclosure, and Litigation Risk*, November 2009
- <u>University of Virginia Law & Economics Workshop</u>, *IPO Underpricing, Disclosure, and Litigation Risk,* October 2009
- <u>Kauffman Foundation Summer Legal Institute</u>, *The Future of Capital Markets Regulation,* July 2009
- <u>Stanford/Yale Junior Faculty Forum</u>, *Vicarious Liability for Securities Fraud*, May 2009
- <u>USC Conference on Financial Law and Innovation</u>, *IPO Underpricing and Prospectus Disclosure*, May 2009
- <u>American Law and Economics Association Annual Meeting</u>, *IPO Underpricing and Prospectus Disclosure*, May 2009
- <u>European Financial Management Association Symposium on Corporate Governance</u>, *Vicarious Liability for Securities Fraud*, April 2009
- <u>21st Annual Australasian Finance Association Meeting</u>, *Vicarious Liability for Securities Fraud*, December 2008
- <u>Stanford Law & Economics Workshop</u>, *Vicarious Liability for Bad Corporate Governance: Are We Wrong About 10b-5?*, November 2008
- <u>Canadian Law and Economics Association</u>, *Vicarious Liability for Securities Fraud*, September 2008
- <u>Kauffman Foundation Summer Legal Institute</u>, *Innovation and Securities Law:  Vicarious Liability for Securities Fraud*, July 2008
- <u>American Law and Economics Association Annual Meeting</u>, *Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?*, May 2008
- <u>University of Chicago Law & Economics Workshop</u>, *Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?*, April 2008
- <u>Financial Lawyers' Conference</u>, *Securities Law Issues for Financial and Bankruptcy Lawyers*, April 10, 2008

D 004918

- Berkeley Center for Law, Business, and the Economy, Corporate Roundtable, *Commentator on Grundfest and Bochner, Fixing 404*, April 2007
- American Association of Law Schools Annual Meeting, *Why Shareholders Want Their CEOs to Lie More after* Dura Pharmaceuticals, January 2007
- American Law and Economics Association Annual Meeting, *Conflict or Credibility: Analyst Conflicts of Interest and the Market for Underwriting Business*, May 2006
- USC Summit on Corporate Governance, *The Global View: Convergence of International Corporate Governance Standards*, March 2006
- USC Marshall School of Business Executive Education Program, *State Fiduciary Duties and Recent Developments in Federal Law*, February 2006 (with Eric Talley)
- American Law and Economics Association Annual Meeting, *IPO Liability and Entrepreneurial Response*, May 2005
- Harvard Law and Finance Workshop, *IPO Liability and Entrepreneurial Response*, February 2005
- Directors Roundtable, *Panel on the Revolution in Investment Management*, April 28, 2004
- Directors' Roundtable, *Panel on SEC Enforcement and Disclosure*, December 3, 2003

## CONSULTING AND EXPERT WITNESS ENGAGEMENTS

Consultant and/or expert witness in matters involving corporate governance, corporate finance, executive compensation, the securities industry, tax, banking, and damages.

Testimony in state court, federal court, and arbitration, as well as numerous depositions.

Trial, deposition, and/or arbitration testimony provided in:
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, v. Daniel Bogar, Osvaldo Pi, and Bernerd Young*, United States District Court, Northern District of Texas (deposition)
- *Fox v. Biomedical Enterprises et al.*, Bexar County District Court, Texas (deposition)
- *Italian Investors, LLC, et al. v. Michael McGehee, et al.*, 68th Judicial District, Dallas, Texas (deposition)
- *NEC Networks and Chris Hotchkiss v. AME & FE Investments Ltd. and Chris Erck,* 73rd Judicial District Court, Bexar County, Texas (deposition and trial)
- *Seaman v. Wykidal*, JAMS binding arbitration, Irvine, CA (deposition and arbitration)
- *Tesoro Refining v. National Union Fire Insurance*, United States District Court, Western District of Texas (deposition)
- *AerReach Aero Space Solutions, LLC and Robert V. Hogan v. Chad G. Stanford et al.*, District Court, 298th Judicial District, Dallas County, Texas (deposition)
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, et al. v. Patricia Maldonado,* United States District Court, Northern District of Texas, Dallas Division (deposition and trial)
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, & Thomas V. Sjoblom*, United States District Court, Northern District of Texas, Dallas Division (deposition)
- *Firefighters' Retirement System, et al., v. Citco Group Limited et al.*, United States District Court, Middle District of Louisiana (deposition)
- *Horn & Hamrick v. Agave Natural Resources et al.*, JAMS Arbitration, San Antonio, TX (deposition and arbitration)
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, v. Greenberg Traurig*, United States District Court, Northern District of Texas (deposition)
- *Thompson Petroleum Corporation and J. Cleo Thompson and James C. Thompson, Jr.,*

