# EXHIBIT B

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
 3     LOGAN PAUL,                *
                                  *
 4     PLAINTIFF,                 *
                                  *
 5     VS.                        * CASE NO.: 5:24-CV-00717
                                  *
 6     STEPHEN FINDEISEN AND      *
       COFFEE BREAK PRODUCTIONS,  *
 7     LLC D/B/A COFFEEZILLA,     *
                                  *
 8     DEFENDANTS.                *
 9
10         *****************************************
                ORAL AND VIDEOTAPED DEPOSITION OF
11                    JAMES C. SPINDLER
                      FEBRUARY 13, 2026
12                    (REPORTED REMOTELY)
           *****************************************
13
14
15            ORAL AND VIDEOTAPED DEPOSITION OF JAMES C.
16     SPINDLER, produced as a witness at the instance of
17     the PLAINTIFF(S), and duly sworn, was taken in the
18     above-styled and numbered cause on FEBRUARY 13,
19     2026, from 8:04 A.M. to 2:49 P.M., before AMY
20     PRIGMORE, CSR, in and for the State of Texas,
21     reported by stenographic means, at the offices of
22     the WITNESS, Austin, Texas, pursuant to the Federal
23     Rules of Civil Procedure, and the provisions stated
24     on the record or attached hereto.
25
```

Page 2

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF(S):
     (REMOTELY)
 4      Jason L. Mays
        Christopher Joyce
 5      NEIMAN MAYS FLOCH & ALMEIDA, PLLC
        100 SE 3rd Avenue, Suite 805
 6      Fort Lauderdale FL 33394
        jmays@nmfalawfirm.com
 7      cjoyce@nmfalawfirm.com
 8
        Andy Phillips
 9      MEIER WATKINS PHILLIPS PUSCH
        1120 20th Street NW, Suite 550
10      Washington DC 20036
        andy.phillips@mwpp.com
11      202-318-3655
12
     FOR THE DEFENDANT(S):
13   (REMOTELY)
        Caroline Newman Small
14      DAVIS & SANTOS
        719 S Flores Street
15      San Antonio TX 78204
        csmall@dslawpc.com
16      210-210-2100
17
18   ALSO PRESENT (REMOTELY):
        Don Harris, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1                I N D E X
                                    PAGE
 2   APPEARANCES ..................   2
     STIPULATIONS .................   1
 3   SIGNATURE AND CHANGES ........  227
     REPORTER'S CERTIFICATE........  229
 4
 5         E X A M I N A T I O N S
 6   JAMES C. SPINDLER              PAGE
        EXAMINATION                    5
 7      BY MR. MAYS
 8
           E X H I B I T S
 9
     EXHIBIT    DESCRIPTION         PAGE
10   EXHIBIT 1  EXPERT REPORT OF JAMES  8
                C. SPINDLER
11   EXHIBIT 2  AMENDED MATERIALS LIST 42
     EXHIBIT 3  EXPERT REPORT OF CHRIS 109
12              DAVIS
     EXHIBIT 4  WHITE PAPER, BEGINNING 114
13              BATES LABEL D 050971
     EXHIBIT 5  NOTES, BEGINNING BATES 139
14              LABEL D 004049
15
```

Page 4

```
 1              P R O C E E D I N G S
 2                      * * *
 3            THE VIDEOGRAPHER:  On the record at
 4   8:04 a.m.  My name is Don Harris, representing
 5   Veritext.  The date is February 13, 2026.
 6            Please note that this deposition is
 7   being conducted virtually.  Quality of recording
 8   depends on the quality of camera and Internet
 9   connection of participants.  What is seen from the
10   witness and heard on screen is what will be
11   recorded.  Audio and video recording will continue
12   to take place unless all parties agree to go off
13   the record.
14            This is the video recorded
15   deposition of James C. Spindler.  He's located in
16   Austin, Texas.
17            Attorneys, please state your
18   appearance.
19            MR. MAYS:  Jason Mays of Neiman Mays
20   Floch & Almeida, on behalf of the Plaintiff, Logan
21   Paul.  Here with my colleague, Christopher Joyce,
22   of the same firm.
23            MR. PHILLIPS:  And this is Andy
24   Phillips of the Meier Watkins Phillips Pusch, LLP,
25   on behalf of the Plaintiff.
```