D 004919

*L.P. v. Frank Peterman and Paul Rudnicki*, District Court of Dallas County, Texas, 68th Judicial District (deposition)

- *SH 130 Concession Company, LLC, v. Central Texas Highway Constructors, LLC, et al.*, United States Bankruptcy Court, Western District of Texas, Austin Division (deposition)
- *Official Stanford Investors Committee v. Trustmark National Bank, HSBC Bank, The Toronto-Dominion Bank, Independent Bank f/k/a Bank of Houston, SG Private Banking (Suisse) S.A., and Blaise Friedli*, United States District Court, Northern District of Texas (deposition)
- *Cox Operating, L.L.C. v. Wells Fargo Bank, N.A.*, U.S. District Court, Southern District of Texas, Houston Division (deposition)
- *Drivetrain, LLC v. Thomas S. Hall et al.*, Court of Chancery of the State of Delaware (deposition)
- *Enterprise Products Operating, LLC v. AMEC Foster Wheeler USA Corp and AMEC Foster Wheeler PLC*, District Court of Harris County, Texas, 151st Judicial District (deposition, trial)
- *Studensky v. Borgfeld et al.*, Case No. 18-60526-RBK, United States Bankruptcy Court, Western District of Texas, Waco Division (deposition, trial)
- *Wisconsin Gas LLC v. American Natural Resources Company and Honeywell International Inc.,* Case No. 2:20-cv-1334, United States District Court, Eastern District of Wisconsin (deposition)
- *Bennet Van de Bunt and Kevin Knee v. Cypress Creek Holdings, LLC and Cypress Creek Renewables, LLC*, JAMS arbitration, Los Angeles, CA (arbitration)
- *Robert P. Padula v. Brandon Davis, Swan Energy, Inc., and Chris Masone*, Cause No. 2020-40525, District Court, 334th Judicial District, Harris County, Texas (deposition)
- *Certain Underwriters v. Strategic Capital Partners, LLC, Ricky Novak, and James Freeman,* Case No. 1:21-cv-05211-AT, United States District Court for the Northern District of Georgia, Atlanta Division (deposition)
- *Ma IRA et al v. Ascendant Capital, LLC, et al.,* Cause No. 19-CV-1050-LY, United States District Court, Western District of Texas, Austin Division (deposition)
- *Hix v. Acrisure, LLC,* United States District Court for the Northern District of Georgia, Atlanta Division (deposition)
- *Betts Revocable Trust v. Phunware et al.*, C.A. No. 2022-0168-NAC, Court of Chancery of the State of Delaware (deposition)
- *McEntire v. Oceanside Capital Advisors, LLC et al*, JAMS Arbitration (deposition)

D 004920

**PROFESSIONAL AFFILIATIONS AND OTHER ACTIVITIES**

Member of the Bar of the State of New York, admitted December 11, 2000

Member, American Law & Economics Association

Member, American Economic Association

Referee or Section Reviewer:
      Journal of Law, Economics, and Organizations
      Journal of Legal Studies
      American Law & Economics Review
      Society of Empirical Legal Studies
      International Review of Law and Economics
      European Journal of Law and Economics
      Labour Economics
      American Association of Law & Economics
      European Association of Law & Economics

D 004921

# Exhibit B

D 004922

## MATERIALS PROVIDED TO JAMES SPINDLER

Misc.:

| BATES | DATE | DESCRIPTION |
|---|---|---|
|  | 06/27/2024 | Original Complaint |
|  | 11/15/2024 | Confidentiality and Protective Order |
|  | 02/17/2025 | Defendants' Motion for Judgment on the Pleadings |
|  | 02/18/2025 | Expert Report of Kevin E. Madura |