Page 5

```
 1            MS. SMALL:  Caroline Small, at
 2   Davis & Santos, for the witness and for the
 3   Defendants.
 4                JAMES C. SPINDLER,
 5   having been first duly sworn, testified as follows:
 6                   EXAMINATION
 7   BY MR. MAYS:
 8      Q.  Good morning, Professor Spindler.  You may
 9   have heard me introduce myself a moment ago.  My
10   name is Jason Mays of Neiman Mays Floch & Almeida.
11   We are one of the firms representing the Plaintiffs
12   in this case.  I'm going to be asking you questions
13   today.
14            I can tell from your CV you've been a
15   witness -- you have been deposed before.  So this
16   probably isn't going to be new to you, but just to
17   go through the ground rules quickly before we get
18   started.
19            When I ask a question, just make sure that I
20   finish asking the question before you start to
21   answer.  That's just for the sake of the -- the
22   court reporter, and to make sure that we're not
23   talking over each other.
24            When you give an answer, please make sure
25   that the answer is audible, as the court reporter
```

Page 62

1  was based on probability, right?
2      A.  Yes.
3              MS. SMALL:  Objection; form.
4      Q.  (BY MR. MAYS)  And -- and that probability,
5  as you understood it, is programmed into this --
6  the game's code, right?
7      A.  Correct.
8      Q.  Okay.  And there was a -- as envisioned, a
9  market component where players could presumably
10 acquire different animals, or NFTs, but -- but
11 there was no discretion, as you understood it --
12 again, if you had an egg, you could do -- as a
13 player, you didn't have discretion as to which
14 animal would hatch out of that egg, right?
15     A.  That's correct.  And again -- but I would
16 say, you know, you keep saying that there was a --
17 an ability to buy other animals.  I don't believe
18 that that functionality would ever -- was ever
19 completed.
20     Q.  We're on the same page.  When I refer to --
21 when I talk about the game and its functionality,
22 I'm referring to the vision for it.
23             So when it comes to the Zoo tokens, you
24 understood -- when you talk about a yield for
25 different animals, your understanding was that

Page 63

1  yield would be in Zoo tokens, right?
2      A.  Correct.
3      Q.  And what did you understand about the
4  functionality -- how -- how Zoo tokens would be
5  used in the game?
6      A.  So Zoo tokens could be used to buy eggs.
7  That was true -- I believe that was actually true,
8  that part of it actually happened, that Zoo tokens
9  could be used to purchase NFT eggs.  Then the Zoo
10 tokens would then be yielded by those hatched eggs.
11             So essentially when you buy an egg, there
12 would be some expected yield, based on the
13 probabilities that were out there.
14             I don't know that those probabilities were
15 ever, you know, announced.  But there would be an
16 expected yield just from buying an egg.  There
17 would be the realization of the yield when the egg
18 hatches.  You would see if it's actually high or
19 low, depending on if it's rare or common.
20             Then there was some ability to interbreed
21 those animals, was the term, to try and obtain
22 higher yields.
23             Again, I never saw specifics on how that was
24 going to -- even how that was proposed to work, and
25 whether that would have been -- again, according to

Page 64

1  stated probabilities, it would have been made known
2  to the -- to the players or -- you know, so there's
3  a lot of uncertainty about this game because it
4  didn't end up getting built.
5              So you get this Zoo yield, which was useful
6  within the game, but then it was also useful
7  outside of the game because it could be cashed out
8  on the secondary markets.  It traded -- it traded
9  on secondary markets and could be cashed out for
10 other -- for other crypto, and ultimately into
11 cash.
12     Q.  Okay.
13             MR. MAYS:  I think this might be a
14 good place to pause and take a quick break, if
15 that's okay with everyone.
16             MS. SMALL:  Much appreciated.
17             MR. MAYS:  Great.
18             THE VIDEOGRAPHER:  Off the record at
19 9:34 a.m.
20             (Break.)
21             THE VIDEOGRAPHER:  On the record at
22 9:50 a.m.
23     Q.  (BY MR. MAYS)  Professor Spindler, if I turn
24 to your report -- let me just share my screen
25 again.