Documents produced by Plaintiff:

| BATES | DATE | DESCRIPTION |
|---|---|---|
| PAUL_CZ00004159-73 | 06/11/2021 | Excerpt from ZooFounders Group Chat |
| PAUL_CZ00004207- 09 | 08/13/2021 | Excerpt from ZooFounders Group Chat |
| PAUL_CZ00004224 | 08/19/2021 | Excerpt from ZooFounders Group Chat |
| PAUL_CZ00004315-16 | 09/01/2021 | Excerpt from ZooFam Group Chat |
| PAUL_CZ00004349-55 | 09/02/2021 | Excerpt from ZooFam Group Chat |
| PAUL_CZ00005570-78 | 03/07/2021 | Excerpt from Jake Crypto King Chat |

Documents produced by Defendants:

| BATES | DATE | DESCRIPTION |
|---|---|---|
| D 004021; D 004022-32 | 10/23/2022 | Email from S. Findeisen to T. McGuire attaching Crypto Zoo SEC Report |
| D 004033; D 004034-44 | 10/23/2022 | Email from S. Findeisen to C. Carney and J. Lucas attaching Crypto Zoo SEC Report |
| D 004048; D 004049-53 | 12/01/2022 | Email from S. Findeisen to T. McGuire attaching Crypto Zoo Meeting Notes 6-3-21 |
| D 004071; D 004072-76; D 004077-78 | 02/14/2023 | Email from J. O'Keefe to S. Findeisen attaching Form 1622 (2021) and 2023.02-14 S. Findeisen request (1662) |

Documents produced by Ophir Bentov:

| BATES | DATE | DESCRIPTION |
|---|---|---|
| BENTOV_0038629-59 | 05/16/2021 | Excerpt from group chat |
| BENTOV_0037840 |  | Page 1 of group chat with identifying names and numbers |

D 004923

Documents produced by Maureen Mellina:

| BATES | DATE | DESCRIPTION |
|---|---|---|
| MELLINA_00000736-43 | | Crypto Zoo slide deck |

Public Links:

| LINK | DATE | DESCRIPTION |
|---|---|---|
| https://www.youtube.com/watch?v=rqrH7TbruZA | 08/18/2021 | Paul's announcement of CryptoZoo |
| https://cryptozoo-1.gitbook.io/cryptozoo | | CryptoZoo Whitepaper (Our Why) |
| https://cryptozoo-1.gitbook.io/cryptozoo/utility | | CryptoZoo Whitepaper (Utility) |
| https://cryptozoo-1.gitbook.io/cryptozoo/tokenomics | | CryptoZoo Whitepaper (Tokenomics) |
| https://cryptozoo-1.gitbook.io/cryptozoo/let-the-games-begin | | CryptoZoo Whitepaper (Let The Games Begin) |
| https://www.sec.gov/newsroom/press-releases/2023-178 | 09/13/2023 | SEC's Stoner Cat Press Release |
| https://www.youtube.com/watch?v=386p68_lDHA | 12/16/2022 | Coffeezilla's original investigative report – Part 1 |
| https://www.youtube.com/watch?v=wvzyDg40-yw | 12/20/2022 | Coffeezilla's original investigative report – Part 2 |
| https://www.youtube.com/watch?v=8-fugWMBwCg& | 12/23/2022 | Coffeezilla's original investigative report – Part 3 |
| https://www.youtube.com/watch?v=hAjggQvFc20& | 01/13/2023 | "Thank you Coffeezilla" video by Logan |
| https://x.com/LoganPaul/status/1369019374787387393 | 03/08/2021 | Tweet by Logan Paul re $SFI |
| https://web.archive.org/web/20210517055043/https://twitter.com/LoganPaul/status/1394168405234683907 | 05/16/2021 | Tweet by Logan Paul re $FUCKELON |
| https://web.archive.org/web/20210517135535/https://twitter.com/COINFUCKELON/status/1394281734603264000 | 05/17/2021 | Reply by FUCKELON |

D 004924

# Exhibit C

D 004925

**<u>STATEMENT OF COMPENSATION FOR JAMES SPINDLER</u>**

James Spindler is being compensated for the time he spends on the study and testimony in this case at a rate of $825 per hour.

D 004926