Page 65

1          I've turned to the page of your report where
2  it's Section 2, which it says:  The CryptoZoo
3  offering by Paul and others constituted an illegal
4  offering of unregistered securities.
5              Do you see where I'm at?
6      A.  Yes.
7      Q.  And this section comprises, as I read it,
8  two opinions, right?  Because on the one hand,
9  you're opining here that the $ZOO tokens are
10 securities, right?
11     A.  Correct.
12     Q.  And you're also opining that these
13 securities were offered in violation of U.S.
14 securities laws, right?
15     A.  Correct.
16     Q.  Okay.  Specifically because you say they
17 were unregistered, right?
18     A.  Correct.
19     Q.  Okay.  When it comes to your opinion that
20 the $ZOO tokens are securities, I'm reading here
21 from the first sentence, it says:  It is my opinion
22 that the offering of CryptoZoo tokens, in which
23 Paul took part -- and then you go on say was
24 securities.
25             Are you offering an opinion as to

Page 118

1  would reasonably anticipate being able to monetize
2  their investments.
3      If individuals were acquiring tokens to play
4  the game, and it was the enthusiasm for playing the
5  game that was driving that secondary market
6  activity, how does that indicate that they
7  reasonably anticipate being able to monetize their
8  investments?
9      A.  You would be able to reasonably anticipate
10 monetizing because there's a vibrant secondary
11 market that's driven by the popularity of the game.
12 If there's a -- a -- a secondary market where a lot
13 of these tokens are being traded, you'd anticipate
14 being able to sell them.  Just like when I buy a
15 share of Meta, there's a very liquid market in
16 that, I anticipate being able to sell that
17 without -- without any trouble.
18      On the other hand, when I buy something
19 that's illiquid, I buy an old used bulldozer,
20 monetizing that is -- is -- is more -- more
21 difficult, obviously.  Trading is more difficult.
22      Q.  At the outset before we started talking
23 about your opinions, I was asking you about the
24 scope of admissible expert opinions generally, and
25 I asked you what a legal conclusion was.

Page 119

1      Do you remember me asking that?
2      A.  I do.
3      Q.  Okay.  How, in your view, is your opinion
4  that the CryptoZoo tokens are securities, which
5  Paul offered to the public in violation of U.S.
6  securities law, how is that not a legal conclusion?
7      A.  So --
8          MS. SMALL:  Form.
9          THE WITNESS:  Is that objection to
10 form?
11         MS. SMALL:  Yeah, go ahead.
12         THE WITNESS:  Yeah, I thought maybe
13 I talked over you, so I want to make sure she got
14 it.
15     A.  The -- there's a few things here.  So one,
16 the -- the -- the -- you know, the -- the sort of
17 primary first order legal issue in this case is,
18 was there defamation, right.  That's my
19 understanding of it.
20     This is not a primary case of was there a --
21 a securities registration violation, right.
22     So this is an ancillary issue that happens
23 to be somewhat legal in character.  So that's the
24 first thing I would point out here.
25     The second thing I would point out is that

Page 120

1  whether something is a security is a mixed question
2  of law and fact.  The Supreme Court and other
3  courts have been very clear that the definitional
4  inquiry is an economic one.  It looks at economic
5  reality.  It involves issues of how do you -- you
6  know, how -- what makes assets valuable, how do
7  assets trade, how do markets work, and so on.
8      This all ties in directly to my expertise
9  as a -- as an economist, as somebody that works in
10 capital markets and the securities industry.
11     My opinions also involve issues related to
12 securities practice, so what's commonly done and
13 what these things -- what these things mean in
14 securities offerings and securities industry.
15     And so I would say that is what I'm
16 offering -- what I'm offering here in this
17 discussion of this section.
18     Q.  (BY MR. MAYS)  Are you familiar with case
19 law?  It says that the question of whether
20 something constitutes a security is for the jury?
21         THE REPORTER:  What was that last
22 word?
23     Q.  (BY MR. MAYS)  For the jury.
24     A.  I'm not aware of any -- I'm not aware of
25 what you're -- you know, what case you're thinking

Page 121

1  of.
2      I am aware of case law saying even -- even
3  where things are specifically legal in character,
4  that they will allow in legal testimony of
5  complex -- complex issues that are beyond what a
6  typical lawyer, say, would -- would have
7  familiarity with.
8      So there, I'm aware of case law to that
9  effect.  Again, this is a mixed question of law and
10 fact.  I am laying out what the standard is.  I
11 don't think there's any controversy about the Howey
12 Test being the -- being the right standard.  I
13 don't think you-all have controverted that at all.
14     And then I'm pointing out what I see as
15 being the important economic considerations that
16 militate in favor of each of the factors, you know,
17 as to the ultimate conclusion that I come to, that
18 these things do all militate towards being a
19 security and an unregistered securities offering,
20 and what the consequences of that would be.
21     You know, the -- the -- the jury can make
22 its own decision as to whether they agree with
23 that.
24     Q.  So do you believe -- just backing up to the
25 first portion of your answer.

Page 122

1  Do you believe that because in your view the
2  question of whether the CryptoZoo offerings were a
3  security is an ancillary legal issue, as having
4  described it, an ancillary issue that is somewhat
5  legal in character?  Do you believe that it's
6  ancillary nature allows an expert to opine on legal
7  issues that they might not otherwise be able to?
8     A.  So believe it or not, I'm not being offered
9  as an expert on the usage of expert testimony in
10 this case.  So I haven't researched that issue.  I
11 could.  I have, in the past, researched issues on
12 whether complex securities and corporate law type
13 of testimony might be allowed in.  And I have
14 reviewed that case law and, indeed, courts are
15 often amenable to that.
16     I would point out, though, that I wouldn't
17 characterize that as what I'm doing.  I'm offering
18 an economic analysis of the economic realities of
19 the CryptoZoo offering.  I am assuming that the
20 Howey Test is what applies.  If the Court finds the
21 Howey Test doesn't apply, then -- then I guess
22 that's -- that's, you know -- that's -- that's too
23 bad for my report.
24     But again, I don't think anybody is
25 controverting that.  I am mostly applying the

Page 123

1  economic realities to the various Howey Test
2  factors, and that's -- I think that's the utility
3  that my report is adding here.
4         MR. MAYS:  On that note, shall we
5  take a break?
6         THE WITNESS:  Sounds good to me.
7         MS. SMALL:  (Unintelligible).
8         THE VIDEOGRAPHER:  Off the record at
9  11:17 a.m.
10        (Break.)
11        THE VIDEOGRAPHER:  On the record at
12 11:34 a.m.
13    Q.  (BY MR. MAYS) Professor, we're going to put
14 your report back on the screen.  And turning to the
15 fourth section of your report, it's titled,
16 Conversations Between Paul and the Other CryptoZoo
17 Insiders Indicate Manipulative Trading Activity.
18    Do you see that?
19    A.  I do.
20    Q.  Okay.  And I'm -- I'm bouncing around your
21 report a little bit.  We skipped over the third
22 section, which we'll come back to.
23    Now, when you refer to manipulative trading
24 activity, how are you defining that?
25    A.  Well, so this is trading activity that is

Page 124

1  done for purposes of other than just buying and
2  selling as, say, an investment.  This is trading
3  activity that appears to be done with a mind toward
4  the effect on the market price.
5     Q.  Is that a legal standard, or is that your
6  own definition?
7     A.  Manipulative trading is a legal -- is a
8  legal term.  And generally, it does include efforts
9  to affect market price.
10    Q.  Okay.  What is the relationship between
11 manipulative trading activity and the standard
12 under 10b5, like the device -- device, scheme, and
13 artifice to defraud?
14    A.  Oh.  Well, so just to be clear, you know,
15 again, and this is part of, you know, that this is
16 not -- not -- this is intended to be more economic
17 and -- and not offering legal opinions.
18    But I would point out that manipulative
19 trading activity isn't just a securities concept.
20 It's a -- it's a concept saying commodities.
21 Market manipulation there is very -- you know, a
22 very broad concept.  Really, anything that's --
23 that's traded, you'd have concerns potentially
24 about manipulation, whether it's a security or a
25 commodity.

Page 125

1     So this would apply regardless of the
2  securities status.
3     As to the 10b5, you know, 10b5 has its own
4  particular elements.  I haven't -- you know, it's
5  some -- it's a issue I've written on in my
6  professional research.  It's not something I've
7  included in my report, so I'm not really talking
8  about the elements of 10b5 here.
9     Q.  As you defined manipulative trading
10 activity, when you say that the CryptoZoo founders
11 engaged in -- in that activity, is that conduct --
12 does that conduct constitute securities fraud, in
13 your opinion?
14    A.  This conduct, I'm not offering that opinion.
15 I'm saying that it is designed to manipulate.  It
16 would certainly -- it appears to be -- it appears
17 to be intended to be -- to manipulate the price.
18 That definitely can lead to legal liability of
19 various sorts.
20    Q.  You say here in the -- in -- in the second
21 sentence, this first paragraph on page 8 of your
22 report:  As also discussed above, Paul and the
23 CryptoZoo insiders discussed ways in which to trade
24 and to coordinate their trading in order to profit
25 from their $ZOO token holdings and to conceal their

32 (Pages 122 - 125)

Page 130

1   A. Sure. Again, I don't believe that I've seen
2 all of Mr. Paul's text messages. But again, I've
3 relied upon counsel to Mr. Findeisen to provide me
4 with the relevant -- relevant documents.
5       So if there were documents dealing with how
6 they were going to sell and -- and accum -- you
7 know, accumulate and then sell down the CryptoZoo
8 interests during this purported lockup period, that
9 was something I asked for. And I believe -- I --
10 you know, to -- to my knowledge, if it was there,
11 they -- they've shown it to me.
12   Q. Okay. And I understand your testimony in
13 that regard.
14       And the other aspect of -- of -- well, you
15 testified right before the break, I asked you a
16 question about admissibility. And you said you're
17 a securities law expert, you're not a --
18 necessarily an expert on admissibility of expert
19 reports, or something to that effect, right?
20       You're also not an expert on mind reading,
21 right?
22   A. No, I am not a mind reader. But these sorts
23 of activities do crop up in capital markets trading
24 situations. So, you know, there's other instances
25 of this that I could talk about where, you know,

Page 131

1 you have sellers trying not to affect the price.
2       How do you do that? Usually by disguising
3 the order flow and limiting the amount that you
4 sell at any one point.
5       There are cases that involve agents
6 attempting to make it look like there's trading and
7 volume in a asset artificially, through things
8 like, you know, concerted -- concerted buying
9 efforts.
10      So it's true I can't read their mind. I
11 can't look into your client's mind and -- and say
12 what he was thinking at the time. But I can look
13 at these communications and say, from the
14 perspective of somebody who's an expert in
15 securities and capital markets and trading
16 activities, that's what these communications would
17 imply.
18   Q. Okay. And you're -- you're -- you're
19 drawing inferences about what they were trying to
20 do, based on the communications you see, right?
21   A. Yes. That's the record that we -- that we
22 have.
23   Q. Okay. And in this section, are you -- are
24 you opining that Mr. Paul personally wanted to
25 coordinate trading in order to profit and conceal

Page 132

1 his activity, or are you opining that Mr. Paul,
2 together with his cofounders, were trying to do
3 this?
4   A. I haven't tried to break this out by what
5 Mr. Paul said, as opposed to his other insider, you
6 know, cofounders. I do believe, if I recall
7 correctly, that he's the one that announced the --
8 I think he announced the rules for selling. I
9 could be -- I could be misremembering that.
10      But in any event, for my purposes, I think
11 it suffices that he was a part of this -- of this
12 group.
13   Q. The manipulative trading practices standard
14 that you articulated, where does that come from?
15 Like, what area of law is that? You mentioned that
16 it's not a securities law specific standard, and
17 I'm curious about where that comes from.
18   A. Well, so it is a securities law thing. It's
19 also a commodities thing, as well. So, you know,
20 various markets in this country are regulated, and
21 a lot of those markets' attempts to influence the
22 price are -- are -- are illegal. They're --
23 they're -- they're prohibited.
24      So that would be true in a commodities
25 market; that would be true in a securities market.

Page 133

1   Q. Okay. And what -- what -- all I'm getting
2 at is under that standard, if you're under the law,
3 as you understand it, is the intent of one party --
4 is intent assessed at a group level or is it
5 assessed at an individual level?
6   A. Well, that's an interesting philosophical
7 and legal question that I am not addressing in this
8 report.
9       I am saying what the -- the gist of the
10 group discussion is, and I believe I'm -- I'm
11 relaying that as accurately as I can. I'm also
12 trying to be fair and acknowledging that there is
13 ambiguity in this, because it is a limited record,
14 and I'm not a mind reader obviously.
15      But that this is a group that Mr. Paul
16 appears to be participating in, does not be -- is
17 not appearing to, you know, abstain from it or
18 appearing to -- attempting to shut it down or
19 attempting to whistleblow it, as it were.
20      And again, for the purposes of participating
21 in what might be termed a, you know, quote, scam, I
22 believe this would be relevant to that inquiry.
23   Q. For purposes of your analysis in this
24 section, I think, as you said, you -- you treated
25 Mr. Paul and the cofounders as one, without

Page 214
1  there's -- there's -- there's -- I think there's
2  more that goes into this than you're -- you're
3  giving it credit for.
4      Q. (BY MR. MAYS) Well, your opinion,
5  respectfully, doesn't -- doesn't just say a pump
6  and dump is X and this is why someone might do
7  it. Your opinion says this is what they were
8  doing.
9          Do you disagree with that?
10     A. Well, I've interpreted the -- the text
11 messages that you've -- that you've been talking
12 about, including your clients texting a
13 pump-and-dump meme out to his confederates.
14         And it does appear, as far as I can tell --
15 and this is the most straightforward discussion of
16 people attempting to pump and dump a stock that
17 I've ever actually -- ever actually seen, where
18 they -- you know, you don't normally refer to it
19 as a pump and dump. I mean, that's a little
20 unusual.
21         But they say very clearly what they're
22 trying to do. They're accumulating positions.
23 They are going to all try to hike the stock at the
24 same -- you know, at or around the same time, and
25 then they're all going to try and sell out.

Page 215
1          And that's -- I think that is a -- I think
2  that is the reasonable interpretation to draw from
3  the set of text messages.
4      Q. After $FUCKELON, you discuss SFI and you
5  say: Additionally, I have reviewed a text chain in
6  which Paul appears to have participated in a
7  pump-and-dump scheme targeting Saffron Finance,
8  referred to as SFI.
9          Same question as with the "F" Elon stuff.
10 How did you bring your expertise to bear on
11 interpreting the message that you've excerpted
12 here?
13     A. Well, much of the same answer is that if you
14 are a layperson that does not understand how
15 financial markets work and you've never heard of
16 a -- you don't understand what a pump and dump is,
17 which I think is possibly a lot of Americans, then
18 you would find this -- you would find my expertise
19 helpful.
20         So, again, I think to say that there's
21 nothing -- nothing involved in understanding this
22 is pretty clearly incorrect. It requires an
23 understanding of how markets work, how a thinly
24 traded security, or thinly traded token, like SFI
25 would be susceptible to this type of thing, just

Page 216
1  like this is why these things occur in penny
2  stocks, and the -- the -- the mechanics of it as
3  well.
4      Q. Did you assess Mr. Paul's trading history
5  with either of these tokens?
6      A. I did see, again, in those demonstratives, I
7  know there was data about his buy-in and then his
8  subsequent sales.
9      Q. Okay. You mentioned that a -- a pump and
10 dump involves -- I think -- I think I wrote this
11 down correctly, dumping the stock after it's been
12 pumped in order to make a profit.
13         Is that right?
14     A. Correct.
15     Q. Does that -- am I reading it correctly
16 that that suggests that the person who was engaging
17 in the pump and dump actually sold and made a
18 profit?
19         Am I -- is that -- is that a true
20 statement?
21     A. So I'm sorry. Could you -- could you repeat
22 that? I didn't quite understand.
23     Q. In order to engage in a pump and dump, you
24 actually have to dump and make a profit?
25     A. Well, you could screw it up, right. It

Page 217
1  might not work. But --
2      Q. But a pump and dump isn't a pump and dump if
3  it doesn't work, is it?
4      A. Well, it's -- it's -- you know, it's like
5  you attempt to rob a bank and you shoot the teller
6  but you don't make off with the money. I mean,
7  you've still done something wrong.
8          So I think, again, this attempt to -- to --
9  to do this thing is doing something wrong, whether
10 or not he profited from it. And I believe
11 that's -- you know, I -- I believe the Defendant
12 here is claiming that he did.
13         Then -- but whether or not he did, it's
14 still -- this is not a good thing to do. This
15 would count as engaging or attempting to engage in
16 a, quote, scam, in my view.
17     Q. That theory of -- of pump and dump, to me,
18 sounds sort of like a irrational theory of
19 self-sabotage, doesn't it?
20         Would it actually be a pump and dump --
21 it's -- well, let me -- let me -- let me start
22 over.
23         Are you saying that even if it doesn't
24 constitute a pump and dump, it would still be a
25 manipulative practice? Is that what you're getting

Page 230

1  cause, nor do I have a financial interest in the
2  action.
3        SUBSCRIBED AND SWORN TO by the undersigned
4  on this the ____ day of _____, _____.
5
6
7        AMY PRIGMORE, Texas, CSR, RPR
         Expiration Date:  4/30/2027
8  Firm Registration: 571
   Veritext Legal Solutions
9  300 Throckmorton Street, Suite 1600
   Fort Worth, Texas 76102
10 Phone. 817-336-3042

Page 231

1  Caroline N Small
2  csmall@dslawpc.com
3           February 17th, 2026
4  RE:  Paul, Logan v. Findeisen, Stephen Et. Al.
       2/13/2026, James  C.  Spindler (#7879720)
5
6     The above-referenced transcript is available for
7  review.
8     James  C.  Spindler should read the testimony to
9  verify its accuracy. If there are any changes,
10 James  C.  Spindler should note those with the reason
11 on the attached Errata Sheet.
12    James  C.  Spindler should, please, date and sign the
13 Errata Sheet and email to the deposing attorney as well as
14 to Veritext at Transcripts-fl@veritext.com and copies will
15 be emailed to all ordering parties.
16    It is suggested that the completed errata be returned 30
17 days from receipt of testimony, as considered reasonable
18 under Federal rules*, however, there is no Florida statute
19 to this regard.
20    If the witness fails to do so, the transcript may be used
21 as if signed.
22        Yours,
23        Veritext Legal Solutions
24
    *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure
25  Rule 1.310(e).

Page 232

1  Paul, Logan v. Findeisen, Stephen Et. Al.
2  2/13/2026, James  C.  Spindler (#7879720)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19
20 Under penalties of perjury, I declare that I have
   read the foregoing document and that the facts
21 stated in it are true.
22
23 _____   _____
      (James  C.  Spindler)          DATE
24
25